# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

SPEECH FIRST, INC.,

*Plaintiff,*

v.

TIMOTHY SANDS, in his individual capacity and official capacity as President of Virginia Polytechnic Institute and State University; CYRIL CLARKE, in his individual capacity and official capacity as Executive Vice President and Provost; KELLY OAKS, in her individual capacity and official capacity as Assistant Vice President for Equity and Accessibility; BYRON HUGHES, in his individual capacity and official capacity as Dean of Students; ENNIS MCCREARY, in her individual capacity and official capacity as Director of the Office of Student Conduct; SCOTT MIDKIFF, in his individual capacity and official capacity as Chief Information Officer and Vice President for Information Technology; KIM O'ROURKE, in her individual capacity and official capacity as Vice President for Policy and Governance; HORACIO VALEIRAS, LETITIA LONG, EDWARD BAINE, SHELLEY BUTLER BARLOW, CARRIE CHENERY, GRETA HARRIS, CHARLES HILL, MELISSA BYRNE NELSON, CHRIS PETERSON, MEHUL SANGHANI, JEFF VEATCH, PRESTON WHITE, all in their individual capacities and official capacities as members of the Virginia Polytechnic Institute and State University Board of Visitors,

*Defendants.*

Case No. ___7:21cv00203___

## VERIFIED COMPLAINT

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution, *see* 42 U.S.C. §1983, against Defendants and alleges as follows:

## INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). In theory, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet Virginia Tech and its officials have created a series of rules and regulations that restrain, deter, suppress, and punish speech about the political and social issues of the day. These restrictions disregard decades of precedent. Four are particularly egregious.

3.      First, the University's discriminatory-harassment policy disciplines students who engage in "inappropriate conduct that is based upon a person's age, color, disability, gender (including pregnancy), gender identity, gender expression, national origin, political affiliation, race, religion, sexual orientation, or veteran status and unreasonably interferes with the person's work or academic performance or participation in university activities, or creates a working or learning environment that a reasonable person would find hostile, threatening or intimidating." According to the University, "discriminatory harassment" includes "telling unwelcome jokes about someone's identity"

and "[u]rging religious beliefs on someone who finds it unwelcome." This vague and overbroad restriction on protected speech violates the First and Fourteenth Amendments.

4.      Second, the University's computer policy forbids students from using its network for "partisan political purposes." It also prohibits students from violating "the rights of others to be free of intimidation, harassment, and unwarranted annoyance." Violations of the computer policy can lead to the loss of computer or network privileges and even formal discipline. The policy is a vague, overbroad restriction on protected speech that is incompatible with the First and Fourteenth Amendments.

5.      Third, the University's bias-related incidents policy martials the authority of University administrators to police speech that someone believes is motivated by "bias." "Bias-related incidents" are formally defined as "expressions against a person or group because of the person's or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law." Bias-related incidents can occur on or off campus, including on social media. Students accused of "bias-related incidents" can be referred for formal disciplinary proceedings or summoned for "educational interventions" with University officials. This policy poses a grave risk of chilling the open and unfettered discourse that should be central to higher education. Its bureaucratic processes—and the vague, overbroad

definition of "bias-related incident" that triggers them—violate the First and Four-teenth Amendments.

6. Finally, the University's "informational activities" policy forbids students from "distribut[ing] literature and/or petitioning for signatures" on campus without prior written authorization from the University—authorization that is given only for events that are "sponsored by a university-affiliated organization." This policy is a speaker-based prior restraint on protected activity that violates the First Amendment.

## JURISDICTION AND VENUE

7. This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

8. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

9. Venue is proper under 28 U.S.C. §1391 because all Defendants reside here and a substantial part of the events or omissions giving rise to the claims occurred here.

## PARTIES

10. Plaintiff, Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. Speech First has members who attend the University, including Students A, B, and C.

11.     Virginia Polytechnic Institute and State University—better known as Virginia Tech—is a public university organized and existing under the laws of Virginia.

12.     Defendant Timothy Sands is President of the University. Sands is responsible for the enactment and enforcement of University policies, including the policies challenged here. Sands is sued in his individual and official capacities.

13.     Defendant Cyril Clarke is Executive Vice President and Provost of the University. Clarke is responsible for the enactment and enforcement of University policies, including the policies challenged here. Clarke is sued in his individual and official capacities.

14.     Defendant Kelly Oaks is the University's Assistant Vice President for Equity and Accessibility. Oaks is responsible for enforcing the University's discrimination and harassment policies. Oaks is sued in her individual and official capacities.

15.     Defendant Byron Hughes is the University's Dean of Students. Hughes is responsible for nearly every aspect of the University's interaction with students, including University-sponsored activities and students' compliance with University policies. Hughes is sued in his individual and official capacities.

16.     Defendant Ennis McCreary is the Director of the University's Office of Student Conduct. McCreary is responsible for upholding and enforcing the University's behavioral standards, administering the University's conduct process, and overseeing sanctions. McCreary is sued in her individual and official capacities.

17.     Defendant Scott Midkiff is the University's Chief Information Officer and Vice President for Information Technology. Midkiff is responsible for the implementation and enforcement of the University's information technology policies, including the computer policies challenged here. Midkiff is sued in his individual and official capacities.

18.     Defendant Kim O'Rourke is the University's Vice President for Policy and Governance. O'Rourke is responsible for the creation and implementation of all University policies, including the policies challenged here. O'Rourke is sued in her individual and official capacities.

19.     Defendants Horacio Valeiras (Rector); Letitia Long (Vice Rector); Edward Baine; Shelley Butler Barlow; Carrie Chenery; Greta Harris; Charles Hill; Anna James; Sharon Brickhouse Martin; Melissa Byrne Nelson; Chris Peterson; Mehul Sanghani; Jeff Veatch; and Preston White are members of the University Board of Visitors. The Board of Visitors is the "governing authority" of the University and is "responsible for … the basic policies under which it is administered," including the policies challenged here. The Board Defendants are all sued in their individual and official capacities.

