**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | | |
|---|---|---|
| SPEECH FIRST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:21-cv-00203 |
| | ) | |
| TIMOTHY SANDS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
  *Deputy Attorney General*

Jacqueline C. Hedblom (VSB No. 68234)
Blaire O'Brien (VSB No. 83961)
  *Assistant Attorneys General*

Kay Heidbreder (VSB No. 22288)
  *University Legal Counsel and*
  *Senior Assistant Attorney General*

M. Hudson McClanahan (VSB No. 46363)
  *Associate University Legal Counsel and*
  *Assistant Attorney General*

Kristina J. Hartman (VSB No. 92279)
  *Associate University Legal Counsel and*
  *Assistant Attorney General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Jessica Merry Samuels (VSB No. 89537)
  *Deputy Solicitors General*

Kendall T. Burchard (VSB No. 95710)
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

University Legal Counsel
236 Burruss Hall (0121)
800 Drillfield Drive
Blacksburg, Virginia 24061
(540) 231-6293 – Telephone
(540) 231-6474 – Facsimile
heidbred@vt.edu
hud3@vt.edu
kjhart06@vt.edu

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INDEX OF SUPPORTING MATERIALS .................................................................... vi

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

      A.  Virginia Tech and the Campus Community ............................................. 2

      B.  This Litigation ................................................................................................ 5

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................... 7

  I.  Plaintiff has failed to demonstrate that this suit presents a justiciable case or controversy ............................................................................................................. 8

      A.  Plaintiff's challenge to the Acceptable Use Standard is moot ................... 8

      B.  Plaintiff lacks standing to bring pre-enforcement challenges to Virginia Tech's policies ......................................................................................... 11

  II.  None of plaintiff's claims are likely to succeed on the merits ......................... 18

      A.  Anti-Harassment Policy ............................................................................ 18

      B.  Bias Intervention and Response Team .................................................... 24

      C.  Informational Activity .............................................................................. 30

  III.  Plaintiff is not entitled to a preliminary injunction ....................................... 35

      A.  On this record, plaintiff has failed to establish irreparable harm ............. 36

      B.  The balance of equities and public interest also weigh against a preliminary injunction ............................................................................. 37

CONCLUSION ............................................................................................................... 38

CERTIFICATE OF SERVICE ...................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott v. Pastides*,
   263 F. Supp. 3d 565 (D.S.C. 2017) .................................................................... 11

*Abbott v. Pastides*,
   900 F.3d 160 (4th Cir. 2018) ................................................................... passim

*Accident, Inj. & Rehab., PC v. Azar*,
   943 F.3d 195 (4th Cir. 2019) ........................................................................... 35

*Benham v. City of Charlotte, N.C.*,
   635 F.3d 129 (4th Cir. 2011) ........................................................................... 16

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ......................................................................................... 21

*Brooks v. Vassar*,
   462 F.3d 341 (4th Cir. 2006) ....................................................................... 8, 10

*Bruce & Tanya & Assocs., Inc. v. Board of Supervisors of Fairfax Cty., Va.*,
   355 F. Supp. 3d 386 (E.D. Va. 2018) .............................................................. 36

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ........................................................................................... 37

*Communist Party of Ind. v. Whitcomb*,
   409 U.S. 1235 (1972) ....................................................................................... 34

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) ..................................................................... 16, 20

*Cornwell v. Sachs*,
   99 F. Supp. 2d 695 (E.D. Va. 2000) ............................................................... 35

*Davis v. Monroe County Bd. of Educ.*,
   526 U.S. 629 (1999) ................................................................................... 22, 23

*Dewhurst v. Century Aluminum Co.*,
   649 F.3d 287 (4th Cir. 2011) ....................................................................... 7, 18

*Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*,
   895 F. Supp. 2d 752 (E.D. Va. 2012) ............................................................... 7

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
   952 F.2d 802 (4th Cir. 1991) ............................................................................. 7

*Doe v. Merten*,
   219 F.R.D. 387 (E.D. Va. 2004) ..................................................................... 37

*Doe v. Virginia Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) ................................................................. 18

*Equity in Athletics, Inc. v. Department of Educ.*,
    504 F. Supp. 2d 88 (W.D. Va. 2007) ............................................... 20, 36

*Feminist Majority Found. v. Hurley*,
    |911 F.3d 674 (4th Cir. 2018) ............................................................. 19

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ............................................................................ 22

*Glover v. Cole*,
    762 F.2d 1197 (4th Cir. 1985) ............................................................ 32

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................ 27

*Grutzmacher v. Howard Cty.*,
    851 F.3d 332 (4th Cir. 2017) .............................................................. 11

*Heffron v. International Soc. for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981) ............................................................................ 33

*Hill v. Colorado*,
    530 U.S. 703 (2000) ...................................................................... 23, 24

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) .............................................................................. 22

*Holbrook v. University of Virginia*,
    706 F. Supp. 2d 652 (W.D. Va. 2010) ............................................... 36

*Imaginary Images, Inc. v. Evans*,
    612 F.3d 736 (4th Cir. 2010) .............................................................. 23

*Incumaa v. Ozmint*,
    507 F.3d 281 (4th Cir. 2007) ......................................................... 9, 10

*Jennings v. University of North Carolina*,
    482 F.3d 686 (4th Cir. 2007) .............................................................. 22

*Kenny v. Wilson*,
    885 F.3d 280 (4th Cir. 2018) .............................................................. 14

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................................ 28

*League of Women Voters of N. Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .............................................................. 35

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ................................................................ 7

*Long Term Care Partners, LLC v. United States*,
    516 F.3d 225 (4th Cir. 2008) ................................................................ 8

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*,
    528 U.S. 32 (1999) ......................................................................................... 22

*Maryland Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) ......................................................................... 13

*Meese v. Keene*,
    481 U.S. 465 (1987) ......................................................................................... 21

*New York v. Ferber*,
    458 U.S. 747 (1982) ......................................................................................... 22

*Parson v. Alcorn*,
    157 F. Supp. 3d 479 (E.D. Va. 2016) ............................................................... 7

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ......................................................................... 34

*Porter v. Clarke*,
    852 F.3d 358 (4th Cir. 2017) ..................................................................... 9, 10

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................... 8

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ......................................................................................... 33

*Regan v. Time, Inc.*,
    468 U.S. 641 (1984) ......................................................................................... 21

*RLI Ins. Co. v. Nexus Servs., Inc.*,
    No. 5:18-CV-00066, 2018 WL 3244413 (W.D. Va. July 2, 2018) ................ 34

*Rock for Life-UMBC v. Hrabowski*,
    411 Fed. Appx. 541 (4th Cir. 2010) ................................................................. 9

*Roe v. Department of Def.*,
    947 F.3d 207 (4th Cir. 2020) ......................................................................... 37

*Schickel v. Dilger*,
    925 F.3d 858 (6th Cir. 2019) ......................................................................... 33

See *S.B. ex rel. A.L. v. Board of Educ. of Harford Cty.*,
    819 F.3d 69 (4th Cir. 2016) ........................................................................... 18

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ......................................................................... 12

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) ........................................................ 10, 17, 28, 29

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ......................................................................... 28

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................................... 11

iv

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
 No. 3:20-CV-98, 2020 WL 1844791 (E.D. Va. Apr. 10, 2020)................................. 34

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ........................................................................................... 12

*Thorne v. Bailey*,
 846 F.2d 241 (4th Cir. 1988)................................................................................ 22

*Tigges v. Northam*,
 473 F. Supp. 3d 559 (E.D. Va. 2020)................................................................... 18

*Trustgard Ins. Co. v. Collins*,
 942 F.3d 195 (4th Cir. 2019)................................................................................ 18

*United States v. W. T. Grant Co.*,
 345 U.S. 629 (1953) ........................................................................................... 37

*Wag More Dogs, LLC v. Cozart*,
 680 F.3d 359 (4th Cir. 2012)................................................................................ 23

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ....................................................................................... 22, 32

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982) ........................................................................................... 37

*White Tail Park, Inc. v. Stroube*,
 413 F.3d 451 (4th Cir. 2005)................................................................................ 11

*Widmar v. Vincent*,
 454 U.S. 263 (1981) ........................................................................................... 33

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .............................................................................. 7, 34, 36, 37

## Constitutional Provisions

U.S. Const. art. III ................................................................................. passim

U.S. Const. amend. I ................................................................................. passim

## Statutory Authority

Va. Code Ann. § 23.1-401.1 ................................................................................. 13

## INDEX OF SUPPORTING MATERIALS

**Exhibit 1: Declaration of Byron Hughes, Dean of Students ("Hughes Decl.")**
> Hughes Decl. Ex. A: Student Affairs Organization Chart
> Hughes Decl. Ex. B: Bias Intervention and Response Team
> Hughes Decl. Ex. C: "What is Bias?" webpage
> Hughes Decl. Ex. D: Dean of Students Office: Bias Incident Review Process
> Hughes Decl. Ex. E: "See something? Say something!" webpage
> Hughes Decl. Ex. F: "Speech on Campus" webpage

**Exhibit 2: Declaration of Ennis McCrery, Director of Student Conduct ("McCrery Decl.")**
> McCrery Decl. Ex. A: Student Code of Conduct
> McCrery Decl. Ex. B: Policy 7000, Acceptable Use and Administration of Computer and Communication Systems
> McCrery Decl. Ex. C: Acceptable Use Standard

**Exhibit 3: Declaration of Harrison Blythe, Director of Compliance and Conflict Resolution in the Office for Equity and Accessibility ("Blythe Decl.")**
> Blythe Decl. Ex. A: Office for Equity and Accessibility Organization Chart
> Blythe Decl. Ex. B: Policy 1025, Policy on Harassment, Discrimination, and Sexual Assault