## BACKGROUND

### I.     College Students and Their First Amendment Rights

20.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S.

254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

21.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957).

22.     The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

23.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university

campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Indeed, "the point of all speech protection is … to shield just those choices of content that in someone's eyes are mis-guided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). These principles apply with more force "[i]n our current national condition," not less. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020).

## II. Universities' Use of Speech Codes and Bias Response Teams to Chill Speech

24.     Instead of promoting the "robust exchange of ideas," *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967), universities are now more interested in protecting students from ideas that make them uncomfortable. Universities do this by adopting policies and procedures that discourage speech by students who dare to disagree with the prevailing campus orthodoxy.

25.     One tried-and-true method of accomplishing this feat is the campus speech code. Speech codes, according to the Foundation for Individual Rights in Edu-cation (FIRE), are "university regulations prohibiting expression that would be consti-tutionally protected in society at large." *Spotlight on Speech Codes 2021* at 10, FIRE, bit.ly/2PxkFzr.

26.     Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Because these policies im-pose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on

speech, federal courts regularly strike them down. *Id.* at 10, 24; *see also Fenves*, 979 F.3d at 338-39 n.17 (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

27.     In addition to speech codes, universities are increasingly turning to a new, innovative way to deter disfavored speech—so-called "bias response teams."

28.     Living up to their Orwellian name, bias-response teams encourage students to monitor each other's speech and report incidents of "bias" to the University (often anonymously). "Bias" is defined incredibly broadly and covers wide swaths of protected speech; in fact, speech is often labeled "biased" based solely on the listener's subjective reaction to it.

29.     Students have been reported to bias-response teams for writing a satirical article about "safe spaces," tweeting "#BlackLivesMatter," chalking "Build the Wall" on a sidewalk, and expressing support for Donald Trump. *Bias Response Team Report 2017*, at 15-18, FIRE, bit.ly/2P9iEaj.

30.     After receiving reports of a bias incident, bias-response teams typically log the incident, investigate it, meet with the relevant parties, attempt to reeducate the "offender," and can recommend formal or informal discipline.

31.     Although universities claim this process is entirely voluntary, they know students do not see it that way. The U.S. Court of Appeals for the Sixth Circuit did not see it that way, either. It found that an "invitation from [a bias-response team] to meet could carry an implicit threat of consequence should a student decline the invitation."

*Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). Even when "there is no indication that the invitation to meet contains overt threats," the University's disciplinary "referral power lurks in the background." *Id.*

32.    A 2017 report from FIRE found that bias-response teams monitor protected expression and lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." *Bias Response Team Report 2017*, at 28. "[T]he posture taken by many Bias Response Teams," the study found, "is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

33.    Other universities have discovered that bias-response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias-response team, citing their "high failure rate" and their tendency to "become almost punitive."

34.    University professors have similarly observed that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints." Jeffrey Snyder & Amna Khalid, *The Rise of "Bias*

*Response Teams" on Campus*, The New Republic (Mar. 30, 2016), bit.ly/1SaAiDB; *see also*
Keith Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466
(2019) ("[E]fforts [by bias-response teams] to encourage students to anonymously ini-
tiate disciplinary proceedings for perceived acts of bias or to shelter themselves from
disagreeable ideas are likely to subvert free and open inquiry and invite fears of political
favoritism.").

35.     Courts have likewise recognized the chilling effect of bias-response teams
that closely resemble the University's. After Speech First challenged similar bias-re-
sponse teams at the University of Texas and the University of Michigan, both schools
disbanded their teams. The Sixth Circuit held that Michigan's team imposed an "objec-
tive chill" on speech because it "act[ed] by way of implicit threat of punishment and
intimidation to quell speech." *Schlissel*, 939 F.3d at 765. The Fifth Circuit agreed, stress-
ing that Texas's team "represent[ed] the clenched fist in the velvet glove of student
speech regulation." *Fenves*, 979 F.3d at 338.

36.     Unsurprisingly, the rise of bias-response teams and speech codes at uni-
versities is matched by a parallel rise in the percentage of college students who believe
they are not free to express controversial opinions on campus. According to a Septem-
ber 2020 survey of more than 20,000 American college students, an astonishing 42 per-
cent of students believe their university would punish them for making an offensive or
controversial statement. *2020 College Free Speech Rankings* 19, FIRE (Sept. 2020),
bit.ly/3w4miVG. A separate survey found that, among non-freshman college students,

nearly half reported that "sharing ideas and asking questions without fear of retaliation, even when those ideas are offensive to some people," had become "more difficult" in the Fall 2020 semester than in previous semesters. *Campus Expression Survey Report 2020*, at 3, Heterodox Academy (Mar. 2021), bit.ly/31oGBiy.

### III.   The University's Discriminatory-Harassment Policy

37.    On August 13, 2020, the University Board of Visitors approved a revised version of Policy 1025, titled Policy on Harassment, Discrimination, and Sexual Assault.

38.    According to the University's Commission on Student Affairs, Policy 1025's purpose is to "create consistency across the University in addressing conduct that runs contrary to University values." During an October 2020 Commission meeting, the Commission stated that the goal of Policy 1025 is to require behavior that aligns with the University's values and prohibit behavior that doesn't. The agenda for the meeting included the following question: "Values: what should Policy 1025 prohibit and require (beyond compliance obligations)?"

39.    Policy 1025 prohibits "[c]onduct of any type (oral, written, graphic, electronic, or physical) that is based upon a person's age, color, disability, sex (including pregnancy), gender, gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, or veteran status and unreasonably interferes with the person's work or academic performance or participation in university activities, or creates a working or learning environment that a reasonable person would find hostile, threatening, or intimidating."

40.     Examples of discriminatory harassment include "telling unwelcome jokes about someone's identity" and "putting down people who are older, who are pregnant, or who come from other countries."