**Exhibit 4: Declaration of Heather Wagoner, Director of Student Engagement and Campus Life ("Wagoner Decl.")**
> Wagoner Decl. Ex. A: "Starting a New Student Organization" Outline
> Wagoner Decl. Ex. B: NextGen webpage
> Wagoner Decl. Ex. C: Students for Reproductive Freedom at Virginia Tech webpage
> Wagoner Decl. Ex. D: United Feminist Movement webpage
> Wagoner Decl. Ex. E: Young Democratic Socialists of America webpage
> Wagoner Decl. Ex. F: Young Democrats at Virginia Tech webpage
> Wagoner Decl. Ex. G: Young Leftists at Virginia Tech webpage
> Wagoner Decl. Ex. H: Young Americans for Freedom at Virginia Tech webpage
> Wagoner Decl. Ex. I: Young Americans for Liberty at Virginia Tech webpage
> Wagoner Decl. Ex. J: Turning Point USA webpage
> Wagoner Decl. Ex. K: Students for Life at Virginia Tech webpage
> Wagoner Decl. Ex. L: Students for Concealed Carry on Campus webpage
> Wagoner Decl. Ex. M: College Republicans webpage
> Wagoner Decl. Ex. N: Closing the Gap webpage
> Wagoner Decl. Ex. O: Give & Take webpage
> Wagoner Decl. Ex. P: *Young Americans for Freedom speak about the election and the future of Virginia Tech*, Collegiate Times (Nov. 4, 2020)
> Wagoner Decl. Ex. Q: *Virginia Tech students, professors react to the first presidential debate*, Collegiate Times (Nov. 1, 2020)

Wagoner Decl. Ex. R: *Agree to disagree: Discussing politics requires understanding and compromise rather than intimidation*, Collegiate Times (Oct. 19, 2020)

Wagoner Decl. Ex. S: *Gentrification revives, transforms poverty-stricken communities*, Collegiate Times (Jan. 13, 2019)

Wagoner Decl. Ex. T: *Women's rights movements provoke mass hysteria, perpetuate victimhood culture,* Collegiate Times (Aug. 26, 2018)

Wagoner Decl. Ex. U: *Caught in the Crossfire: The GOP should fill the Supreme Court vacancy*, Collegiate Times (Oct. 26, 2020)

Wagoner Decl. Ex. V: *Caught in the Crossfire: Republicans should not fill Justice Ruth Bader Ginsburg's seat*, Collegiate Times (Oct. 26, 2020)

Wagoner Decl. Ex. W: *Acceptance of transgender identities denies science, furthers 'politically correct' agenda,* Collegiate Times (Oct. 24, 2018)

Wagoner Decl. Ex. X: *Acceptance of transgender identities necessary to support gender-questioning youth,* Collegiate Times (Oct. 24, 2018)

Wagoner Decl. Ex. Y: *Feminist movements promote divisive victimhood culture, unproductive rhetoric,* Collegiate Times (Sept. 5, 2018)

Wagoner Decl. Ex. Z: *Feminist movements promote healthy dialogue, inclusivity, and social justice,* Collegiate Times (Sept. 5, 2018)

Wagoner Decl. Ex. AA: *Campuswide Debate a model for political discussion,* Collegiate Times (Oct. 26, 2016)

Wagoner Decl. Ex. BB: Policy 5215, Sales, Solicitation and Advertising on Campus

Wagoner Decl. Ex. CC: Policy 5000, University Facilities Usage and Events

**Exhibit 5: Declaration of Scott Midkiff, Vice President for Information Technology and Chief Information Officer ("Midkiff Decl.")**

Midkiff Decl. Ex. A: Policy 7000, Acceptable Use and Administration of Computer and Communication Systems

Midkiff Decl. Ex. B: Acceptable Use Standard

Midkiff Decl. Ex. C: Notice of Change to Acceptable Use Standard

**Exhibit 6: Declaration of Richard A. Sparks, Jr., Associate Vice Provost and University Registrar ("Sparks Decl.")**

**Exhibit 7: Declaration of Lisa Wilkes, Vice President for Strategic Initiatives and Special Assistant to the President ("Wilkes Decl.")**

Wilkes Decl. Ex. 1: Senior Leadership Organization Chart

Wilkes Decl. Ex. 2: Principles of Community

Wilkes Decl. Ex. 3: Revising Principles of Community Article

Wilkes Decl. Ex. 4: Message from the President, April 2021

Wilkes Decl. Ex. 5: Message from the President, April 2018

Wilkes Decl. Ex. 6: Message from the President, October 2017

**Exhibit 8: Declaration of Kim O'Rourke, Vice President for Policy and Governance and Secretary to the Board of Visitors ("O'Rourke Decl.")**

O'Rourke Decl. Ex. A: Shared Governance Chart
O'Rourke Decl. Ex. B: 2020 Speech on Campus Annual Report

## INTRODUCTION

As a leading research institution and public university, Virginia Tech brings together nearly 50,000 students, faculty, and staff from across the Commonwealth and around the world. That community is oriented around several fundamental principles, including mutual respect, the value of human diversity, and the right of every person to express thoughts and opinions freely.

While Virginia Tech firmly believes that these principles can co-exist, plaintiff insists they cannot. Instead, plaintiff—a national advocacy organization—has sued Virginia Tech on behalf of three anonymous members who claim to be students at the university. According to plaintiff, its anonymous members live in constant fear of expressing their views on controversial political and social issues because they believe they will be singled out, targeted, and punished by university officials. Based on those anonymous claims of subjective fears, plaintiff challenges an assortment of university policies and asks this Court to preliminarily enjoin those policies as facially unconstitutional under the First Amendment.

That request should be denied for three separate and independent reasons. First, none of plaintiff's claims are justiciable: one challenge is moot and there is no reason to think the other policies will ever be enforced in the way plaintiff alleges. Second, plaintiff is not likely to succeed on the merits because the complaint attacks the wrong policies, and those policies are fully consistent with the First Amendment in any event. Finally, even if plaintiff could clear those first two hurdles, the factual record does not support any finding of irreparable harm and the other preliminary injunction factors (balance of equities and public interest) weigh strongly in favor of the university.

For any—or all—of these reasons, the motion for a preliminary injunction should be denied.

## BACKGROUND

### A.     Virginia Tech and the Campus Community

Less than a decade after the Civil War, Virginia Polytechnic Institute and State University (Virginia Tech) was founded as a white land-grant institution. Now a modern university dedicated to "inclusion" and "creat[ing] a community that nurtures learning and growth," Virginia Tech is home to a diverse array of students "from across the Commonwealth and around the world." Decl. of Lisa Wilkes ¶¶ 3, 9, Ex. 2 (Wilkes Decl.).

As of last fall, more than 37,000 graduate and undergraduate students were studying in one of Virginia Tech's 280 degree programs across its six campuses. Decl. of Richard A. Sparks, Jr. ¶¶ 4–7 (Sparks Decl.). For tried-and-true Hokies, however, the university's main campus in Blacksburg, Virginia will always be home. Spanning 2,600-acres, boasting its own airport and rescue squad, and with a population of approximately 34,000 students, the campus effectively "functions as a small city." Sparks Decl. ¶¶ 8, 9.

### 1.     The University's Commitment to Freedom of Expression

Two things unite the Virginia Tech community at all levels: adherence to the university's motto, *Ut Prosim* (That I May Serve), and its Principles of Community. Wilkes Decl. ¶¶ 3, 9, Ex. 2. Adopted by the Board of Visitors in 2005 and reaffirmed in 2014, the Principles of Community formalize the university's most foundational values, including a shared belief in "the value of human diversity," every person's "inherent dignity," and "the right of each person to express thoughts and opinions freely . . . within a climate of civility, sensitivity, and mutual respect." *Id.* ¶¶ 9–10, Ex. 2. Together, these commitments place an "individual and collective responsibility" on the university community "to eliminate bias and discrimination" by "increasing our own understanding of these issues through education, training, and interaction with others." *Id.* Ex. 2. The university's commitment to these principles animates every aspect of

the Virginia Tech experience, from the moment "a person accepts admission to Virginia Tech" through the upper most levels of administration. Decl. of Ennis McCrery ¶ 2 (McCrery Decl.).

Because of the university's pledge to abide by these ideals, students are consistently reminded of the ample protections that Virginia Tech provides for their speech. At orientation, students are informed of the Principles of Community and the university's commitment to protecting a free and open exchange of ideas on campus. Decl. of Kim O'Rourke ¶ 14, Ex. B at Schedule G (O'Rourke Decl.). Furthermore, the Student Code of Conduct specifically reaffirms and advises that "[s]tudents at Virginia Tech enjoy those rights guaranteed by the Constitutions of the United States and the Commonwealth of Virginia," including those "protected under the First Amendment." McCrery Decl. ¶ 5, Ex. A at 4.

Virginia Tech also hosts a website dedicated to advising students of their speech rights. That website—named "Speech on Campus"—highlights the text of the First Amendment and specifically notes that Virginia Tech "values the rights guaranteed by the First Amendment of the United States Constitution and does not intend to restrict the exercise of these rights." O'Rourke Decl. ¶ 9, Ex. B at Schedule F. It also provides information about the importance of freedom of speech in the campus community and includes an online tool to report any alleged disruption of constitutionally protected speech. *Id.* ¶¶ 9–13, Ex. B at Schedule F.

President Tim Sands also frequently stresses the importance of the First Amendment on campus in university-wide statements and public interviews. Wilkes Decl. ¶ 11. That message remains consistent, even when members of the university community endorse messages "deeply antithetical to [the university's] values." *Id.* ¶ 11(a), Ex. 4. This is consistent with what seasoned university administrators know the university's commitment to free speech to be. See *id.* ¶ 12 ("Virginia Tech's commitment to free speech has been consistent throughout my more than 25

3

years here."); see also O'Rourke Decl. ¶ 15 ("Virginia Tech's policies are specifically designed to encourage an open and robust exchange of ideas, and the University makes a great effort to promote and encourage free expression by all members of the campus community.").