41.     According to the University, discriminatory harassment can occur any-where, at any time, by any medium. The policy applies to "on-campus incidents and off-campus incidents that cause continuing effects on campus." It authorizes "students or employees, or others on their behalf" to file complaints "alleging discrimination or discriminatory harassment … carried out by faculty, staff, other students, or third par-ties." The Code of Conduct disavows any "time limit" for students to report an alleged violation to the University.

42.     University "[a]dministrators, supervisors, and those with instructional re-sponsibility" have a duty to report incidents of discriminatory harassment "whenever they learn—directly or indirectly—about [them]."

43.     Students can make discriminatory-harassment allegations by filing a com-plaint with the University's Office of Equity and Accessibility (OEA)—specifically, by using the Equity & Accessibility Complaint Form on the University's website. The form asks the complainant to describe the alleged harassment and explain how OEA should resolve the complaint. The form allows students to upload "[p]hotos, video, email, and other supporting documentation."

44.     After a student files a complaint, OEA reviews the allegations and conducts an investigation. Students found guilty of discriminatory harassment are subject to disciplinary action via the student conduct process outlined in the Code of Conduct.

45.     Depending on the nature of the alleged incident, the University can resolve a student-conduct case through "agreed resolution" or a formal hearing. Under agreed resolution, "the respondent meets with a hearing office to discuss an incident and collaborates with the hearing officer to determine whether they violated a policy and, if so, what sanctions may be appropriate." If the student does not agree with the hearing officer's decision, the matter proceeds to a formal hearing. Students who are found liable for discriminatory harassment are subject to the full range of formal disciplinary sanctions. Even when the University "determines that adjudication is not appropriate," it still can invite the students involved "to participate in an educational conversation about the concerns raised in the complaint."

46.     On top of forbidding students from engaging in discriminatory harassment, the Code of Conduct also penalizes students for being present "during any violation of the Student Code of Conduct and/or other university policies in such a way as to condone, support, or encourage that violation." The Code of Conduct further emphasizes that students who "anticipate or observe a violation of university policy are expected to remove themselves from participation and are encouraged to report the violation" to University authorities.

## IV.    The University's Computer Policy

47.    Students must comply with the University's Acceptable Use Standard to maintain access to the internet network. The standard "applies to the use of any computing or communications device, regardless of ownership, while connected to the University network, and to the use of any information technology service provided by or through the University."

48.    The Acceptable Use Standard states that students "must NOT" use "university systems for … partisan political purposes." An example would be "using electronic mail to circulate advertising … for political candidates."

49.    On October 29, 2020, the University also promulgated a revised version of Policy No. 7000, titled Acceptable Use and Administration of Computer and Communication Systems, which governs "every individual using … Virginia Tech computer and communication networks, systems, and/or data with any device."

50.    To comply with Policy 7000, students must "demonstrate respect of … the rights of others to be free of intimidation, harassment, and unwarranted annoyance." Policy 7000 does not elaborate on the terms "intimidation" "harassment," or "unwarranted annoyance." Nor does it provide any examples of prohibited behavior.

51.    Policy 7000 also requires students to abide by the rules set forth in the Acceptable Use Standard.

52.    Suspected violations of Policy 7000 can be reported to the University via email. When the University receives a report of an alleged violation, it "automatically

generates a ticket and follow[s] up on the report. Alleged violations are then referred to the appropriate University office or law enforcement agency for further investigation." The University reserves the right to suspend an accused student's network access while it investigates an alleged violation.

53.     The University considers "any violation" of Policy 7000 to be "a serious offense." Students accused of violating Policy 7000 are "subject to established university disciplinary policies and procedures." Under the policy, students "who use information technology resources in ways that violate a University policy, law(s), regulations, … or an individual's rights" are "subject to limitation or termination of user privileges/access to services and appropriate disciplinary action, legal action, or both."

## V.     The University's Bias-Related Incidents Policy

54.     On top of its speech codes, the University has a "bias-related incidents" policy that monitors "words or actions that contradict the spirit of [its] Principles of Community."

55.     The University defines bias-related incidents as "expressions against a person or group because of the person's or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law."

56.     Bias-related incidents can occur on or off campus, including on social media or other digital platforms.

57.     Examples of bias-related incidents listed by the University include "words or actions that contradict the spirit of the [University's] Principles of Community," "jokes that are demeaning to a particular group of people," "assuming characteristics of a minority group for advertising," and "posting flyers that contain demeaning language or images."

58.     Students can submit complaints about bias incidents online via a "Bias Incident Reporting Form" on the University's website. Complainants are not required to identify themselves or provide their email addresses or phone numbers.

59.     The intake form asks students to specify the date and location of the alleged incident and to "list all involved parties." It contains entries for the respondent's name, role in a student organization (if any), email address, and Virginia Tech student ID number. It also contains an option to include additional respondents, if applicable.

60.     The form requires complainants to provide a description of the incident and provides an option to include "supporting documentation" for the complaint.

61.     Complainants can choose from a list of 12 personal characteristics that were the alleged basis for the bias-related incident. They also have the option to select "other" and then elaborate on the basis for their complaint.

62.     The form also asks complainants to select at least one of nineteen options describing "the nature of the incident." The various categories of "bias-related incidents" recognized by the University include: "Comment in Class or Assignment"; "Comment in Person"; "Comment in Writing or on Internet"; "Comment via

Email/Text"; "Comment via Phone/Voicemail"; "Emotional Attack/Assault"; "Intimidation"; "Verbal Attack/Assault"; and "Written Slur."

63.     University records reveal that the vast majority of bias-incident reports involve protected speech. "Bias-related incidents" reported to the University during the Fall 2018 semester included:

- A report that the words "Saudi Arabia" were written on a whiteboard outside of a student's dorm room. According to the report, the remainder of the words on the whiteboard had either been erased or were illegible. The complainant alleged bias based on "national or ethnic origin."