       2.    *Freedom of Expression on Campus*

As Virginia Tech's vibrant student life demonstrates, students have enthusiastically embraced their university's commitment to free speech. In any given year, at least 750 student groups of all purposes and persuasions gather and host activities and events on Virginia Tech's campus. Decl. of Heather Wagoner ¶ 6 (Wagoner Decl.). These organizations "cover[] a remarkable breadth of views," *id.*, and seek to promote, for example:

- "intersectional, progressive movement[s]," like NextGen, *id.* ¶ 6, Ex. B;

- "economic justice, democracy, and the rights of the exploited and oppressed," like Young Democratic Socialists of America, *id.* ¶ 6, Ex. E;

- "individual freedom, a strong national defense, free enterprise, and traditional values," like Young Americans for Freedom, *id.* ¶ 6, Ex. H;

- "free market, constitutional freedoms, and limited government," like Turning Point USA, *id.* ¶ 6, Ex. J; and

- "bring[ing] students as well as other groups . . . together" to "have meaningful conversations" and find "common ground," like Closing the Gap, *id.* ¶ 12, Ex. N.

In the words of a recent chairman of Young Americans for Freedom at Virginia Tech, "[i]t's great that Virginia Tech has a lot of people coming from all sorts of backgrounds and experiences" because "we're allowed to discuss things and . . . have disagreements with our peers, and you don't have to worry about getting in trouble." *Id.* ¶ 12(a), Ex. P.

As enthusiastic as students are about these groups, the university is equally quick to support them and their programing by offering financial resources and space to host events. Since 2016, for example, Young Americans for Freedom has received more than $30,000 from

Virginia Tech to cover the cost of speakers, and the United Feminist Movement—which is dedicated to "the advancement of oppressed and marginalized peoples by providing a platform on which their voices can be heard"—has received more than $10,000. Wagoner Decl. ¶¶ 6, 9, Ex. D. Since July 2016, the United Feminist Movement has hosted at least 52 events on campus and Turning Point USA has hosted at least 34, including an annual Free Speech Ball. *Id.* ¶ 10.

Virginia Tech has gone to great lengths to ensure these events are successful and that the First Amendment rights of individuals and organizations are respected. In 2018, for example, Young Americans for Freedom invited conservative commentator Steven Crowder to speak on campus. Wagoner Decl. ¶ 11. When the police department assessed the organization an unexpected security fee for additional police presence at the event necessitated by the great interest it inspired among students, the university refunded that fee to the student group and created a fund to ensure that similar fees would be paid with university funds. *Id.* As these examples show, Virginia Tech's commitment to protecting community members' First Amendment rights is evident "in the text of [the] formal policies, as well as in the way those policies are interpreted, applied, and enforced." Decl. of Harrison Blythe ¶ 11 (Blythe Decl.).

### B.    This Litigation

Plaintiff Speech First, Inc. is a "nationwide membership organization" located in Washington, D.C. Compl. ¶ 10; Dkt. 1-1. Three anonymous individuals—labeled "Students A, B, and C"—have submitted declarations claiming to be students at Virginia Tech and members of Speech First. Compl. ¶ 10; see Dkt. 4-4, 4-5, 4-6.

Plaintiff filed suit on Thursday, April 8, 2021.[1] See Dkt. 1 (Compl.). The complaint asserts seven claims against four different policies at Virginia Tech, all of which allege

---

[1] Although Virginia Tech received a copy of the complaint from the press on April 8, counsel for plaintiff did not notify university counsel about this suit until the following Monday, April 12.

violations of the First Amendment. Compl. ¶¶ 142–94. Specifically, plaintiff challenges:

- A now-outdated provision in the Standard for Acceptable Use of Information Systems that purportedly limited use of university systems for "partisan political purposes." That provision has since been revised to clarify that it only applies to employees. See Part I(A), *infra*.

- Policy 1025 (Policy on Harassment, Discrimination, and Sexual Assault), which prohibits harassment and discrimination across the entire university separate and apart from the anti-harassment provision in the Student Code of Conduct. See Part II(A), *infra*.

- Prior procedures that formerly governed how Virginia Tech responded to reports of potential bias-related incidents but are no longer in effect. See Part II(B), *infra*.

- Section 2.1.3 of Policy 5215 (Sales, Solicitation and Advertising on Campus), which sets forth how informational activities—including distribution of literature and petitioning for signatures—may proceed on campus. See Part II(C), *infra*.

Plaintiff seeks a declaratory judgment that the policies are facially unconstitutional, a permanent injunction barring Virginia Tech from enforcing any of those policies, nominal damages, and costs and fees. Compl. at 47–48. As relevant to this motion, plaintiff has also moved for a preliminary injunction, asking the Court to enjoin Virginia Tech from enforcing any of the challenged policies, before any of plaintiff's claims are adjudicated on the merits. See Dkt. 4; see also Dkt. 4-1 (supporting memorandum) (Mem.). In particular, plaintiff seeks broad preliminary relief barring Virginia Tech from "investigating" or "taking any action" in response to reports of "bias-related incidents." Dkt. 4-7.

After the parties agreed to a briefing schedule on plaintiff's motion for a preliminary injunction, Dkt. 9, the Court adopted the parties' proposal and set a hearing for July 9, 2021, Dkt. 12.[2]

---

[2] Virginia Tech's responsive pleading deadline has been stayed pending resolution of the preliminary injunction motion. See Dkt. 12. Virginia Tech reserves the right to assert any and all defenses, whether included in this opposition or not, in responding to the complaint.

**LEGAL STANDARD**

"A preliminary injunction . . . may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Specifically, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*

"[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); accord *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 819 (4th Cir. 1991) (on a preliminary injunction motion, "[m]ore than a summary judgment review [i]s required"). For that reason, a court considering whether to grant such an "extraordinary remedy," *Winter*, 555 U.S. at 22, is "required to weigh evidence and articulate its findings of fact." *Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, 895 F. Supp. 2d 752, 755 n.2 (E.D. Va. 2012). "[F]ailure to show any one of the relevant factors mandates denial of the preliminary injunction." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016).

**ARGUMENT**

Plaintiff's request for a preliminary injunction fails for three sets of reasons. First, this Court lacks jurisdiction to enter any injunction because none of plaintiff's claims are justiciable. See Part I, *infra*. Second, plaintiff has failed to carry its heavy burden of clearly showing that its claims are likely to succeed on the merits. See Part II, *infra*. Finally, plaintiff cannot satisfy any of the other preliminary injunction factors on the record presented here. See Part III, *infra*.

I.      **Plaintiff has failed to demonstrate that this suit presents a justiciable case or controversy**

Plaintiff's request for a preliminary injunction fails at the threshold because this Court lacks jurisdiction over plaintiff's claims. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). As the party seeking to invoke this Court's jurisdiction, plaintiff bears the burden of showing that all of Article III's requirements are satisfied. See *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230–31 (4th Cir. 2008).

Plaintiff has failed to carry that burden here for two reasons: (a) plaintiff's challenge to the Acceptable Use Standard is moot; and (b) plaintiff lacks standing to raise a pre-enforcement challenge.

A.      **Plaintiff's challenge to the Acceptable Use Standard is moot**

Under Article III, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006). Where "a live dispute" no longer exists, a case is moot and falls outside "the constitutional limits of federal court jurisdiction." *Id.*

1.      Plaintiff's current motion seeks a preliminary injunction against Virginia Tech's Standard for Acceptable Use of Information Systems (Acceptable Use Standard) on the ground that students are not permitted to use the university's computer systems or networks for "partisan political purposes." Mem. 17. But that Standard has been revised to better reflect how it has always been understood: as applicable *only* to employees, not students. Decl. of Scott Midkiff ¶¶ 9–11, Ex. B (Midkiff Decl.). As of May 17, 2021, the Acceptable Use Standard—which is available online and linked in Virginia Tech's policy library—reads: "In making acceptable use

8

of resources you must NOT . . . *if you are an employee*, use university systems for partisan political purposes, such as using electronic mail to circulate advertising for political candidates." Midkiff Decl. Ex. B (emphasis added).[3] That change was made "to better align the standard with practices" because the prior version "did not accurately reflect how the Acceptable Use Standard is applied." *Id.* ¶ 9, Ex. C. Because the challenged provision now expressly does not cover the only people whose rights plaintiff seeks to vindicate—students—plaintiff's claim for prospective injunctive relief is moot. See *Rock for Life-UMBC v. Hrabowski*, 411 Fed. Appx. 541, 550 (4th Cir. 2010) (facial challenge to university policy was moot where policy had been revised during the course of litigation).

2.     Nor does this situation fall within the "voluntary cessation" exception to mootness. That doctrine is meant to stop "a manipulative litigant" from "altering its behavior long enough" to avoid judicial review "indefinitely." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017). That is not the case here because there is no reason to believe that Virginia Tech will revert to the prior Acceptable Use Standard and thus "no reasonable expectation that the wrong will be repeated." *Incumaa v. Ozmint*, 507 F.3d 281, 288 (4th Cir. 2007). Virginia Tech has formally revised the Acceptable Use Standard and alerted the entire campus community to that change. Midkiff Decl. ¶¶ 9–10, Ex. C. And even though the Acceptable Use Standard is not subject to the full governance process, the university's governing body—the Board of Visitors—will consider a resolution confirming this change at their next meeting on June 8, 2021. *Id.* ¶¶ 4, 11.

The other circumstances of this case also point to the same conclusion. Even before the recent revision, there is no evidence that the "political purposes" provision was ever applied to or

---

[3] The Acceptable Use Standard is available online at https://vt.edu/acceptable-use.html.

enforced against students, Midkiff Decl. ¶ 8, which refutes any suggestion that the change is "temporar[y]" and meant "to evade judicial review." *Porter*, 852 F.3d at 364. That is all the more true given the sworn statement submitted by Virginia Tech's Vice President for Information Technology and Chief Information Officer that the Division of Information Technology "considers this change . . . permanent" and "has no intention" of adding any similar prohibition on students "back into the Acceptable Use Standard at any point in the future." Midkiff Decl. ¶ 11. The mere *possibility* that Virginia Tech may theoretically change the Acceptable Use Standard at some point in the future is not enough to sustain this Court's jurisdiction here. See *Brooks*, 462 F.3d at 348 (mootness applies unless "reenactment" of prior policy "appears probable" rather than "merely possible").