- A report that a student in a University residence hall overheard several male students privately "talking crap about the women who were 'playing' in [a] snowball fight." The witness "could not remember exact quotations," but stated that "the young men said that the young ladies in the snowball fight were not athletic." The complaint alleged "discrimination" and "harassment" based on "gender."

- A report that a student told a joke "that included Caitlyn Jenner's deadname" during a classroom lecture. The complaint alleged "discrimination" on the basis of "gender identity."

64.     According to Dean Hughes, the University strives to "be both proactive and responsive" to allegations of bias-related incidents. It usually responds to complaints "within 24 hours."

65.     The "university investigates, adjudicates, and advocates for students" when it receives a complaint about a bias-related incident, "so that all parties are aware of their rights, responsibilities, and the expectations of the university community."

66.     Complaints about bias-related incidents are directed to the Dean of Students Office (DOS), which will "record the incident within the secure DOS Reporting System" and refer reports to the Virginia Tech or Blacksburg Police Department, the University Threat Assessment Team, or the Office of Student Conduct for an "appropriate response, if needed."

67.     DOS reviews complaints using "the following questions": "Does it seem the incident is bias-motivated? Does it violate university policy? Does it violate the shared values and expectations of university community members? Who is affected by the incident? Are there legal consequences? Might the incident be investigated as a hate crime?" DOS's response to bias allegations include "record[ing] exactly what was said" and "includ[ing] bystander names" in its summary of an incident.

68.     The University separates bias-related incidents into two categories: "localized" bias incidents and "community" bias incidents. "Localized" bias incidents are seen or heard by few people, do not involve violations of a university policy, do not generate interest from the media, and cannot be investigated as hate crimes. "Community" bias incidents, by contrast, are seen or heard by many people, involve violations of university policies, generate media interest "or interest from outside the university community," and can be investigated as hate crimes.

69.     When DOS determines that a "localized" bias-related incident has occurred, "the administrator closest to the incident will address the issue, facilitate a response that resonates with the student or group of students involved, and issue a

community statement if appropriate." In such instances, DOS refers the complaint "to the appropriate offices for follow-up." For example, "[i]f the behavior described is an issue between roommates that would impact their living situation or the experience in our residence halls, it would be referred to Housing and Residence Life."

70.     When DOS determines that a "community" bias-related incident has occurred, it forms a "Core Response Team" to address the issue "as soon as feasible." The Core Response Team can include officials from the "Virginia Tech or Blacksburg Police Department"; DOS; the Office of Student Conduct; the Intercultural Engagement Center; the Office of House and Residence Life; "[d]epartments where the incident occurred"; and students or student organizations "targeted" by the incident.

71.     Among other things, the Core Response Team may discuss the "process of adjudication with the reporting student," determine "if disciplinary action is appropriate," provide "regular status reports to [the] reporting student(s) until [the] case is closed," and implement "appropriate restorative justice techniques or methods."

72.     According to the University, all students "involved" in a bias-related incident are "given the opportunity to civilly discuss the incident with a trained professional and will be apprised of their options for resolving the incident."

73.     Even when bias-related incidents involve protected speech and do not rise to the level of a crime or a violation of another University policy, the University still views them as "inconsistent with [its] Principles of Community." The University believes that it is "crucial" to respond to bias-incident reports "in a timely and consistent

manner," regardless of whether the "incidents violate policy or are inappropriate or insensitive." No matter what, the University "is committed to stopping" such incidents.

74.     The University refers to this entire scheme of reporting, investigating, and responding as "the bias-related incident protocol."

75.     The protocol provides a number of tips for "[a]chieving bias-free communication." It tells students to "[b]e aware of words, images, and situations that suggest all or most of a group are the same"; "[a]void qualifiers that reinforce stereotypes"; "[b]e aware of language that has questionable racial, ethnic, class, or sexual orientation connotations"; "[a]void patronizing language and tokenism toward any group"; and "[r]eview language, images, and other forms of communication to make sure all groups are fairly represented."

76.     The protocol also informs students that, "[w]hile a word or phrase may not be personally offensive to you, it may be to others."

77.     The University promotes the protocol and encourages students and professors to report "bias-related incidents."

78.     A DOS webpage "encourage[s]" students "to make a report" if they "hear or see something that feels like a bias incident statement or expression." The webpage stresses, borrowing the Department of Homeland Security's famous slogan about terrorism, "[i]n short, if you see something, say something!"

79.     In February 2017, the University's official Twitter account tweeted "[b]ias has no place at Virginia Tech. Help us make sure all #Hokies thrive. See something?

Say something." The tweet included a link to the University webpage informing students how to file bias-related incident complaints.

80.    A campus notice in the Virginia Tech Daily similarly promoted the "See Something? Say Something" campaign in a release titled "[s]tudents encouraged to report incidents of bias."

81.    After COVID-19 caused the University to switch to a remote-learning format in Spring 2020, the University sent a message reminding professors that they can use the "online reporting form" if they "observe or experience what [they] believe to be a bias-related incident involving students." In a similar message addressed to the student body, senior University administrators encouraged students to "contact the Dean of Students with concerns about bias-related incidents."

82.    The University's continuous promotion of its bias-incident reporting system has had an effect. Twenty-nine bias-incident complaints were filed in Spring 2017. That number increased to 35 reports in Fall 2017, 37 reports in Spring 2018, and 52 reports in Fall 2018.

83.    Under the University's Code of Conduct, "[f]ailure to comply with a request and directives of university officials acting within the scope of their authority, including but not limited to … failure to keep or attend a required meeting" is "prohibited conduct" and subjects a student to formal discipline.