The Seventh Circuit reached the exact conclusion in a parallel challenge brought by the same plaintiff against a different public university. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 646 (7th Cir. 2020). There, as here, the university revised a policy during the course of litigation but the Seventh Circuit still held that plaintiff's challenge was moot. *Id.* at 647. The Court emphasized that, as "a public entity and an arm of the state government," the university was entitled to "the presumption that it acts in good faith." *Id.* at 646. And because the original policy had been amended and was no longer in effect, "no current student c[ould] suffer any harm from it." *Id.* Accordingly, "the merely theoretical possibility that the University could decide to revisit the policy at some remote point in the future without any evidence of an intention to do so," the Seventh Circuit held, was "not enough to survive a mootness challenge." *Id.*

So too here. Given the recent revision to Virginia Tech's Acceptable Use Standard, "[a]ny declaratory or injunctive relief ordered" in plaintiff's favor "would have no practical impact" or "redress in any way the injury . . . originally asserted." *Incumaa*, 507 F.3d at 287. In

these circumstances, plaintiff's request for a preliminary injunction is moot. See *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 349 (4th Cir. 2017) (finding facial challenge moot where prior policies had been revised); *Abbott v. Pastides*, 263 F. Supp. 3d 565, 582 (D.S.C. 2017) (rejecting claim as moot where university revised policy after suit had been filed and "declin[ing] to issue injunctive relief against any future revision to the policies").[4]

### B.   Plaintiff lacks standing to bring pre-enforcement challenges to Virginia Tech's policies

The remainder of plaintiff's complaint also fails to raise a justiciable controversy for a different reason: plaintiff's members have yet to suffer any cognizable harm—and likely never will. Whether viewed as a matter of standing or ripeness, this failure of proof deprives the Court of jurisdiction to enter the preliminary injunction plaintiff seeks.

1.      Like mootness, "standing to sue" is "rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To have standing, a plaintiff must show the "invasion of a legally protected interest" that is "actual or imminent, not conjectural or hypothetical." *Id.* at 1548. In this way, standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* at 1547.

As an organization (see Compl. ¶ 10), plaintiff may satisfy Article III's standing requirement in one of two ways: (a) showing "standing to bring suit on its own behalf . . . for an injury suffered by the organization itself," or (b) establishing "associational standing . . . on behalf of its members." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005).

---

[4] To the extent plaintiff brings a standalone challenge to a separate provision in the Acceptable Use Standard prohibiting "us[ing] mail or messaging services to harass or intimidate another person," Midkiff Decl. Ex. B, there is no evidence that policy has ever been enforced against students, and even if it were, any alleged violations would be adjudicated through Student Conduct. *Id.* ¶¶ 12–14; McCrery Decl. ¶¶ 20–22.

Plaintiff does not assert standing to sue on its own behalf. Nothing in either the complaint or the preliminary injunction claims any direct injury that Speech First has suffered as an organization, and a declaration from its President specifically states that plaintiff has "brought this suit" on behalf of "its members and other students." Neily Decl. (Dkt. 4-3) ¶ 8. Accordingly, to proceed any further, plaintiff must show that "its members . . . have been injured in fact, and thus could have brought suit in their own right." *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183–84 (4th Cir. 2013).

      2.    Plaintiff lacks standing because it has failed to establish that any of its individual members would have had standing to bring this pre-enforcement challenge on their own. Where—as here—a lawsuit challenges the constitutionality of a policy before that policy has actually been enforced, the standing inquiry looks to whether "threatened enforcement . . . creates an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*). Specifically, a plaintiff must satisfy two elements: (1) "an intention to engage in a course of conduct" that is "arguably affected with a constitutional interest" but "proscribed" by the challenged policy; and (2) that "there exists a credible threat of prosecution thereunder." *Id.* at 159. Absent a showing that "threatened enforcement" is "sufficiently imminent," a pre-enforcement challenge is not justiciable and falls outside this Court's jurisdiction. *Id.*; *SBA List*, 573 U.S. at 158 n.5 (emphasizing that "[t]he doctrines of standing and ripeness originate from the same Article III limitation," and in pre-enforcement challenges those requirements "boil down to the same question"). Plaintiff has failed to carry either part of that burden here.

      a.    Plaintiff has not established that any of its anonymous members intend to "engage in a course of conduct" that would be "proscribed" by any of the challenged policies. *SBA List*, 573 U.S. at 159. Although the members insist that they wish to "distribute literature . . . in high-

traffic areas of campus," see, *e.g.*, Student A Decl. (Dkt. 4-4) ¶ 20, they do not separately assert

that they are barred from doing so under Policy 5215 as part of a university-affiliated

organization. Similarly, all three members offer the same vague and generalized assertion about

what they would like to do—"engage in open and robust intellectual debate" and "speak

passionately and repeatedly" about certain topics, see Student A Decl. (Dkt. 4-4) ¶¶ 13–14;

Student B Decl. (Dkt. 4-5) ¶¶ 12–13; Student C Decl. (Dkt. 4-6) ¶¶ 12–13—without offering any

reason why doing so would violate *any* of Virginia Tech's policies.

This is no small or technical matter. The record before this Court shows the many ways

Virginia Tech works to promote and encourage all forms of student expression on campus. See,

*e.g.*, Wagoner Decl. ¶¶ 9–12. That commitment is also evident in the annual reporting the

university submits to the General Assembly every year regarding free speech on campus, see Va.

Code Ann. § 23.1-401.1; see also O'Rourke Decl. ¶¶ 6–15, and the explicit carve-outs in the

Student Code of Conduct and other university policies for constitutionally protected expression,

see McCrery Decl. ¶ 11, Ex. A at 9; Blythe Decl. Ex. B at 2. And, more to the point, students

would never face discipline for merely stating their views, so long as they did do not also engage

in any threatening or harassing conduct that would violate the Student Code. See McCrery Decl.

¶¶ 10, 11, 18. Accepting their own representations that plaintiff's anonymous members wish

only to speak about their views—rather than threaten or harass their fellow students—they have

failed to show any intent to violate the policies they seek to challenge. See *Maryland Shall Issue,*

*Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (holding that "[p]laintiffs' generalized fears and

concerns" about potential future enforcement were not sufficient for standing where plaintiffs did

not show "intention of engaging in such conduct in the first place").

b.      Plaintiff's claims also fail step two of the standing analysis because its anonymous members have offered no reason to believe that they face any credible threat that the challenged policies will be enforced against them. Although "[t]he most obvious way to demonstrate a credible threat of enforcement in the future" is to establish that there has been "an enforcement action in the past," *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), plaintiff attempts no such showing here. None of the anonymous students claim they have ever faced any discipline or other consequence under the challenged policies *themselves*. Nor do they identify particular situations in which those policies have been enforced against *any* students at Virginia Tech, much less in the way plaintiff claims. Cf. *Kenny v. Wilson*, 885 F.3d 280, 289 (4th Cir. 2018) (students had standing for First Amendment challenge where they "ha[d] been prosecuted under those laws in the past").

This significant gap in the record comes as no surprise given the detailed declarations submitted by Virginia Tech that explain how the challenged policies work and are enforced. For one thing, there is no evidence that the challenged provisions in the Acceptable Use Standard or Policy 5215 have *ever* been enforced against students. See McCrery Decl. ¶¶ 20–23; Wagoner Decl. ¶ 16; Midkiff Decl. ¶ 13. The Bias Intervention and Response Team (BIRT) is also no help to plaintiff in establishing a credible threat of enforcement because BIRT has no enforcement authority of its own; rather, any alleged policy violations are referred to Student Conduct for investigation and adjudication as appropriate. Decl. of Byron Hughes ¶¶ 8, 15, 17 (Hughes Decl.). And although students have in the past been found responsible for harassment under the Student Code, the Director of Student Conduct is "not aware of any case in which a student was charged with violating the policy against harassment in the Student Code of Conduct simply as a result of views the student expressed." McCrery Decl. ¶ 11.

Without any relevant prior enforcement action, plaintiff must look elsewhere to establish injury under Article III. But the record includes no evidence that would support a reasonable fear of discipline or any other enforcement by university officials if the anonymous members were to engage in the speech they describe. The anonymous members do not claim that they have even been *approached* by university officials—much less threatened with any investigation or potential sanction—based on their speech.

To the contrary, the record demonstrates that other Virginia Tech students regularly express many of the views that plaintiff's members wish to share without any fear or consequence. For example, Students for Life at Virginia Tech "advocates for a culture where human life is valued and accepted from the very beginning in the womb." Wagoner Decl. ¶ 6, Ex. K. Among the events Students for Life hosts each year is a "cemetery for the innocent" in one of the most public areas on campus. *Id.* ¶ 10. As for Second Amendment issues, Students for Concealed Carry on Campus focuses on "making the public aware of the facts" about concealed carry of firearms and lobbying to allow concealed carry on college campuses. *Id.* ¶ 6, Ex. L. The Young Americans for Freedom has also hosted speakers—paid for, at least partially, with university funds—who have expressed views against abortion and questioned the concepts of white privilege, gender identity, and feminism. *Id.* ¶ 9. And students feel free to express their views in writing, as evidenced by the "Caught in the Crossfire" series in the student newspaper in which student authors published conflicting editorials on a range of topics including gender identity, feminism, and Supreme Court nominations. *Id.* ¶ 12, Ex. U, V, W, X, Y, Z.

The record also shows that the campus appetite to "engage in open and robust intellectual debate" is quite high. Cf. Student A Decl. ¶ 13; Student B Decl. ¶ 12 (same); Student C Decl. ¶ 12 (same). "Closing the Gap" and "Give & Take" are two organizations that specifically exist

to "facilitate dialogue among people with varying points of view." Wagoner Decl. ¶ 6, Ex. N, O. Indeed, students on campus have celebrated the fact that students are "allowed to have disagreements with [their] peers" without fear of "getting in trouble." *Id.* ¶ 12(a), Ex. P.