## VI.   The University's Informational Activities Policy

84.   On August 25, 2020, the University issued the latest version of Policy 5215, titled Sales, Solicitation, and Advertising on Campus. Policy 5215 imposes a number of restrictions on students' ability to advertise events, gather petitions, and distribute informational literature. It governs "all … students" and applies "on the Virginia Tech campus and in university facilities."

85.    Policy 5215 requires students to obtain "prior written authorization" before engaging in "informational activities." It defines "informational activities" as "the distribution of literature and/or petitioning for signatures where no fee is involved nor donations or contributions sought." University officials "take into account overall campus safety and security, any special circumstances relating to university activities, and the impact such activity may have on the university" when making "[d]ecisions regarding requests" to distribute literature or to petition for signatures.

86.   In addition to requiring prior authorization, Policy 5215 prohibits "informational activities" that are not "sponsored by a university-affiliated organization." Put differently, students who are not sponsored by a University-affiliated organization are forbidden from distributing literature or petitioning for signatures on campus.

87.   Violations of Policy 5215 "are actionable under the Student Code of Conduct" and can lead to "sanction[s]."

## VII.   The Effect of the University's Policies on Speech First's Members

88.     Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech that is covered by the University's harassment policies, computer policy, bias-incidents policy, and informational-activities policy, but they credibly fear that the expression of their deeply held views will be considered "biased," "harassing," "unwarranted," "intimidating," and the like.

89.     One Speech First member ("Student A") is a junior at the University.

90.     Student A is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

91.     Student A is strongly against affirmative action in college admissions. He believes that individuals should be admitted to college because of merit, not the color of their skin.

92.     Student A believes that Black Lives Matter has had a terrible impact on society. He believes that they've taken tons of donations and have not helped out black communities. He thinks the organization has caused the destruction of communities and businesses rather than help bring about positive change.

93.     Student A is strongly against abortion. He believes that women should have no right to kill an innocent child.

94.     Student A believes that human beings are created either male or female. He believes people often change their gender identity because they want to be noticed

or be part of a group, because of childhood trauma, or because they want to fill an empty spot in their lives. He doesn't want to be forced to use someone's "preferred pronouns" simply because that person believes that his or her "truth" involves being "non-binary."

95.     Student A does not support gay marriage. He thinks it leads to a slippery slope. He thinks it will lead to society being forced to accept marriages among multiple people or something even worse. Student A is a Christian, so his belief of marriage also stems from his faith.

96.     Student A is strongly against illegal immigration and supports the Border Wall. He believes that we need to stop the flow of illegal immigration into this country.

97.     Student A also strongly believes in gun rights. He believes that our Second Amendment rights are designed to prevent tyranny.

98.     Student A enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

99.     Student A wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Blacksburg.

100.    Because he has strong views on these issues, Student A wants to speak passionately and repeatedly about them. He wants to point out the flaws in fellow

students' arguments and encourage them to change their minds or, at a minimum, to understand his views.

101.    But the University's harassment policies, computer policy, bias-related incident policy, and informational-activities policy make Student A reluctant to openly express his opinions.

102.    Student A does not fully express himself or talk about certain issues because he fears that sharing his beliefs may be considered "discriminatory harassment." He fears that other students will find his views "inappropriate" or "intimidating" or claim that his views "interfere[] with" their educational opportunities. Student A believes that many of the topics that he wants to address could easily be considered "discriminatory" under the University's definition of "discriminatory harassment." Student A's fears are grounded in his own personal experiences on campus.

103.    Student A's fears are amplified by the fact that the University can punish him not only for committing "discriminatory harassment" himself, but also for being present during someone else's "discriminatory harassment" in a manner that allegedly "condone[s], support[s] or encourage[s] the violation."

104.    Student A also wants to use the University email system to contact other students in support of conservative initiatives and political candidates and to oppose controversial student-government proposals. But Student A refrains because he fears that doing so will be considered a violation of the Acceptable Use Standard and Virginia Tech Policy 7000, and that he will lose his network privileges or even face disciplinary

sanctions as a result. Student A fears that other students will characterize emails asserting his views as "intimidating," "harassing," or "unwarranted" and "annoying," or report him for sending emails for "partisan political purposes."

105.    Student A also does not fully express himself or talk about certain issues because he fears that other students, faculty members, or others will report him to DOS for committing a "bias-related" incident. Student A worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student A is afraid that DOS will keep a record on him, share the allegations with others at the University, call him in for meetings, or refer the allegations to the Office of Student Conduct, the Office of Equity and Accessibility, or the Virginia Tech Police Department.

106.    Finally, Student A wants to independently distribute literature about conservative causes on campus and gather signatures for petitions, especially in high-traffic areas of campus that are open to the public. He refrains from doing either of those things, however, because he fears that he will be punished for engaging in "informational activities" without the sponsorship of a "university-affiliated organization."

107.    Another Speech First member ("Student B") is a senior at the University.

108.    Student B is politically conservative and holds views that are unpopular, controversial, and in the minority on campus.

109.    Student B believes that affirmative action is reverse racism. He believes that when colleges segregate housing and other activities by a student's skin color, that

is racism pure and simple. Student B believes that a student should be admitted to a university because of merit, not because of the color of his or her skin.

110.    Student B believes that the Black Lives Matter organization is a scam that has taken money from people who believe they are donating to a cause and funneled it to politicians. He believes that Black Lives Matter as a movement is causing hate in the name of getting rid of hate. But Student B believes that other students would consider him a racist for voicing those beliefs.

111.    Student B thinks the killing of another human through abortion is wrong. He believes that women are not killing a "fetus" or a "bunch of cells," they are killing a person. He believes that women should not be allowed to abort their babies.

112.    Student B believes that a person is either male or female. Student B thinks if a person is born a male, he will always be a male—even if he "feels" like a female. Student B doesn't want to be forced to call someone a "he" or a "she" when that is not the person's biological sex. He thinks it's terrible that some men are allowed to play women's sports because they claim to be women.