This evidence also defeats any claim of injury based on self-censorship. To establish that type of harm, plaintiff would need to show that their anonymous members' speech has been chilled and that the claimed chilling effect is "objectively reasonable." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). The reason is simple: for Article III's standing limitation to have any meaning in the First Amendment context, "[s]ubjective or speculative accounts of . . . a chilling effect . . . are not sufficient" to show the necessary injury. *Id.* But that is all plaintiff has offered here. Although the anonymous members insist that they are afraid to speak their mind, nothing in the record supports a finding that any of the challenged policies have the effect of chilling student speech on an objectively reasonable basis. Accordingly, plaintiff lacks standing for this reason as well. Cf. *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013) (concluding that "specific and . . . unsolicited written and oral correspondence" from state officials "explaining that [plaintiff]'s speech violates the [law]" supported objectively reasonable chilling effect).

The Fourth Circuit's decision in *Abbott*—which concluded that student-plaintiffs lacked standing to bring a facial challenge against a public university's harassment policies—is directly on point. See *Abbott*, 900 F.3d at 175–79. The Court noted that the plaintiffs had "point[ed] to no evidence of prior sanctions under [the challenged policy]—against them or anyone else—for the type of speech in which they wish to engage." *Id.* at 176–77; see also *id.* at 177 ("[T]he record in this case is devoid of any evidence that there has been frequent actual or threatened use of [the challenged policy] to silence the types of speech in which the plaintiffs wish to engage[.]"). That

was true even though one of the students in *Abbott* had been the subject of student conduct complaints, received an official letter from a university official reporting those complaints and threatening an investigation, and been required to attend a mandatory meeting to discuss potential charges of harassment. *Id.* at 165–66. The Fourth Circuit also observed that prior harassment complaints that had been "inquired into and then dismissed"—which again, plaintiff here does not even allege—did not "translate into a credible threat that the University would sanction the plaintiffs for engaging in protected speech in the future simply because others found it offensive." *Id.* at 177. Based on those facts, the court held that plaintiffs' challenge fell outside the federal courts' jurisdiction. *Id.* at 175–79. To hold otherwise, the court explained, "would do a disservice to the good-faith efforts of university officials to mind the details, crafting harassment policies so that they protect the open exchange of ideas." *Id.* at 178.[5]

The fact that the plaintiffs in *Abbott* lacked standing on the facts of that case confirms that plaintiff cannot proceed on much sparser allegations of injury here. Simply put, three anonymous declarations that assert a subjective chilling effect on speech—without any other evidence to corroborate that fear or show that it is objectively reasonable—is not the stuff of a "case" or "controversy" under Article III.

3.      The fact that plaintiff's current challenge is not justiciable at this point will not leave its members without a remedy should one become necessary. Plaintiff would, of course, be free to seek affirmative relief in a pre-enforcement challenge if and when the threat of enforcement becomes sufficiently credible and imminent to satisfy Article III. And in the

---

[5] Relying on *Abbott* as "instructive," the Seventh Circuit reached the same conclusion in a similar case involving the same organizational plaintiff just last year: "Speech First's sparse submission failed to demonstrate that any of its members face a credible threat of any enforcement on the basis of their speech or that [the university's] responses to reports of bias-motivated incidents have an objective chilling effect." *Killeen*, 968 F.3d at 639, 640, 644.

unlikely event that a student were to face disciplinary charges on the basis of expression believed to be constitutionally protected, that student may always bring an as-applied challenge. Waiting to resolve plaintiff's claims until a specific factual dispute arises—if it ever does—ensures that any controversy will be "presented in clean-cut and concrete form," *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013), thereby avoiding the risk of an advisory opinion in a hypothetical dispute, see *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200–01 (4th Cir. 2019). For now, however, this Court lacks jurisdiction over plaintiff's claims and plaintiff's request for a preliminary injunction should be denied on that basis alone.

## II. None of plaintiff's claims are likely to succeed on the merits

Even if plaintiff's claims were properly before this Court, plaintiff would still not be entitled to a preliminary injunction. To obtain that relief, plaintiff "must clearly show that it is likely to succeed on the merits," *Dewhurst*, 649 F.3d at 290, which "requires . . . more than a grave or serious question for litigation," *Tigges v. Northam*, 473 F. Supp. 3d 559, 568 (E.D. Va. 2020) (citation omitted). Because plaintiff has failed to carry that burden as to any of the challenged policies that are still in effect,[6] the motion for a preliminary injunction should be denied on that basis as well.

### A. Anti-Harassment Policy

1.     It is well-settled that "universities have obligations not only to protect their students' free expression, but also to protect their students." *Abbott*, 900 F.3d at 173. Indeed, some of these obligations raise the prospect of legal liability: a public institution that fails to adequately address student-on-student harassment may be held liable under Title IX. See *S.B. ex rel. A.L. v. Board of Educ. of Harford Cty.*, 819 F.3d 69, 76–77 (4th Cir. 2016); see also *Feminist*

---

[6] As outlined above, the Acceptable Use Standard has been revised to clarify that the challenged provision applies only to employees, not students. See *supra* at 8.

*Majority Found. v. Hurley*, 911 F.3d 674, 688–89 (4th Cir. 2018) (criticizing public university in Virginia for allegedly "turn[ing] a blind eye to the sexual harassment that pervaded and disrupted its campus").

Like most (if not all) universities, one of the ways that Virginia Tech seeks to fulfill its obligation to protect its students is by adopting policies governing students' behavior while enrolled at the university. Those policies are outlined in the Student Code of Conduct, which also sets forth the procedures for adjudicating and sanctioning any violations of those policies. See McCrery Decl. Ex. A at 3. The Code of Conduct specifically prohibits "harassment," which is defined as "[u]nwelcome conduct not of a sexual nature that is sufficiently severe, pervasive, or persistent that it could reasonably be expected to create an intimidating, threatening, or hostile environment that limits the ability of an individual to work, study, or participate in the activities of the university." *Id.* ¶ 8, Ex. A at 9.

2.      The specific policy that plaintiff challenges here—Policy 1025 (Policy on Harassment, Discrimination, and Sexual Assault)—also prohibits harassment but is entirely separate from the Student Code of Conduct. See Blythe Decl. ¶¶ 7–8, Ex. B. Indeed, by its own terms, Policy 1025 does not subject students to discipline. See Blythe Decl. ¶ 8, Ex. B. Although Policy 1025 applies to the entire Virginia Tech community, "[t]he appropriate university avenue for resolving a complaint covered under th[e] policy" depends on who is alleged to have committed the violation. Blythe Decl. Ex. B at 2; see also Blythe Decl. ¶ 8. Specifically, Policy 1025 provides that "[a]ll undergraduate, graduate, and professional students at the university are subject to the university's student code of conduct as outlined in the Student Code of Conduct." Blythe Decl. ¶ 8, Ex. B at 2 (emphasis omitted). That means any complaints alleging that a student engaged in discriminatory or harassing behavior in violation of Policy 1025 would be

referred to Student Conduct "to be reviewed, investigated, and if necessary, adjudicated." *Id.* ¶ 8. Accordingly, students who engage in harassing behavior are never charged with violating Policy 1025 but would instead be charged with violating the harassment provision in the Student Code of Conduct. *Id.*; see also McCrery Decl. ¶ 9 (noting that students accused of harassment are "charged under the harassment section of the Student Code of Conduct, not under the University's Policy 1025").

In this suit, plaintiff purports to challenge how Virginia Tech "disciplines students" under the university's harassment policy (Mem. 1), but fails to challenge the provision in the Student Code that would actually form the basis of any alleged violation. In other words, plaintiff has challenged the wrong policy. And although plaintiff could seek to amend its complaint to assert a different claim, "new legal theories must be added by way of amended pleadings, not by arguments asserted in legal briefs." *Equity in Athletics, Inc. v. Department of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007) (citations omitted). This mis-match between claim and alleged harm defeats plaintiff's request for a preliminary injunction against the enforcement of Policy 1025. *Cf. Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (noting that "[a] favorable decision" on behalf of the plaintiff "would mean [state officials] would be enjoined from enforcing" the allegedly unconstitutional policy).[7]

3.      Even if plaintiff had properly challenged Policy 1025, that claim would not be likely to succeed on the merits. Policy 1025 specifically states that it "does not allow curtailment or censorship of constitutionally protected expression," nor does it "attempt to address behaviors that do not constitute discrimination or harassment." Blythe Decl. Ex. B at 2. Rather, to be

---

[7] To the extent plaintiff contends that this suit encompasses a First Amendment challenge to the anti-harassment provision in the Student Code, that claim would be unlikely to succeed on the merits for largely the same reasons explained regarding Policy 1025.

considered harassment under Policy 1025, conduct must either (a) "unreasonably interfere[]
with" an individual's "work or academic performance or participation in university activities," or
(b) "create[] a working or learning environment that a reasonable person would find hostile,
threatening or intimidating." *Id.* ¶ 7, Ex. B at 4. In evaluating allegations of verbal harassment
specifically, the Office for Equity and Accessibility determines whether the conduct is "severe,
pervasive, persistent, or objectively offensive enough" to meet either of those criteria. *Id.* ¶ 7.
Conduct that does not rise to this level does not violate Policy 1025, even where the behavior
may otherwise be "[o]ffensive." *Id.* ¶ 6, Ex. B at 2. Accordingly, so long as an individual's
expressive conduct does not seriously interfere with another's ability to work or learn, Policy
1025 does not apply and therefore "places no burden on protected expression." *Meese v. Keene*,
481 U.S. 465, 480 (1987).

   a.   Policy 1025 is not overbroad. To succeed on that challenge, plaintiff must show
that the policy "is unconstitutional in a substantial portion of the cases to which it applies."
*Regan v. Time, Inc.*, 468 U.S. 641, 650 (1984). "[W]here," as here, "conduct and not merely
speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well,
judged in relation to the [policy's] plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S.
601, 615 (1973).

   As explained above, Policy 1025 is limited to situations where an individual's conduct
creates a hostile environment or unreasonably interferes with another's ability to learn or work.
Not only is that what the text of the policy says, but it is also how Virginia Tech interprets and
applies it. See Blythe Decl. ¶ 7 (allegations of verbal conduct "must be severe, pervasive,
persistent, or objectively offensive" to rise to the level of harassment). For example, in
responding to complaints regarding social media posts that some found objectionable, the posts

21

were determined to be expression that fell outside the scope of Policy 1025 and the matter was closed with no further action. *Id.* ¶ 9.