113.    Student B believes that we must stop the flow of illegal immigrants into this country. He finds it incredibly disheartening that illegal immigrants are getting in-person education for free while American citizens are not. Student B thinks American citizens should be prioritized over illegal immigrants, who do not pay taxes and don't contribute to society.

114.    Finally, Student B strongly supports the Second Amendment. He thinks he should be able to own whatever gun he wants in order to defend himself.

115.    Student B enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

116.    Student B wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Blacksburg.

117.    Because he has strong views on these issues, Student B wants to speak passionately and repeatedly about them. He wants to point out the flaws in fellow students' arguments and encourage them to change their minds or, at a minimum, to understand his views.

118.    But the University's discriminatory-harassment policy, computer policy, bias-related incidents policy, and informational-activities policy make Student B reluctant to openly express his opinions.

119.    Student B does not fully express himself or talk about certain issues because he fears that sharing his beliefs may be considered "discriminatory harassment." He fears that other students will find his views "inappropriate" or "intimidating" or claim that his views "interfere[] with" their educational opportunities. Student B believes that many of the topics that he wants to address could easily be considered

"discriminatory" under the University's definition of "discriminatory harassment." Student B's fears are grounded in his own personal experiences on campus.

120.    Student B's fears are amplified by the fact that the University can punish him not only for committing "discriminatory harassment" himself, but also for being present during someone else's "discriminatory harassment" in a manner that allegedly "condone[s], support[s] or encourage[s] the violation."

121.    Student B also wants to use the University email system to contact other students in support of conservative initiatives and political candidates and to oppose controversial student-government proposals. But Student B refrains because he fears that doing so will be considered a violation of the Acceptable Use Standard and Virginia Tech Policy 7000, and that he will lose his network privileges or even face disciplinary sanctions as a result. Student B fears that other students will characterize emails asserting his views as "intimidating," "harassing," or "unwarranted" and "annoying," or report him for sending emails for "partisan political purposes."

122.    Student B also does not fully express himself or talk about certain issues because he fears that other students, faculty members, or others will report him to DOS for committing a "bias-related" incident. Student B worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student B is afraid that DOS will keep a record on him, share the allegations with others at the University, call him in for meetings, or refer

the allegations to the Office of Student Conduct, the Office of Equity and Accessibility, or the Virginia Tech Police Department.

123.    Finally, Student B wants to independently distribute literature about conservative causes on campus and gather signatures for petitions, especially in high-traffic areas of campus that are open to the public. He refrains from doing either of those things, however, because he fears that he will be punished for engaging in "informational activities" without the sponsorship of a "university-affiliated organization."

124.    Another Speech First member ("Student C") is a junior at the University.

125.    Student C is "politically conservative/libertarian" and holds political beliefs that are unpopular, controversial, and in the minority on campus.

126.    Student C does not support the Black Lives Matter movement. He strongly disagrees with many of the positions it has taken. He thinks all lives matter and that no life matters more than another.

127.    Student C is strongly against abortion. He believes that women should have no right to kill an innocent child.

128.    Student C believes there are only two genders: male and female. He doesn't want to be forced to call someone a "him" or a "her" or "they" or "them" because that person claims to have a new gender identity. He is strongly against allowing children to "choose" their gender and have hormones and chemicals pumped into their bodies. He believes that these kids are young and do not know any better.

129.    Student C disagrees with gay marriage on a personal level and thinks it is wrong.

130.    Student C believes that we need a border wall and border security. He believes that we can't have a country without borders. Illegal immigrants are crossing the border daily and are getting welfare without paying taxes.

131.    Student C strongly supports the Second Amendment and is against gun control. He believes that the government should not be allowed to keep logs of people who buy guns.

132.    Student C enrolled in the University because he wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation.

133.    Student C wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, in other areas of campus, online, and in the City of Blacksburg.

134.    Because he has strong views on these issues, Student C wants to speak passionately and repeatedly about these matters. He wants to point out the flaws in fellow students' arguments and encourage them to change their minds or, at a minimum, to understand his views.

135.    But the University's discriminatory-harassment policy, computer policy, bias-related incidents policy, and informational-activities policy make Student C reluctant to openly express his opinions.

136.    Student C does not fully express himself or talk about certain issues because he fears that sharing his beliefs may be considered "discriminatory harassment." He fears that other students will find his views "inappropriate" or "intimidating" or claim that his views "interfere[] with" their educational opportunities. Student C believes that many of the topics he wants to address could easily be considered "discriminatory" under the University's definition of "discriminatory harassment." Student C's fears are grounded in his own personal experiences on campus.

137.    Student C's fears are amplified by the fact that the University can punish him not only for committing "discriminatory harassment" himself, but also for being present during someone else's "discriminatory harassment" in a manner that allegedly "condone[s], support[s] or encourage[s] the violation."

138.    Student C also wants to use the University email system to contact other students in support of conservative initiatives and political candidates and to oppose controversial student-government proposals. But Student C refrains because he fears that doing so will be considered a violation of the Acceptable Use Standard and Virginia Tech Policy 7000, and that he will lose his network privileges or even face disciplinary sanctions as a result. Student C credibly fears that other students will characterize emails asserting his views as "intimidating," "harassing," or "unwarranted" and "annoying," or report him for sending emails for "partisan political purposes."

139.    Student C also does not fully express himself or talk about certain issues because he fears that other students, faculty members, or others will report him for

committing a "bias-related" incident. Student C worries that there are other students who will "catch him" engaging in "biased" speech and that the University will take action against him. For example, Student C is afraid that DOS will keep a record on him, share the allegations with others at the University, call him in for meetings, or refer the allegations to the Office of Student Conduct, the Office of Equity and Accessibility, or the Virginia Tech Police Department.

140.   Finally, Student C wants to independently distribute literature about conservative causes on campus and gather signatures for petitions, especially in high-traffic areas of campus that are open to the public. He refrains from doing either of those things, however, because he fears that he will be punished for engaging in "informational activities" without the sponsorship of a "university-affiliated organization."