These standards are consistent with the Supreme Court's guidance in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), which defines harassment under Title IX as conduct that is "so severe, pervasive, and objectively offensive" that it "undermines and detracts from the victims' educational experience." *Id.* at 651; see *Jennings v. University of North Carolina*, 482 F.3d 686, 696 (4th Cir. 2007) (en banc) (citing *Davis*). Moreover, "it has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); accord *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (noting that "invidious [] discrimination . . . has never been accorded affirmative constitutional protections"). As the Fourth Circuit has explained, "[p]rohibiting harassment is not prohibiting speech" even though "it may take the form of speech." *Thorne v. Bailey*, 846 F.2d 241, 243 (4th Cir. 1988) (citation omitted). Because Policy 1025 only applies to conduct that unreasonably disrupts or interferes with an individual's ability to work or learn, it does not "reach[] a substantial number of impermissible applications" and is therefore not so clearly overbroad to warrant a preliminary injunction. *New York v. Ferber*, 458 U.S. 747, 771 (1982); see also *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999) ("[T]he overbreadth doctrine is not casually employed.").

b.     Nor is Policy 1025 unconstitutionally vague. The Supreme Court has instructed that "perfect clarity and precise guidance have never been required" by the First Amendment. *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Instead, to survive a vagueness challenge, a policy need only "provide people of ordinary intelligence a reasonable opportunity

to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Policy 1025 comfortably satisfies that standard. As its terms state, the policy prohibits conduct that creates an objectively "hostile" environment or "unreasonably interferes" with another's work or education, and it does not apply to "constitutionally protected expression." Blythe Decl. Ex. B at 2, 4. This standard is far from "incomprehensible," as plaintiff claims, Mem. 15, both because it tracks the Supreme Court's guidance in *Davis* and also "set[s] out in terms that [an] ordinary person exercising ordinary common sense can sufficiently understand and comply with." *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 749 (4th Cir. 2010). When it comes to the vagueness test under the First Amendment, "an ounce of common sense is worth more than an 800-page dictionary," *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) (citation and parenthetical omitted), and under that rubric plaintiff has failed to show that Policy 1025 is clearly void for vagueness.

c.      Plaintiff's suggestion (Mem. 15) that "one-off, routine human interactions" would violate Policy 1025 is unsupported by the law and undercut by plaintiff's own declarations. For one thing, plaintiff cites only "possible" examples of the types of conduct that could—depending on the circumstances—amount to harassment where Policy 1025's other criteria are satisfied. Norris Decl. (Dkt. 4-2) Ex. C. As the Supreme Court stressed in *Davis*, however, evaluating allegations of potential harassment is necessarily a fact-specific inquiry that "depends on a constellation of surrounding circumstances, expectations, and relationships." 526 U.S. at 651. Plaintiff likewise fails to identify a single instance in which a supposedly "routine human interaction[]" was actually deemed enough to violate university policy. In terms of what may or may not happen in the future, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack" where a policy is likely valid "in the vast

majority of its intended applications." *Hill*, 530 U.S. at 733. Here, however, plaintiff does not even speculate on the basis of concrete or specific hypotheticals, opting instead to rely on the entirely generic (and verbatim) assertions by three anonymous members that they wish to "engage in open and robust intellectual debate with [their] fellow students." See Student A Decl. ¶ 13; Student B Decl. ¶ 12 (same); Student C Decl. ¶ 12 (same). For all of these reasons, even if the complaint did raise a claim under Policy 1025, plaintiff has failed to make a clear showing that any such claim would be likely to succeed on the merits.[8]

      **B.    Bias Intervention and Response Team**

      Plaintiff's claim regarding Virginia Tech's process for responding to bias-related incidents fails for the same reasons as its claim under Policy 1025: plaintiff challenges the wrong policy, and the process that does apply does not violate the First Amendment in any event.

      1.     Plaintiff's challenge regarding bias-related incidents reflects a fundamental misunderstanding of the university's policies and goals. To start with, although plaintiff's entire argument is based on the "Bias-Related Incident Protocol" dated February 2016, Mem. 18–19; Norris Decl. Ex. H, "the procedures described in that document are no longer in effect," Hughes Decl. ¶ 11. Rather, since 2019, the Dean of Students Office has relied on the revised "Bias Intervention and Response Team" process to govern the university's response to reports of potential bias. *Id.* ¶¶ 7, 11, 17, Ex. B.

      Under that process, the Bias Intervention and Response Team (BIRT) meets on a regular basis to review complaints of potential bias and develop an appropriate response. Hughes Decl. Ex. B. Members of BIRT include representatives from several offices across the university,

---

      [8] Even the Foundation for Individual Rights in Education (on which plaintiff relies to a significant degree, see Compl. ¶¶ 25, 32, 36) agrees that Policy 1025 "[do]es not seriously imperil speech," as shown by its "green light" rating for that policy. FIRE, "Policy 1025: Policy on Harassment, Discrimination, and Sexual Assault," https://www.thefire.org/fire_speech-codes/vt-discrim-harass/ (last accessed May 20, 2021).

including: the Dean of Students; the Office of Fraternity and Sorority Life; the Office for Equity and Accessibility; the Office for Inclusion and Diversity; Housing and Residence Life; Services for Students with Disabilities; the Corps of Cadets; Student Conduct; Cultural and Community Centers; and the Virginia Tech Police Department (VTPD). *Id.* ¶ 9. By bringing these offices together in one team, BIRT includes different perspectives across campus and "serves as a sort of 'air traffic control'" to coordinate the university's response to bias-related incidents. *Id.* ¶ 8. Coordinating in this way is also simpler for both complaining parties and reporting parties—rather than leaving each office to respond independently, BIRT centralizes the process and ensures that the university responds in a coherent and consistent way. *Id.* ¶ 6.

When a complaint is submitted to BIRT, the team reviews the report and assesses whether the allegations raise an issue of bias. A "bias incident" is "an expression against a person or group because of the person or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law." Hughes Decl. ¶ 12. If BIRT determines that a complaint does not implicate bias, a representative will follow up with the complaining party and offer other resources and support. *Id.* ¶ 13, Ex. D. By contrast, where BIRT determines that a complaint appears to involve bias and is not constitutionally protected speech, the incident will be assessed and referred the university office best situated to respond. See *id.* ¶¶ 14, 15 ("For example, a complaint alleging an incident of bias between two roommates may be referred to Housing and Residence Life to address.").

2.      Even if plaintiff had challenged the correct BIRT process, the way it operates at Virginia Tech is fully consistent with the First Amendment.

25

a.      As an initial matter, plaintiff errs in suggesting that BIRT "target[s] speech."
Mem. 18. To the contrary, Virginia Tech's commitment to free expression is one of BIRT's most
important guiding principles. See Hughes Decl. ¶ 14. The 2019 procedure states that "BIRT will
examine and review each complaint through the lens of free and protected speech" and
emphasizes that "Virginia Tech cannot adjudicate matters that are deemed protected speech." *Id.*
Ex. B at 3. That same document specifically acknowledges that "[f]ree speech . . . protect[s]
many forms of intolerant statements, expressions, and conduct," and in certain contexts, "hate
speech" may be "protected even though many in the university community find it repugnant." *Id.*
Consistent with these principles, "BIRT does not intervene if a complaint addresses expressions
that are protected speech." *Id.* ¶ 14; see Blythe Decl. ¶ 10 ("BIRT regularly concludes that
reports of alleged bias [are] constitutionally protected speech."); McCrery Decl. ¶ 17 ("Protected
speech never results in a referral [from BIRT] to Student Conduct").

b.      Just as importantly, BIRT lacks any authority to discipline or otherwise punish
students for their speech or anything else. The Office of Student Conduct administers the Student
Code of Conduct, which is "the exclusive process by which students are adjudicated to be in
violation of University policy and sanctioned for any such violations." McCrery Decl. ¶ 7. In
contrast, BIRT is administered by the Dean of Students Office, which is an entirely separate
department. Unlike Student Conduct, the Dean of Students Office "ha[s] no role in student
discipline" but rather seeks to "provide support, advice, services, and resources to students facing
challenges in their personal or academic lives at Virginia Tech." Hughes Decl. ¶¶ 3, 10. Given
this difference in mission and structure, Student Conduct and the Dean of Students Office have
separate reporting structures under the Vice President for Student Affairs, see Hughes Decl. Ex.

A (Student Affairs organizational chart), and neither the Director of Student Conduct nor the Dean of Students report to or supervise one another. See Hughes Decl. ¶ 17; McCrery Decl. ¶ 3.

Unlike Student Conduct, BIRT would never "conduct a formal investigation" or "make any adjudication or responsibility finding." Hughes Decl. ¶ 17. "BIRT does not have the power to impose discipline on any student for any reason," and "[n]othing about BIRT's interaction with a student—as either a complaining party or a responding party—would ever appear on . . . academic transcripts or disciplinary record." *Id.* To be sure, BIRT may refer complaints to Student Conduct but would do so "only [in] cases that implicate an alleged violation of the Student Code." *Id.* ¶ 15. And "[t]he Dean of Students Office has no special authority to refer cases to Student Conduct." *Id.*; see McCrery Decl. ¶¶ 3, 15. Although a representative from Student Conduct does serve on BIRT, that office's participation "does not give BIRT or the Dean of Students Office any additional authority in making referrals to Student Conduct." *Id.* ¶ 15.