141.   Students A, B, and C are not alone. Tellingly, only twenty percent of Virginia Tech students who responded to a recent Gallup survey said they felt comfortable expressing ideas in class that "are probably only held by a minority of people."

## COUNT I
### Violation of the First Amendment
### (Discriminatory-Harassment Policy)

142.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

143.   The First Amendment prohibits public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First

Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A regulation is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

144.    "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

145.   The University's discriminatory-harassment policy is unconstitutionally overbroad. By its terms, the policy applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody—could be perceived as "unwelcome" or "inappropriate."

146.   While a university might be able to prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), the University's discriminatory-harassment rule goes far beyond that.

147.   The Supreme Court has also consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

148.   "The First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Policies cannot "suppress disfavored speech." *Id.* at 2229. Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

149.   By restricting offensive speech about personal characteristics such as race, ethnicity, or gender, the discriminatory-harassment policy is a content-based and view-point-based restriction on protected speech. The University has no compelling interest in suppressing the unfettered exchange of viewpoints. Even if the University could identify a compelling interest, its viewpoint-discriminatory ban is not narrowly tailored to further that interest.

150.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Discriminatory Harassment Policy)

151.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

152.   It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) ("A law is unconstitutionally vague if it fails to establish standards for the government and public that are sufficient to guard against the arbitrary deprivation of liberty interests.").

153.   With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence

must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) ("The purpose of the fair notice requirement is to enable citizens to conform their conduct to the proscriptions of the law."). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Grayned*, 408 U.S. at 108-09).

154.   This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

155.   The discriminatory-harassment policy gives students no guidance about what speech is permitted and what speech isn't. The policy does not specify what constitutes an "interfere[nce]" with someone's "academic performance or participation in

university activities" or delineate the "inappropriate conduct" that the University pro-

hibits.

156.   The examples of "discriminatory harassment" provided by the University

only compound the policy's vagueness. The University states that "[m]istreating some-

one due to their race, religion, or sexual orientation" can be discriminatory harassment,

but never defines "mistreating someone." It likewise states that discriminatory harass-

ment includes "[t]elling unwelcome jokes about someone's identity such as race or na-

tional origin," but doesn't elaborate further. And because the policy only prohibits jokes

that a listener finds "[u]nwelcome," the legality of a joke depends entirely on the per-

ception of the listener.

157.   This absence of a clear standard creates a serious risk that the policy will

be enforced in an arbitrary manner or will be used to target speech based on the view-

point of the speaker. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614-15 (1971). The

University's disclaimer that "[t]his policy does not allow curtailment or censorship of

constitutionally protected expression" only exacerbates the vagueness. *See Nat'l People's

Action v. City of Blue Island*, 594 F. Supp. 72, 75-79 (N.D. Ill. 1984); *Coll. Republicans at San

Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1021 (N.D. Cal. 2007).

158.   The discriminatory harassment policy is thus void for vagueness.

159.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT III
### Violation of the First Amendment
### (Computer Policy)

160.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

161.    The University's Policy 7000 requires students to "respect … the right of others to be free of intimidation, harassment, and unwarranted annoyance." The University's Acceptable Use Standard also prohibits students from using "university systems for … partisan political purposes, such as using electronic mail to circulate advertising" for "political candidates."

162.    Violations of the computer policy are a "serious offense"; students accused of violating it are "subject to established university disciplinary policies and procedures," including the loss of network privileges and other punishments.

163.    The computer policy is unconstitutionally overbroad. There are a substantial number of instances where the policy cannot be applied consistent with the First Amendment. According to the policy itself, the legality of a post or message depends entirely upon whether the recipient perceives it to be "intimidat[ing]," "harass[ing]," or "unwarranted" and "annoy[ing]." The policy does not require objectivity or impose a reasonable-person standard, and it does not require any level of severity or pervasiveness. This overbroad policy chills protected speech and expression.

164.    The computer policy is also a content-based restriction on political speech—where the First Amendment has "its fullest and most urgent application."

*Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). The University's email accounts and internet networks are traditional public forums, at least for students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that the internet is today's quintessential traditional public forum). Students can and do use these resources for personal and political speech. Content-based restrictions on speech in a traditional public forum must satisfy strict scrutiny. *Summum*, 555 U.S. at 469.

165.   "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic. Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 135 S. Ct. at 2230. For instance, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* So too here.

166.   The University allows students to send emails about any issue of public debate *except* for "partisan political" issues like "advertising … for political candidates." That is a classic content-based regulation. For example, the University's policy appears to allow a student to send an email that says "support universal healthcare" but forbids the same student from sending an email that says "re-elect Delegate Chris Hurst." That is indefensible and cannot satisfy any level of scrutiny, much less strict scrutiny.

167.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT IV
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Computer Policy)

168.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

169.   The University's computer policy prohibits speech that is "partisan"—a term it does not define. Though the policy provides an example, that example does not purport to exhaust the meaning of "partisan"—let alone speech that is made for a "partisan political *purpose*." The policy thus has a "vagueness" problem, as "'the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application.'" *Fed. Election Comm'n v. GOPAC, Inc.*, 917 F. Supp. 851, 861 (D.D.C. 1996) (quoting *Buckley v. Valeo*, 424 U.S. 1, 42 (1976)).

170.   The University's computer policy lacks any definitions, detail, context, or notice to students about what sorts of messages the University views as "intimidat[ing]," "harrass[ing]" or "unwarranted" and "annoying." The acceptability of a post or message thus turns entirely on the subjective perspective of an observer or recipient. This provision cannot possibly give students "fair notice" so they can "conform their conduct to the proscriptions of the law." *Manning*, 930 F.3d at 274.