Because BIRT has no disciplinary authority, nothing about the BIRT process would ever penalize a student for doing or saying *anything*. Students only ever face charges and sanctions for policy violations under the Student Code of Conduct—which plaintiff has not challenged here. For that same reason, the definition of "bias incidents" cannot be vague or overbroad in the way that plaintiff claims (see Mem. 18) because nothing is proscribed and no one can be punished. See *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (noting that, for a law to be vague, it must "operate[] to inhibit the exercise of [First Amendment] freedoms" or proscribe conduct without notice (internal citations and quotations omitted)).

c.    Plaintiff attempts to salvage its claim against BIRT by insisting that the university's response to reports of bias has an "objective 'chilling' effect on speech." Mem. 18–20. That argument fails for the same reason that plaintiff lacks standing to bring this suit in the

first place. See Part I(B), *supra*. To show an objective chilling effect, a plaintiff must show that the "challenged government action" is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Abbott*, 900 F.3d at 169. Importantly, the "mere[] . . . knowledge" of a public entity's capacity to "engage[] in certain [investigative] activities" or the "concomitant fear" that the entity "might" take "detrimental" actions against the plaintiff "in the future" are insufficient to support a claim. *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

Yet that is all plaintiff alleges here. Plaintiff has failed to offer any evidence that even tends to show how BIRT's coordinated response to potential bias incidents objectively chills speech. Plaintiff erroneously conflates "reports," "referrals," and "discipline" in a way that does not accurately reflect how BIRT operates. Mem. 19–20. Again, when complaints are submitted to the Dean of Students Office, BIRT members review the complaint to collectively decide if the complaint implicates a bias-related incident that is outside the scope of the First Amendment. Hughes Decl. ¶¶ 12, 14. If it does, BIRT may contact the students "to invite them to engage in a voluntary conversation" or refer the matter elsewhere. *Id.* ¶¶ 15, 17. Should a student fail to respond to BIRT's invitation or decline to meet, "no further action is taken, and the student faces no consequences of any kind." *Id.* ¶ 17; see also McCrery Decl. ¶ 16 ("[T]he BIRT process is entirely voluntary for students."). This voluntary, non-compulsory process cannot support plaintiff's claim of an objective chilling effect. See *Speech First, Inc. v. Killeen*, 968 F.3d 628, 642 (7th Cir. 2020) (noting in a similar bias-response case that "[t]he University's invitation to a voluntary meeting falls well short" of establishing harm under the First Amendment); cf. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (finding potential harm to students' expression where "failure to meet" with that university's bias response team "could result in far-reaching consequences, including reputational harm or administrative action").

Nor does BIRT's ability to refer reports support an objective chill here. "Any person or office," including BIRT, "may make a referral to Student Conduct, and each of those referrals will be approached objectively and in accordance with the procedures outlined [in the Student Code of Conduct]." McCrery Decl. ¶ 15. Similarly, the Dean of Students Office (which administers BIRT) has "no special or automatic referral power or prerogative"—any referrals from that office "are adjudicated or otherwise resolved in the same fashion as any other referral from any other individual or office at Virginia Tech." *Id.* ¶ 3. And even though a representative of VTPD participates in BIRT, the police department "will only become involved" in responding to a reported bias incident "when the alleged facts credibly describe unlawful activity or otherwise necessitate a law enforcement response." Hughes Decl. ¶ 9.[9] In similar circumstances, the Seventh Circuit recently held that it does not "infring[e] on any student's right to free speech" for a bias-response team—"like any member of the University community"—to "report a potential Student Code violation" to the conduct office or the police. *Killeen*, 968 F.3d at 642.

Setting aside what BIRT does or does not have the power to do, the factual record before the Court shows that BIRT does not exercise its referral authority with any frequency. During the most recent semester (Spring 2021), BIRT referred only 3 complaints to Student Conduct in total. Hughes Decl. ¶ 15. And out of 14 conduct cases over the last five years in which harassment charges involved bias or discrimination, only *one* was sent from BIRT independently (rather than a joint referral or direct report). McCrery Decl. ¶¶ 12–13. On this record, it comes as no surprise that plaintiff has failed to show any likelihood that BIRT infringes constitutionally protected expression.

---

[9] For example, when BIRT received "reports of political signs for former President Donald Trump being torn down around campus," those complaints were referred to VTPD because they "alleged the criminal destruction of property." Hughes Decl. ¶ 20.

### C.     Informational Activity

Plaintiff fares no better on its challenge to Policy 5215 (Sales, Solicitation and Advertising on Campus). Out of that 14-page policy, plaintiff seeks to enjoin only Section 2.1.3 (Informational Activity), which establishes the procedures by which "distribution of literature" and "petitioning for signatures" are permitted on campus. Wagoner Decl. Ex. BB at 3; see also Mem. 21–22. Plaintiff takes issue with two requirements in particular: that such informational activities must be (1) "approv[ed] by the designated university scheduling office" and (2) "sponsored by a university-affiliated organization." Wagoner Decl. Ex. BB at 3.[10]

1.      For informational activities conducted by students, the "designated university scheduling office" under Policy 5215 is Student Engagement and Campus Life (SECL). Wagoner Decl. ¶ 13. As the Director of that office explains, SECL administers activities pursuant to Policy 5215 through a reservation system to which all student organizations have access. *Id.* ¶ 14. Reservations "are free of charge" and "provided without regard to the content of the proposed informational activity on a first come, first served basis." *Id.* ¶ 14; see also Sparks Decl. ¶¶ 10–11 (describing similar prior practice). Accordingly, the "approval" required under Policy 5215 for students to engage in informational activities "is merely to make a reservation." Wagoner Decl. ¶ 14. "[T]here is no application process, and SECL does not exercise any discretion in deciding which [student organizations] will be permitted to use University spaces." *Id.* "If [the] desired location or date is not available, SECL staff will assist in selecting an alternative date or location for the proposed informational activity." *Id.*

As implemented by SECL, the administrative requirements that apply to informational activities under Policy 5215 serve to "facilitate[] and protect"—rather than curtail—free

---

[10] Plaintiff's complaint does not challenge or otherwise refer to Policy 5000, University Facilities Usage and Events. Any arguments regarding that policy are therefore not properly before the Court.

expression among all students and student organizations. Wagoner Decl. ¶ 15. Importantly, SECL processes student requests without regard to content or viewpoint. *Id.* ¶ 14. In applying Section 2.1.3 of Policy 5215, SECL confirms the location is available and then approves. *Id.* Because "[s]pace and resources on [c]ampus are limited and must be shared," SECL's registration system "ensures fair and equitable access"—"no matter the content of the planned speech"—by coordinating scheduling and other logistical details. *Id.* ¶ 15. "For the same reason, registration to engage in informational activities is limited to official organizations so that Virginia Tech's limited physical resources can be used for the benefit of the most students." *Id.*[11] The reservation requirement also allows SECL to protect and maintain communal spaces on campus and "hold[] [student organizations] accountable for . . . litter" and any other damage resulting from their informational activities. *Id.*

SECL's reservation system also facilities student expression by ensuring the safety and security of all involved. By confirming and approving space availability, pre-registration allows students engaged in expression to "access high-traffic areas of [c]ampus without impeding student movement (for example, by blocking the exits to busy classrooms) or invading student living spaces (for example, soliciting door to door in residence halls)." Wagoner Decl. ¶ 15. And where an activity may implicate safety concerns or other student needs, registration through SECL alerts the university in advance so that any necessary arrangements can be made. *Id.*

      2.     Plaintiff's challenge to Policy 5215 fails on both the facts and the law.

      a.     On the facts: The record does not support plaintiff's claim of threatened enforcement. Although plaintiff insists that Virginia Tech "threatens to discipline" students under Policy 5215, Mem. 21–22, that is simply not the case. As with any university policy,

_____

[11] The process to form a new registered student organization is not burdensome or content-based, and students may also create informal groupings. Wagoner Decl. ¶¶ 4–5.

student discipline under Policy 5215 would be referred to and adjudicated by Student Conduct. See McCrery Decl. ¶¶ 6, 23; Wagoner Decl. ¶ 16. In the past six years, however, "SECL has not referred *any* cases to Student Conduct for violations of Policy 5215." Wagoner Decl. ¶ 16 (emphasis added). The Director of Student Conduct likewise confirms that "Student Conduct does not seek to charge students with failing to observe rules and regulations related to informational activities out of respect for the students' First Amendment rights," and that she is "not aware of any Student Conduct charges related to Policy 5215 in the past 4 years." McCrery Decl. ¶ 23. Plaintiff's discipline-based theory therefore cannot support a preliminary injunction.

b.     Plaintiff likewise fails to establish any likelihood of success as a legal matter because Policy 5215's informational activities provision is a reasonable, content-neutral "time, place, or manner" restriction of the kind that have long been upheld. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Under SECL's registration system, student requests are approved so long as space is available, and SECL does not review or otherwise consider the content of any proposed informational activities in processing student requests. See *supra* at 30; accord Wagoner Decl. Ex. BB at 5 (describing requirements under Policy 5215 as "limit[ing]" certain activities "in regards to time, place and manner"). By coordinating reservations in this way, the SECL system serves the interests of both facilitating student expression and "providing a productive living, learning, and working environment for students and employees." Wagoner Decl. Ex. BB at 1. Especially in the context of a university campus the size of Virginia Tech, requiring students to use a content-neutral administrative process to reserve space prior to distributing literature or petitioning for signatures on campus is a far cry from the unconstitutional censorship imposed by a true prior restraint. See *Glover v. Cole*, 762 F.2d 1197, 1202 (4th Cir. 1985) (acknowledging college policy allowing student groups to solicit on campus

"upon prior written approval" was reasonable "time, place, and manner restriction[] on the use of the campus"); see also *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (acknowledging "a university's authority to impose reasonable regulations compatible with [its educational] mission upon the use of its campus and facilities").[12]

Nor does SECL apply Policy 5215 in a way that unconstitutionally "favors some speakers over others." Mem. 21–22. The fact that SECL's registration system is limited to registered student organizations does not block students with certain viewpoints from engaging in informational activities. So long as they satisfy basic administrative requirements, any group of students may form a new registered student organization, and SECL "make[s] no content-based decision with regard to recognizing" new organizations. Wagoner Decl. ¶ 4. Even so, "speaker-based" restrictions "are not automatically content based or content neutral," *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019), and only raise constitutional concerns when the "speaker preference reflects a content preference," *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 170 (2015). Plaintiff cannot identify any such preference here.