171.   Moreover, the policy purports to cover only speech that causes "unwarranted annoyance." But if "unwarranted annoyance" is prohibited, then *warranted*

annoyance must be okay. What constitutes "warranted annoyance" is anyone's guess. *See Wollschlaeger v. Gov'r*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc).

172.   Defendants adopted this unconstitutional policy under color of state law.

**COUNT V**
**Violation of the First Amendment**
**(Bias-Related Incidents Policy)**

173.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

174.   The University's definition of "bias-related incident" encompasses speech that is fully protected under the First Amendment.

175.   The "bias-related incidents" policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot survive strict scrutiny.

176.   The policy is unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

177.   The University openly acknowledges that students can face disciplinary sanctions for committing "bias-related incidents," which renders the policy unconstitutional on its own. But even when students cannot be formally disciplined, the bias-related incident protocol objectively chills speech by threatening students with negative consequences and by subjecting them to burdensome administrative processes (including meetings with University administrators and "educational opportunities for

understanding protected speech and the role of tolerance in the campus community").
*See Schlissel*, 939 F.3d 756; *Fenves*, 979 F.3d 319.

178.   This overbroad policy chills protected speech and expression.

179.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT VI
### Violation of the First and Fourteenth Amendments: Void for Vagueness
### (Bias-Related Incidents Policy)

180.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

181.   The University's definition of a "bias-related incident," which applies to "expressions against a person or group" based upon "the person's or group's age, color, disability, gender, gender identity, gender expression" or other protected characteristics, is amorphous and subjective.

182.   This amorphous standard creates a serious risk that the policy will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

183.   The University's policy on "bias-related incidents" is thus void for vagueness.

184.   Defendants adopted this unconstitutional policy under color of state law.

## COUNT VII
### Violation of the First Amendment
### (Informational Activities Policy)

185.   Plaintiff repeats and realleges each of the prior allegations in this complaint.

186.   Prior restraints "preclude expression until certain requirements are met." *Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018). A prior restraint exists when a regulation gives "public officials the power to deny use of a forum in advance of actual expression." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, (1975). "The relevant question is whether the challenged regulation authorizes suppression of speech in advance of its expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989).

187.   "Prior restraints bear 'a heavy presumption against their constitutional validity.'" *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). They "upend core First Amendment principles because a free society prefers to punish the few who abuse rights of speech after they break the law [rather] than to throttle them and all others beforehand." *Id.*

188.   Prior restraints cannot overcome their presumptive invalidity if they "place[] unbridled discretion in the hands of a government official or agency" or "fail[] to place limits on the time within which the decisionmaker must issue the license." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990); *see also Am. Entertainers*, 888 F.3d at 720. Thus, "a law subjecting the exercise of First Amendment freedoms to the

prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969).

189.   The informational-activities policy is a textbook prior restraint. The University expressly limits informational activities to speakers who "are sponsored by a university-affiliated organization," and even then, "[s]uch activities require prior approval by the designated university scheduling office and are subject to university policies and the reasonable guidelines of the authorizing official."

190.   The informational-activities policy affords the University unbridled discretion to grant or deny requests to engage in speech that involves "the distribution of literature and/or petitioning for signatures," and to impose subjective "guidelines" on that speech.

191.   The policy also fails to place any limits on the time that the University has to grant or deny permission. The only "standard" the University uses when deciding whether to allow students to distribute literature or gather signatures for petitions on campus is whether the speech in question implicates "overall campus safety and security," involves "any special circumstances relating to university activities," or affects the University. These vague criteria fall woefully short of the "concrete standards" required by the First Amendment. *Am. Entertainers*, 888 F.3d at 720. The University's informational-activities policy is thus an unconstitutional prior restraint.

192. The informational-activities policy also imposes unconstitutional speaker-based restrictions. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content" and are therefore "[p]rohibited." *Citizens United*, 558 U.S. at 340. The informational-activities policy favors some speakers over others. The policy permits students who "are sponsored by a university-affiliated organization" to engage in (approved) informational activities but does not permit unaffiliated students to do the same.

193. Under the policy, students who engage in unauthorized "informational activities" face discipline.

194. Defendants adopted this policy under color of state law.

**WHEREFORE**, Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A. A declaratory judgment that the University's discriminatory-harassment policy violates the First and Fourteenth Amendments;

B. A declaratory judgment that the University's computer policy violates the First and Fourteenth Amendments;

C. A declaratory judgment that the University's bias-related incidents policy violates the First and Fourteenth Amendments;

D. A declaratory judgment that the University's informational-activities policy violates the First Amendment;

E.     A permanent injunction barring Defendants from enforcing the University's discriminatory-harassment policy;

F.     A permanent injunction barring Defendants from enforcing the University's computer policy;

G.     A permanent injunction barring Defendants from enforcing the University's bias-related incidents policy;

H.     A permanent injunction barring Defendants from investigating, logging, threatening, referring, or punishing (formally or informally) students for bias-related incidents;

I.     A permanent injunction barring Defendants from enforcing the University's informational-activities policy;

J.     A preliminary injunction granting the relief specified above during the pendency of this action;

K.     An order holding Defendants jointly and severally liable for nominal damages in the sum of $1;

L.     Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

M.     All other relief that Plaintiff is entitled to.

Dated: April 8, 2021

Respectfully submitted,

*/s/ Cameron T. Norris*
J. Michael Connolly (Va. Bar No. 77632)
Cameron T. Norris (Va. Bar No. 91624)
James F. Hasson (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com

# VERIFICATION

I, Nicole Neily, declare as follows:

1.   I am the President of Speech First, Inc., the plaintiff in this case.

2.   I have reviewed this complaint.

3.   For the allegations within my personal knowledge, I believe them all to be true.

4.   For the allegations not within my personal knowledge, I believe them all to be true based on my review of the cited policies and documents and based on my conversations with members of Speech First, including Students A, B, and C.

5.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___April___, __7__, 2021

_____
Nicole Neily, President of Speech First, Inc.