Finally, SECL does not operate Policy 5215 with "unbridled discretion." Mem. 21. The only approval students need to engage in informational activities is to make a reservation, and SECL does not exercise *any* discretion in processing student requests. *Supra* at 30. Plaintiff has failed to offer any evidence to the contrary and is therefore unlikely to succeed on this claim as well. See *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (holding that policy of "allocating space" on a "straightforward first-come, first-served

---

[12] To the extent a student believed SECL had denied a reservation on the basis of the content of any proposed speech, Policy 5000 provides a process for reconsideration and appeal of that decision. See Wagoner Decl. Ex. CC at 7.

system" was "not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation").

*      *      *

For all of the reasons explained above, plaintiff has failed to make the "clear showing" of likelihood of success on the merits that is required to obtain a preliminary injunction. *Winter*, 555 U.S. at 22. But to the extent any of plaintiff's claims even raise a close call—which they do not—the specific type of injunction requested here weighs further in favor of Virginia Tech.

Where a plaintiff seeks an injunction that is "mandatory rather than prohibitory in nature," the standard for granting relief is even higher. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). By contrast to a traditional "prohibitory" injunction that would "maintain the status quo . . . while a lawsuit remains pending," a "mandatory" injunction sweeps more broadly than restoring the parties to the same position they were in before the dispute arose. *Id.* Because "mandatory injunction[s]" are "disfavored," a plaintiff's "right to relief must be indisputably clear" for a court to enter that type of order. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:20-CV-98, 2020 WL 1844791, at *9 (E.D. Va. Apr. 10, 2020) (internal quotation marks and citations omitted); see also *RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-CV-00066, 2018 WL 3244413, at *4 (W.D. Va. July 2, 2018) ("Mandatory preliminary injunctions generally do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.").

Here, the relief that plaintiff seeks is mandatory rather than prohibitory in nature. Nowhere does plaintiff contend that any recent changes to university policy have materially affected the rights of its members or interfered with speech or activity in which those members were previously engaged. Cf. *League of Women Voters of N. Carolina v. North Carolina*, 769

34

F.3d 224, 236 (4th Cir. 2014) (lawsuit sought "prohibitory injunction seeking to maintain the status quo" where plaintiffs filed suit to block a new statute "on the very same day" the bill was "signed into law"). The breadth of the injunction plaintiff seeks underscores its mandatory nature: instead of asking the Court to allow Students A, B, and C to continue doing something they were already doing before, plaintiff requests an injunction blocking all four pre-existing policies across the *entire* university. See Dkt. 4-7 (proposed order). Such an exceptionally broad injunction would necessarily "alter the status quo," *League of Women Voters*, 769 F.3d at 236— not just for these three individuals, but potentially for anyone affiliated with Virginia Tech.

To be sure, longstanding policies may be enjoined where they are found to violate the Constitution. But whether a plaintiff is entitled to "temporary relief *before* trial of the type that can be granted permanently *after* trial" is a different question altogether. *Accident, Inj. & Rehab., PC v. Azar*, 943 F.3d 195, 201 (4th Cir. 2019). And where preliminary relief would do more than going back to how things were at some earlier point in time, the plaintiff's right to that type of mandatory injunction must be all but certain. See *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000) ("[I]f there is doubt as to the probability of plaintiff's ultimate success, a request for preliminary mandatory relief must be denied."). Because the injunction plaintiff seeks here would create an entirely new state of affairs on the Virginia Tech campus, plaintiff carries an extremely heavy burden that it has not come close to satisfying.

### III. Plaintiff is not entitled to a preliminary injunction

Even if plaintiff were able to overcome all of these hurdles, the current motion should still be denied for the independent reason that plaintiff has failed to satisfy the other requirements for a preliminary injunction. Although plaintiff insists that likelihood of success on the merits "necessarily satisfie[s]" the requirements for a preliminary injunction (Mem. 22), the Supreme Court has specifically rejected collapsing the standard in that way. Because "[a]n injunction is a

35

matter of equitable discretion," the Court has explained that such relief "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. These principles apply with full force in cases that allege violations of the First Amendment. See *Bruce & Tanya & Assocs., Inc. v. Board of Supervisors of Fairfax Cty., Va.*, 355 F. Supp. 3d 386, 399 (E.D. Va. 2018) (noting in a free speech case that "[a] preliminary injunction is an extraordinary remedy never awarded as of right"), aff'd, 2021 WL 1854750 (4th Cir. May 10, 2021).

Here, plaintiff has failed to show that any of the non-merits factors weigh in its favor. The record does not support a finding of irreparable harm, and equitable considerations weigh decisively against the broad and potentially dangerous injunction plaintiff seeks.

### A.  On this record, plaintiff has failed to establish irreparable harm

Plaintiff's burden on this point is a not a trivial one. The mere "possibility" of irreparable harm is not enough—for the Court to issue a preliminary injunction, it must find that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22; accord *Holbrook v. University of Virginia*, 706 F. Supp. 2d 652, 655 (W.D. Va. 2010) ("A plaintiff may no longer succeed by merely showing that a possibility of irreparable injury exists."). The sparse evidentiary support plaintiff has offered here comes nowhere close to meeting that standard, especially where that record does not support any finding of injury for the purposes of Article III. *Supra* at 12–17. Nor does plaintiff explain why judicial relief is necessary to prevent irreparable injury *now*, when all of the challenged policies have been in effect for at least an entire school year (if not much longer). See *Equity in Athletics*, 504 F. Supp. 2d at 100–01 (noting that delay between change in policy and filing suit weighs against finding irreparable harm).

What is more, plaintiff's only evidence of ongoing injury comes in the form of three anonymous declarations signed by individuals who claim to be students at Virginia Tech as of April 2021. Without more information, however, there is no way for this Court to conclude that

36

any of those individuals have suffered—much less will continue to suffer—any alleged harm. Accord *Doe v. Merten*, 219 F.R.D. 387, 390 (E.D. Va. 2004) (noting "long-standing common law presumption of openness in judicial proceedings"). Nor has Virginia Tech been able to verify the enrollment status or any other information about the individual members on whose behalf plaintiff has sued. Even if the declarations were accurate when submitted, things may have changed: Student B, for example, claims to have been "a senior" in April 2021, which means that individual probably graduated during commencement earlier this month. Student B Decl. ¶ 1. Because this record cannot verify plaintiff's "claim of future injury," the equitable remedy of an injunction "is unavailable." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); see also *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations.").[13]

### B. The balance of equities and public interest also weigh against a preliminary injunction

Plaintiff has also failed to establish that the balance of the equities tips in its favor or that an injunction is in the public interest. Before issuing a preliminary injunction, a court must "consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24, and "pay particular regard for the public consequences in employing th[at] extraordinary remedy," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Even when some degree of injunctive relief is appropriate, moreover, a court must ensure that it is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Roe v. Department of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (internal quotations and citation omitted).

---

[13] In an attempt to resolve this issue, undersigned counsel requested that plaintiff disclose the identities of their anonymous members under any confidentiality arrangement of plaintiff's choosing. Plaintiff specifically declined to do so.

The breadth of the relief plaintiff seeks here is staggering. Plaintiff requests that—before any of its claims have been adjudicated on the merits—this Court enjoin the university from "taking *any* action" to enforce four separate policies. Dkt. 4-7 (emphasis added). But plaintiff's request does not stop there. Beyond the specific policies themselves, plaintiff also asks the Court to enjoin Virginia Tech from "investigating" or "logging" any potential misconduct that might implicate bias and therefore fall under BIRT—which would arguably include obvious policy violations and even unlawful activity. *Id.*

Granting plaintiff's motion would severely undermine Virginia Tech's ability to fulfill its "obligation[] not only to protect their students' free expression, but also to protect their students." *Abbott*, 900 F.3d at 173. Unfortunately, the university's "compelling interest in maintaining a school environment free from illegal discrimination and harassment," *id.* at 172, has only grown in the wake of the COVID-19 pandemic and national conversations about racial justice, see, *e.g.*, McCrery Decl. ¶ 12. Enjoining Virginia Tech from enforcing these polices while this case is pending hardly benefits the university community or the public interest more broadly. Virginia Tech has provided the Court with significant evidence of its commitment to and success in facilitating a free and robust exchange of ideas on campus, see, *e.g.*, Wagoner Decl. ¶¶ 6, 9, 10, 12, and its thoughtful approach to mitigating instances of bias, see, *e.g.*, Hughes Decl. ¶¶ 6–17; McCrery Decl. ¶¶ 11–18; Blythe Decl. ¶¶ 7, 9, and plaintiff's motion should be denied.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated: May 21, 2021

Respectfully submitted,

**TIMOTHY SANDS**

By:    */s/ Jessica Merry Samuels*
        Jessica Merry Samuels (VSB No. 89537)
        *Deputy Solicitor General*

Mark R. Herring
  *Attorney General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Michelle S. Kallen (VSB No. 93286)
  *Deputy Solicitor General*

Samuel T. Towell (VSB No. 71512)
  *Deputy Attorney General*

Kendall T. Burchard (VSB No. 95710)
  *John Marshall Fellow*

Jacqueline C. Hedblom (VSB No. 68234)
Blaire O'Brien (VSB No. 83961)
  *Assistant Attorneys General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

Kay Heidbreder (VSB No. 22288)
  *University Legal Counsel and
  Senior Assistant Attorney General*

M. Hudson McClanahan (VSB No. 46363)
  *Associate University Legal Counsel and
  Assistant Attorney General*

Kristina J. Hartman (VSB No. 92279)
  *Associate University Legal Counsel and
  Assistant Attorney General*

University Legal Counsel
236 Burruss Hall (0121)
800 Drillfield Drive
Blacksburg, Virginia 24061
(540) 231-6293 – Telephone
(540) 231-6474 – Facsimile
heidbred@vt.edu
hud3@vt.edu
kjhart06@vt.edu

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel who have appeared.

By:   ___*/s/ Jessica Merry Samuels*___
      Jessica Merry Samuels
      *Deputy Solicitor General*
      Office of the Attorney General
      202 North Ninth Street
      Richmond, Virginia 23219
      (804) 786-6835 – Telephone
      (804) 371-0200 – Facsimile
      solicitorgeneral@oag.state.va.us