Speech First, Inc. v. Sands 7:21cv203 7/9/21

1                    UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF VIRGINIA
2                       ROANOKE DIVISION

3    ****************************************************************

4    SPEECH FIRST, INC.,           CIVIL CASE NO.:  7:21CV203
                                   JULY 9, 2021  9:01 a.m.
5                                  VIA ZOOM
            Plaintiff,             PRELIMINARY INJUNCTION HEARING
6    vs.

7                                  Before:
     TIMOTHY SANDS, et al.,        HONORABLE MICHAEL F. URBANSKI
8                                  UNITED STATES DISTRICT JUDGE
            Defendants.            WESTERN DISTRICT OF VIRGINIA

9    ****************************************************************

10   APPEARANCES:

11   For the Plaintiff:   JOHN MICHAEL CONNOLLY, ESQUIRE
12                        Consovoy McCarthy PLLC
                          1600 Wilson Blvd, Suite 700
13                        Arlington, VA 22209
                          703-243-9423
14                        mike@consovoymccarthy.com

15                        CAMERON THOMAS NORRIS, ESQUIRE
16                        Consovoy McCarthy PLLC
                          1600 Wilson Blvd, Suite 700
17                        Arlington, VA 22209
                          703-243-9423
18                        cam@consovoymccarthy.com

19

20

21

22
     Court Reporter:   JoRita B. Meyer, RPR, RMR, CRR, FOCR
23                     210 Franklin Road, S.W., Room 540
                       Roanoke, Virginia  24011
24                     540.857.5100, Ext. 5311
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   APPEARANCES CONTINUED:

2   For the Defendants:   JESSICA MERRY SAMUELS, ESQUIRE
                          Office of the Attorney General
3                         202 North Ninth Street
                          Richmond, VA 23219
4                         804-786-6835
                          jsamuels@oag.state.va.us
5
                          BLAIRE HAWKINS O'BRIEN, ESQUIRE
6                         Harman, Claytor, Corrigan & Wellman, P.C.
                          P.O. Box 70280
7                         Richmond, VA 23255
                          804-622-1103
8                         bobrien@hccw.com

9                         KAY KURTZ HEIDBREDER, ESQUIRE
                          University Legal Counsel, Virginia Tech
10                        327 Burruss Hall (0121)
                          Blacksburg, VA 24061
11                        540-231-6293
                          heidbred@vt.edu
12
                          MARVIN HUDSON MCCLANAHAN, ESQUIRE
13                        Virginia Polytechnic Institute
                          and State University
14                        Associate University Legal Counsel
                          Spcl Assistant Atty Gen
15                        236 Burruss Hall (0121)
                          Blacksburg, VA 24601
16                        540-231-6293
                          hud3@vt.edu

17

18

19

20

21

22

23

24

25

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  (Proceedings commenced, 9:01 a.m.)

2          THE COURT:  Okay.  Good morning.  Can you hear me?

3          (All respond affirmatively)

4          THE COURT:  Okay.  Do we have everybody on the phone

5  that we need?

6          THE CLERK:  Yes, sir.

7          THE COURT:  Okay.  What I'd like to do is ask the

8  clerk to call the case.

9          THE CLERK:  Speech First, Incorporated versus Timothy

10 Sands, et al., Civil Action 7:21CV203.

11         THE COURT:  Okay.  Good morning, folks.  First thing

12 I want to say is if you are not speaking, I would like you to

13 mute yourself.  And the reason for that is because over the

14 course of the last year, as we've done Zoom hearings, the

15 connection is just a little better if folks are muted unless

16 they're speaking.  So that would be helpful to the Court.

17         Next, I would prefer that this hearing be in the

18 courtroom rather than by Zoom.  I guess it was scheduled by

19 Zoom and it just happened, but as I was thinking about it --

20 and I had a jury trial last week and we didn't have any issues

21 with folks with trying to do things back in the courtroom, so I

22 would have preferred that this be done in the courtroom, but

23 we're here now, and so let's do what we can do by Zoom.

24         I think I asked my law clerk to check with y'all to

25 see if you needed any evidence that needed to be put on; each

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   side said not, it's just a matter of argument.  So I'm happy to

2   hear from you today.

3         I've tried to read everything that was filed.  I

4   tried to review the cases out of the Sixth Circuit, the Fifth

5   Circuit, the Seventh Circuit, the Fourth Circuit, the Supreme

6   Court.  I tried to pay attention to those.  I have a number of

7   questions, both procedurally -- procedural and substantive.

8         I do want to mention one thing.  This is -- I don't

9   know who we have on the phone line.  We have the phone line so

10   the public can attend during the pandemic, and I just wanted

11   to, as I do from time to time, remind everyone who is on this

12   call and who may be calling in that, by standing order that I

13   issued as the chief judge of the district court issued on May

14   1, 2020, way back at the start of this pandemic, even though

15   the public is given remote access to judicial proceedings by

16   means of the telephone phone-in line, the Judicial Conference

17   of the United States does not allow courtroom proceedings to be

18   broadcast, televised, recorded, photographed for the purposes

19   of public dissemination.  That's Volume 10, Chapter 4, Guide to

20   Judiciary Policy.  And the Court just wants to remind everybody

21   that we have an official court reporter on the call.  The

22   official court reporter is going to be taking down the

23   transcript of this hearing.  It is the record of this hearing,

24   and the standing order of the Court precludes any other

25   recording or broadcast of these judicial proceedings.  And

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   that's standing order 2020-12.

2           Okay.  With that, we are here on a motion for a

3   preliminary injunction, and so I will hear first from the --

4   hear first from the plaintiff.

5           MR. CONNOLLY:  Thank you, Your Honor.  Michael

6   Connolly for the plaintiff, Speech First.

7           We're here today seeking a preliminary injunction to

8   enjoin five of Virginia Tech's policies that are infringing the

9   First Amendment rights of Speech First members who attend

10  Virginia Tech.

11          THE COURT:  How old are these policies?  One of

12  them -- the discriminatory one, I think, was passed in maybe

13  October of 2020, discriminatory and harassment policy, 1025.

14  What about the other policies, aren't some of those pretty old?

15  And in that regard, it gets to the procedural remedy you're

16  seeking here is a preliminary injunction, and it goes straight

17  to the -- if the policies have been around for a long time,

18  doesn't that affect the issue of irreparable harm?

19          MR. CONNOLLY:  So first of all, I don't believe the

20  policy has been around for a long time.  These are not sort of

21  moth-eaten statutes that --

22          THE COURT:  Well, the bias-related incidence policy

23  that you challenge dates from 2016.  The informational

24  activities policy, Section 5215, there was some suggestion that

25  it's been in force since at least 2014.  I think some of the

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   evidence that you cite in support of your preliminary

2   injunction motion talks about the number of bias complaints

3   over, you know, '17, '18, '19, '20, '21.  So doesn't that cut

4   against the notion of irreparable harm if these policies have

5   been around for a long time?  That's just -- the timing is an

6   issue I have a concern about.

7        MR. CONNOLLY:  The Supreme Court has been clear that

8   a deprivation of First Amendment rights is irreparable harm.

9   And I'm aware of no -- no case that somehow, you know, a

10  litigant sleeps on his or her First Amendment rights if this

11  student didn't challenge the policy, you know, day one of

12  entering the university.

13        THE COURT:  But you would agree with me, though, that

14  in terms of irreparable harm, the timing is important?

15        MR. CONNOLLY:  I actually wouldn't agree.  I would

16  say what's important is whether you are being -- a student here

17  is being denied their First Amendment rights.  I have been --

18  I'm aware of no case in which a Court held that a policy was

19  infringing on a student's or on any individual's First

20  Amendment rights, but the policy has been around for a long

21  time and, therefore, we don't have -- there's no irreparable

22  harm.  These students --

23        THE COURT:  No, but it goes to the issue of the

24  remedy you're seeking, because the remedy -- I mean, I get the

25  fact -- I get the fact that First Amendment rights are

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  critically important.  Okay?  I get that.  And I get what the
2  Supreme Court has said about that.  But you're seeking a
3  preliminary injunction, which is an extraordinary remedy, and
4  so there's a calculus that the Court has to go through to see
5  whether or not the claims in this case warrant the
6  extraordinary remedy of a preliminary injunction.  And I was
7  just wondering if the timing of these policies goes to that.

8         And because one of the things in your brief,
9  Mr. Connolly -- I think it was your reply brief, you mentioned
10  that these policies are either recently amended or that they're
11  new.  And I was simply asking, as a matter of fact, how old
12  these policies are, because I don't think that's clear enough
13  in the record.  And I want to make sure your brief is correct,
14  because you clearly state these policies were either new or
15  they're recently amended.  And I'm just trying to drill down on
16  what the facts are.

17         MR. CONNOLLY:  Sure.  So many of these policies were
18  recently amended.  However -- in the fall of 2020, let's say.
19  But many of these, I believe, are four or five years old, let's
20  say.

21         In each of the policies, at the back of the policies,
22  it shows the timeline of when they were first adopted and when
23  they were amended since then.  So when we say these were new or
24  recently amended, we're speaking more in the terms of, when
25  you're thinking of a credible threat of enforcement, that the

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  Supreme Court talked about -- I'm sorry, the Fourth Circuit

2  talked about in *Bryant*.  These are not 50-year-old statutes or

3  policies.

4          And just getting back real quickly to your point

5  about the urgency here, you know, the two students were -- who

6  are Speech First members, they're juniors.  They were juniors

7  when they filed the declaration; they're rising seniors.  If we

8  don't get a preliminary injunction, it is all but certain that,

9  by the time this Court has ruled or the Fourth Circuit has

10  ruled, they will have graduated.  And that's the type of

11  irreparable injury that the PI standard is designed to protect.

12          THE COURT:  In fact, one of your students, I think,

13  one of your three students, I think maybe Student B --

14          MR. CONNOLLY:  That's correct.

15          THE COURT:  -- was a senior when the suit was filed

16  but has, I guess, graduated now?

17          MR. CONNOLLY:  Correct, he's graduated.

18          THE COURT:  Okay.  I get that.  Let's talk about the

19  timing again for a minute.

20          MR. CONNOLLY:  Yes, sir.

21          THE COURT:  Because usually when the Court sees a

22  preliminary injunction motion, the parties want the Court to

23  act tomorrow.  Right?  You know, do something right now; that's

24  why it's preliminary, that's why it's an extraordinary remedy.

25          Does the fact that y'all have waited months and

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  months to brief this, does that cut against the notion that a

2  preliminary remedy is appropriate in this case?  Just another

3  aspect of the timing issue.

4          MR. CONNOLLY:  Sure.  We worked with the defendants

5  here to set up a schedule and we accommodated their schedule.

6  I believe that they asked for an extension and we agreed to it.

7  And it is the summer right now, so I think by the time -- you

8  know, we're happy -- our calculus was we're holding this

9  hearing; by the time the fall starts up, I think that's plenty

10 of time for the Court to make a ruling here.

11         THE COURT:  All right.  Fair enough.  Fair enough.  I

12 have one other question and then I'll let you get back to your

13 argument, Mr. Connolly.

14         MR. CONNOLLY:  I am happy to answer any questions,

15 Your Honor.

16         THE COURT:  Sure.  You say you challenge five

17 policies, right?  Should the Court's analysis be sort of

18 overall, or should the Court's analysis be policy by policy?

19 How do you think the First Amendment and the preliminary

20 injunction remedy that we're at requires the Court to assess

21 this?  I mean, should I -- should the Court consider it as sort

22 of a group, or should I take it policy by policy, just in terms

23 of how I should structure my analysis?  I'd be interested in

24 your thoughts.

25         MR. CONNOLLY:  Sure.  So some of the policies overlap

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   and some of them are -- have sort of unique aspects to them.

2   So, for example, the acceptable use standard.  The acceptable

3   use standard, this is the computer policy that prohibits

4   e-mails made for partisan political purposes.

5           Shortly after we filed suit, the university

6   eliminated this policy, and they're now claiming that this

7   policy is moot.

8           THE COURT:  But they didn't -- according to your

9   reply brief, they didn't eliminate another part of the policy

10  that you challenge.

11          MR. CONNOLLY:  That's correct.  So we have -- so --

12          THE COURT:  That one sort of overlaps with Policy

13  1025, doesn't it?

14          MR. CONNOLLY:  The acceptable use standard -- there's

15  two parts of the computer policy: the acceptable use policy and

16  then the policy 7000, which prohibits e-mails that others find

17  to cause unwarranted annoyance.

18          So if you want to think of buckets here, there's the

19  mootness bucket, which only applies to acceptable use standard;

20  there's standing, which the university says applies to all

21  five; and the one that has a unique wrinkle to that, I think,

22  is the Bias Response Team, which I'm happy to address.  And

23  then the third bucket is the merits of all this.  And those are

24  similar but they are unique.  There are unique aspects to each

25  of those.  One of them is a prior restraint.  One of them is

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  viewpoint-based.

2          So I'm happy to sort of start walking through each

3  bucket, if that would be helpful and a logical way to address

4  this, I think.

5          THE COURT:  Well, I've got those three points written

6  down on my notes in front of me, so I think it would be helpful

7  for you to go forward and address it.  That's how I've been

8  trying to think about it, Mr. Connolly, and I appreciate if you

9  want to just walk through your argument, I will be happy to

10  hear it.

11          MR. CONNOLLY:  Perfect.  Happy to do it.

12          So the first bucket is mootness.  So the acceptable

13  use standard prohibits e-mails made for a partisan political

14  purpose.  That was the provision we challenged.

15          Shortly after -- shortly after we sued, Virginia Tech

16  amended that policy to eliminate it.  They say it's now moot.

17          That's wrong.  Under Supreme Court and Fourth Circuit

18  precedent, a defendant has a formidable burden of showing that

19  it is absolutely clear that this will never happen again.  And

20  under the Fourth Circuit precedent, *Porter* and *Wall*, if the

21  government official retained the ability to revert to the old

22  policy, then they cannot show mootness.  And that's exactly

23  what we have here.  There's a policy --

24          THE COURT:  Okay.  I was thinking about this last

25  night.  When I was taking my trashcan out, I was thinking about

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  this.  And I understand that argument, you know, the argument

2  that you don't eliminate the need for injunctive relief simply

3  because the government changes its policy when the government

4  can go back and change it back, right?  I understand that

5  argument and I understand the legal principles there.

6       But what about in the context of this case, when what

7  you're seeking is a preliminary injunction?  Because right now

8  the issue of the partisan political e-mails, Virginia Tech has

9  said that only applies to employees, that does not apply to

10 students.  And so you're seeking a preliminary injunction and

11 you want me to enjoin something that Virginia Tech is not now

12 doing.

13      Doesn't your argument apply to issue a permanent

14 injunction?  How does it fit within the rubric of a preliminary

15 injunction?

16      Because, for example, let's say Virginia Tech

17 decided -- let's say I deny preliminary injunction on this,

18 saying it's moot.  Okay, Mr. Connolly?  And then Virginia Tech

19 tomorrow changed its mind.  Well, you can apply for a

20 preliminary injunction again because the case is still pending.

21      So does that argument make sense in the context of a

22 preliminary injunction versus a permanent injunction?  Again,

23 my thought about timing.

24      MR. CONNOLLY:  Right.  And I -- I recognize the

25 point, but as an initial matter, Virginia Tech hasn't made this

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  argument.  They've been thinking in terms of -- they've

2  structured the mootness argument on likelihood of success on

3  the merits, and they're saying it's moot.  And so what the

4  parties have been briefing is whether they're likely to succeed

5  on their argument that this is moot.

6          THE COURT:  Right.  But I get to think about what the

7  law requires, right?

8          MR. CONNOLLY:  That's true.  That's true.

9          THE COURT:  I get to think about the remedy and the

10 timing.  That's kind of my job.

11         MR. CONNOLLY:  Right.  And, again, and I think the

12 issue here is, again, can the defendant -- can the defendant

13 easily go back to this policy?  And if they can, then there's

14 really no harm in issuing the preliminary injunction.  Because

15 if they're swearing they're not going to uphold this or to

16 start enforcing this, then there's no harm in going ahead and

17 issuing the PI, if you conclude that this case is not moot.

18         And there's a case -- I don't have it at my

19 fingertips but I can track it down for you -- that stands for

20 this principle.

21         THE COURT:  Yeah, I'd be interested in that mootness

22 notion in the context of a preliminary injunction versus a

23 permanent injunction.  I certainly get your argument and

24 understand your argument with regard to the notion of a

25 permanent injunction, but here we are at a preliminary

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  injunction, no depositions have been taken, there's no

2  evidence -- I mean, the defense has put in a ton of evidence by

3  way of affidavit.  Your evidence is limited to the verified

4  complaint and the declarations that have been filed.

5         And so I just was curious about that.  Again, I'm

6  sorry I interrupted your argument.  Go ahead.

7         MR. CONNOLLY:  Not at all.  Not at all.  And after --

8  after Virginia Tech speaks, I have a case that I think will be

9  helpful for this and I'll provide it for you; I'll track it

10  down.

11         But, again, so why they meet the mootness standard is

12  -- or why they cannot meet the mootness standard is that

13  Virginia Tech admits in its declaration a single person can

14  change this policy, just like that.  This is not like a statute

15  or, you know, adopting a new rule with notice and comment.  A

16  person could, you know, change it tomorrow.  And that's exactly

17  the type of issue where the Fourth Circuit has held there is no

18  mootness.  *Wall versus Wade* is right on point here.

19         Next turning to the standing arguments.  So for

20  standing, we need to make two showings.  First we need to show

21  that the policies arguably cover the speech that we want to

22  engage in.  And second, we need to show that there's a credible

23  threat of enforcement.  We can make both showings here.

24         First, the speech that our students want to engage in

25  is all arguably covered by the policies here.  Some of these

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  are really easy.  The acceptable use standard prohibits

2  partisan political e-mails.  Our students say they want to send

3  those.

4         Policy 5215 prohibits passing out literature and

5  gathering signatures without prior approval and support from a

6  registered student organization.  Our students say they want to

7  do that.  Those are easy.

8         The other ones --

9         THE COURT:  Well, I don't know, isn't that just a

10  time, place, or manner restriction with regard to the -- you

11  know, with regard to the informational activities policy, 5215,

12  isn't it just a reasonable time, place, or manner restriction

13  for Virginia Tech to say, look, if you're going to conduct

14  activities on our campus, you just need to sign up, reserve a

15  room, and it's got to be through a government -- a student

16  organization that is registered with the university?  Isn't

17  that really not First Amendment prohibition on speech but a

18  reasonable time, place, or manner restriction?

19         That's what defendants argue.  So what do you have to

20  say about that, Mr. Connolly?

21         MR. CONNOLLY:  So it's possible they could have

22  drafted a policy that complies with the First Amendment here,

23  but they didn't.  All of those things you mentioned, none of

24  that is in the policy.  They're bringing all of that in through

25  a declaration, where they say, we'll give this to people on a

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   first come, first serve basis; we don't discriminate based on

2   content.  None of that is in the policy at all.

3        And the case we cited from the Seventh Circuit,

4   *Weinberg versus City of Chicago*, is right on point here.  So

5   prior restraints -- what the Supreme Court has been clear on is

6   that in order for it not be an unconstitutional prior

7   restraint, you need to put things in the guidelines or in the

8   policies, in the statutes, that cabin the discretion.  It's

9   not -- you can't get away with coming back and saying, don't

10  worry, we do everything fairly.  You need to put it in a

11  policy.

12       And, frankly, I'm a little -- it's a little confusing

13  why, while they were already at amending these policies, they

14  didn't just go ahead and fix some of these statutes, but --

15       THE COURT:  Well, they're not statutes, they're

16  policies, but --

17       MR. CONNOLLY:  I apologize.  Yes, policies.

18       THE COURT:  I understand the analysis.  And your

19  point applies to several of these in terms of not just this

20  policy, but your point says, hey, look, the policy says this,

21  but Virginia Tech says this is actually how we interpret it.

22  And your point is, I've got to look at the policies themselves,

23  right?

24       MR. CONNOLLY:  That's exactly right.

25       The case of *United States versus Stevens* from the

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  Supreme Court, the government isn't allowed to draft a

2  sweeping, broad statute or policy and say, hey, don't worry, we

3  enforce this responsibly.  That's not how Courts analyze the

4  First Amendment.

5         And Policy 1025 is another good example of this.

6  That policy prohibits -- all it says is it prohibits hostile

7  speech and speech that is -- could unreasonably interfere.

8         And through a declaration, Virginia Tech tries to

9  bring in the *Davis* standard.  They say, hey, but don't worry,

10  we only apply this if it's severe, if it's persistent, if it's

11  pervasive.

12         But, again, none of that is in the policy, and so a

13  government can't save its statutes and its policies by saying,

14  hey, don't worry, we always act responsibly.  So --

15         THE COURT:  Well, you make that "and/or" argument

16  under *Davis*; you make it in your reply brief.  And didn't the

17  Fourth Circuit in *Abbott versus Pastides*, if I'm saying that

18  right, with regard to the University of South Carolina, didn't

19  it just flatly reject that argument?

20         MR. CONNOLLY:  It addressed that argument, but that's

21  not our primary argument, because none of that is in the

22  policy.

23         So in *Abbott* they were challenging a South Carolina

24  statute -- I apologize, a South Carolina policy, that contained

25  language similar to *Davis*.  But Policy 1025 does not contain

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  that language at all.

2          THE COURT:  How does STAF 6.24 compare with Virginia

3  Tech 1025?  Because the Fourth Circuit in a published opinion

4  has already said -- they denied a facial challenge to STAF 6.24

5  at the University of South Carolina.  So how does that compare

6  and what should I be thinking about when thinking about

7  Virginia Tech 1025, Mr. Connolly?

8          MR. CONNOLLY:  What you should be thinking about is

9  you should look at the Policy 1025 and think, why didn't

10  Virginia Tech incorporate the *Davis* standard?  Why didn't they

11  put in there that the harassment must be severe, pervasive,

12  persistent?

13          THE COURT:  Yeah, but South Carolina didn't verbatim

14  incorporate the *Davis* standard, as well, in STAF 6.24.  That's

15  the way I read *Abbott.*  And if I'm misreading it, let me know.

16          MR. CONNOLLY:  I believe --

17          THE COURT:  I'm looking at subheading (3).  It's the

18  same argument you make in your reply brief about, oh, well,

19  they didn't use "and," Davis says "and"; you know, you got

20  "severe, pervasive, and objectively offensive."

21          And in *Abbott* they said -- they say the university

22  defendants follow it, they -- and because of the way it's

23  written, there's no credible threat.  And, of course, that goes

24  straight to the injury-in-fact analysis.

25          So I'm sorry.  I keep asking you these questions, but

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  obviously I'm -- these are interesting and complicated issues,

2  and I'm just trying to wrap my arms around them.

3         MR. CONNOLLY:  By all means.  This is way more

4  interesting than me just speaking.

5         *Abbott* does include language similar to *Davis*.  The

6  definition of harassment in *Abbott* was that it needed -- it

7  needed to be sufficiently severe, pervasive, or persistent so

8  as to interfere with or limit the ability of the targeted

9  students to participate in or benefit from the program,

10  services, and activities provided by the university.

11         So *Abbott* did contain language that was very -- that

12  was close to what was said in *Davis*.  It didn't have the

13  "and/or" distinction, but the problem is, is that Policy 1025

14  does not have that at all.  And so when it doesn't have to be

15  severe, pervasive, persistent, all you're left with are these

16  vague terms about whether a policy -- you know, whether a

17  student feels something is hostile or whether a student feels

18  that it unreasonably interferes with their academic

19  environment.  And so that's really the big difference here

20  between *Abbott* and this case.

21         Again, Virginia Tech just, for some reason, decided

22  to make this standard far broader than the Supreme Court and

23  the Fourth Circuit have ever endorsed.  And that's why it

24  sweeps in all the speech.

25         The other thing, of course, that's a huge problem

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  with Policy 1025 is that it targets speech on the basis of
2  viewpoint.  So if you look at *R.A.V.* from -- R-A-V, from the
3  Supreme Court, what Policy 1025 does is it says speech that is
4  biased on the basis of race, gender, sexual orientation, gender
5  identity, that's not allowed; but other speech, other hostile
6  speech, is allowed.

7        And the Supreme Court in *R.A.V.* said you're not
8  allowed to do this sort of viewpoint discrimination.  And,
9  again, that's another huge problem.

10        THE COURT:  Isn't that just part of the issue about
11  the restriction must be narrowly tailored to achieve legitimate
12  government ends?  You know, because actually we're on the
13  merits now; we've left the issue of standing.  But, I mean,
14  isn't there an argument here that these policies -- that there
15  is a countervailing legitimate government interest here, and
16  that is to protect students on campuses from harassment and
17  intimidation and things like that?  And -- there's a legitimate
18  government issue, and that the -- as to merits, that this is a
19  narrowly-tailored policy that passes the strict screening test?

20        MR. CONNOLLY:  There's a case out of the Fourth
21  Circuit, I think it's against George Mason, that says you're
22  not allowed to do viewpoint discriminatory -- you're not
23  allowed to have a viewpoint discriminatory policy in order
24  to --

25        THE COURT:  Is this really -- is it really viewpoint

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   discrimination to say you can't engage in conduct that is --

2   that demonstrates bias or that discriminates against people on

3   the basis of their gender or their national origin or things

4   like that?  Is that really viewpoint -- is that a content-based

5   restriction?

6           MR. CONNOLLY:  Yeah, definitely.  Think of two types

7   of speech.  First you have speech, like one of our students

8   wants to engage in, that says he wants to be -- criticize the

9   Black Lives Matter movement and be critical of affirmative

10  action.  Now, that is -- and he wants to say "All Lives

11  Matter."  Now, that would be considered bias and harassment on

12  the basis of race, but someone else who wants to talk in favor

13  of the Black Lives Matter, who wants to talk in favor of

14  affirmative action, it's the exact same topic, that is not

15  bias, that is not harassment on the basis of race.

16          And so you've tied the hands -- there's the line from

17  *R.A.V.* about fighting the Marquess of Queensberry with one hand

18  behind your back.  That's what the university has done here,

19  and that's the type of viewpoint discrimination that's not

20  allowed under the First Amendment.  And that's a huge problem

21  with Policy 1025.

22          THE COURT:  All right.  Go ahead.

23          MR. CONNOLLY:  Turning back to standing again, as I

24  think I've sort of explained, we meet the first requirement:

25  that the policies arguably cover the type of speech that our

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  students want to engage in.

2          The second is the credible threat of enforcement.

3  Now, what the Fourth Circuit has said in *Bryant* and in *North*

4  *Carolina Right to Life* is that when you have a non-moribund

5  statute that facially covers expressive conduct, that that

6  statute -- that you have a credible threat of enforcement.  And

7  just recently in *Bryant*, what the Fourth Circuit called these

8  statutes were moth-eaten statutes or antique statutes.  And in

9  there, in *Bryant*, North Carolina argued that they hadn't

10 enforced an abortion statute in 50 years.  And the Fourth

11 Circuit still said this is not a non-moribund statute; you

12 therefore have a credible threat of enforcement.

13         Same thing here.  These aren't even close to what was

14 going on in *Bryant*.

15         The second point is that the university is in here

16 vigorously defending all of their policies.  And the Fifth

17 Circuit in *Fenves* made the same point.  It's a little odd for

18 them to say we have no plans to ever enforce these policies and

19 then come here and vigorously defend them on the merits.

20         For example, Section 5215, they say, oh, we'd never

21 enforce them, but then they have an extensive defense of them

22 on the merits.

23         The Eleventh Circuit's in its opinion in

24 *Wollschlaeger* makes the same point.

25         So what you have here is non-moribund statutes that

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  facially cover the type of speech we want to engage in, and the
2  university is here vigorously defending them; you have a
3  credible threat of enforcement.
4        With the Bias Response Team -- so those arguments I
5  just mentioned, those cover all the policies.  The Bias
6  Response Team has a slight wrinkle to it.
7        On the one hand, we have a definite history of
8  enforcement here because the types of speech that our students
9  want to engage in is regularly reported to the university, and
10  it's reported in Bias Response Teams all over the country.
11        Now, the university's primary argument about why we
12  don't have standing to challenge the bias response policy is
13  they say that the university lacks the explicit authority to
14  punish someone for biased speech.
15        But the Fifth Circuit's opinion in *Fenves*, the Sixth
16  Circuit's opinion in *Schlissel* explain exactly why that isn't
17  persuasive.  And it's because the government can chill speech
18  through implicit threats and implicit intimidation.  And that's
19  exactly how the Bias Response Team works.
20        Think about what the Bias Response Team does here.
21  It collects reports anonymously, like the police do.  They
22  encourage students -- they have posters that say:  "See
23  something, say something," like how the Department of Homeland
24  Security encourages people to report about terrorism.  They log
25  and they keep records of all the reports of bias they receive,

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  about all the students they receive.  They have a police

2  officer on the Bias Response Team.  They refer reports to the

3  police, and they refer reports to Student Conduct, which the

4  Fifth and the Sixth Circuit said was a huge problem.  They use

5  terms like "victim" and "perpetrator" to describe the person

6  who sees bias and the person who engages in the, quote, "bias

7  speech."  And the whole name of the policy suggests that

8  someone has been prejudged to be biased.  So -- and then

9  finally, they admit that their goal is to eliminate biased

10 speech.

11        So as the Fifth and Sixth Circuit explained, it's not

12 crazy for a student to look at all of this that is happening

13 and have their speech chilled.  The whole point of this is to

14 say:  We are watching you and you better not engage in this

15 type of biased speech.

16        And that's why we have standing to challenge this

17 policy.

18        THE COURT:  What about the Seventh Circuit's opinion

19 in *Killeen*?

20        MR. CONNOLLY:  So as an initial matter, we

21 obviously -- we are the plaintiff.  We obviously disagree with

22 the outcome, but --

23        THE COURT:  Yeah, but you were the plaintiff in the

24 Fifth and Sixth Circuit cases, too, right?  And you agree with

25 those outcomes.  So you just can't discount the Seventh

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  Circuit, right?

2          MR. CONNOLLY:  Well, the Fifth and Sixth Circuit

3  definitely got it right.

4          THE COURT:  Can I ask you a question?  Is the Seventh

5  Circuit's opinion in *Killeen* on appeal?

6          MR. CONNOLLY:  No.  That ended in a settlement.

7          THE COURT:  So that is not on -- no one sought cert.

8  to the Supreme Court?

9          MR. CONNOLLY:  We did not, no.  The parties reached a

10  settlement and dismissed the case.

11          THE COURT:  Okay.

12          MR. CONNOLLY:  But *Killeen* -- *Killeen* is

13  distinguishable.  One of the things the Seventh Circuit faulted

14  us for, that the Fifth and Sixth Circuit had no problems with,

15  but the Seventh Circuit faulted us for not including

16  declarations from our students about the specific speech they

17  wanted to engage in.

18          We obviously included that here to address the

19  concerns the Seventh Circuit had.

20          The Seventh Circuit also relied on evidence that the

21  vast majority of students at the University of Illinois did not

22  meet with -- rejected requests to meet with the Bias Response

23  Team.

24          And the university, Virginia Tech, Virginia Tech

25  hasn't put on similar evidence here.  So there are some

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  distinguishing factors here that explain what was going on in

2  the Seventh a little better.

3           So turning to the merits real quickly.  We have

4  addressed some of them.  One of the things I want to make sure

5  I don't forget to cover is Policy 1025, Virginia Tech makes

6  sort of an odd argument.  They say that we've challenged the

7  wrong policy.  But on the face of the documents, it applies to

8  students.  So the Code of Student Conduct incorporates Policy

9  1025, and it says a violation of Policy 1025 is a violation of

10 the student conduct, of the Code of Student Conduct.  And

11 Policy 1025 itself, on the face of the document, says that it

12 applies to harassment made by other students.

13          So apparently Virginia Tech might have a preference

14 to charge people with different provisions, that might be what

15 they're saying, but the face of these documents all say that

16 students can violate them.

17          And looking through my notes, I think I've addressed

18 the points that I wanted to get out in the opening.  I'm happy

19 to answer any questions or happy to turn it over to Virginia

20 Tech at this point, if you'd like.

21          THE COURT:  Okay, Mr. Connolly.  Thank you for that.

22          I'll be happy to hear from counsel for the

23 defendants, the many defendants -- I guess there's just one.

24 There used to be a lot, but now there's just one, right?  So

25 let's hear from counsel for the defendant, who is the president

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  of Virginia Tech.

2          MS. SAMUELS:  Thank you.  Good morning.  My name is

3  Jessica Samuels, and I'm here on behalf of Virginia Tech.  I'm

4  joined by my colleagues, Blaire O'Brien, Kay Heidbreder, and

5  Hud McClanahan.

6          THE COURT:  While we're introducing folks, you see

7  some other folks on the screen.  Let me just introduce them.

8          Amanda Lineberry is one of my term law clerks;

9  Garrison Ambrose, one of my term law clerks; and Emily

10  Chrisman, an intern I've got this summer.  Those are the other

11  three folks that you see on the screen, just so everybody knows

12  who everybody is.

13          Go ahead, Ms. Samuels.

14          MS. SAMUELS:  Thank you, Your Honor.

15          I'd just like to start with a framing for the Court,

16  which is that, in our view, this motion can be denied for three

17  entirely independent reasons, and so we think you have some

18  options about how you want to resolve it, and we hope deny the

19  motion.

20          The first of those is that none of the claims here

21  are justiciable under Article III.

22          The second is that, even if the Court had

23  jurisdiction, plaintiff has come nowhere close to carrying the

24  heavy burden of clearly showing likelihood of success on the

25  merits, which is the standard.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          And the third is that, even if you don't agree with

2     me on either of those, that the plaintiffs still have failed to

3     satisfy the other injunction factors.

4          So I think in terms of the decision tree, there are

5     three independent options, and we only need to win on one of

6     them.

7          In terms of specific arguments, Your Honor, I'd like

8     to pick up with, I think, two of the most important themes that

9     emerged from your discussion with plaintiff's counsel, and the

10    first one of those is that the timing does matter.  And the

11    second of those is that *Abbott* controls and, I think, dictates

12    the outcome here.

13         So if it's okay with you, Your Honor, I'd like to

14    start with the timing point because that's where you started

15    with plaintiffs.

16         To answer your question, the policies have been

17    around for a long time.  This question about when each kind of

18    comment was amended didn't come up until the reply brief and

19    then the supplemental authority filed on Monday of this week.

20    And so I'm happy to walk the Court through what we think the

21    record shows.  And if Your Honor would like more evidence on

22    that, we're also happy to submit it.

23         THE COURT:  I think Mr. Connolly makes a good point

24    when he says that -- you know, I looked at these policies and

25    they all kind of show the revisions in them.  And I, frankly,

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  yet have not drilled down on each revision to each policy

2  because there's so many policies that they challenge.  But the

3  one obviously that sort of jumped out was the change in the

4  acceptable use standard, the computer policy, which went from

5  applies to everybody, and then Virginia Tech said no, no, no,

6  it was never intended to apply to students, and you took the

7  partisan political aspect out of that.

8       So I'm sorry.  What about Mr. Connolly's point,

9  though, that, look, sure, timing matters, but this is the First

10 Amendment, you know, this is important, this is freedom of

11 speech, this is the First Amendment, right?  The First

12 Amendment, and this is really important, and the Supreme Court

13 has said that it's irreparable harm if speech is chilled.  What

14 do you say to his argument?  He makes a good point.  What do

15 you say to his argument there?

16       MS. SAMUELS:  Well, we have several responses to

17 that, Your Honor.  First of all, Virginia Tech agrees that the

18 First Amendment is important, and that's why the university

19 works so hard to protect and facilitate and foster student

20 speech.  I think that's the point of a lot of these policies.

21       The other point is when it goes to the timing of it,

22 that Speech First may be entitled -- which we, of course,

23 dispute -- but that they may be entitled to a permanent

24 injunction once we've had a chance to litigate this, not on a

25 compressed timeline over the summer, is an entirely different

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   proposition than whether they're entitled to what the Supreme

2   Court has consistently described as an extraordinary remedy

3   before the fact and before we've adjudicated it.

4          But to your question, Your Honor, about when the

5   policies have been around, you can go through and you can look

6   at those revisions, and I agree it's tedious, but we've done it

7   for you and I'm happy to tell you what we found.  And the

8   provisions that are specifically challenged here have all been

9   in effect in substantially the same form -- I'm talking about

10  the university-wide policies -- for at least nine years,

11  meaning the entire time that these anonymous members claim to

12  have been enrolled.  And the question now is, well, they're

13  juniors and they're about to graduate, but if they were so

14  restrained by these speech codes, they were perfectly free to

15  file this motion, and they didn't.

16         The other point, Your Honor, is this suggestion

17  that --

18         THE COURT:  They were probably scared to file one

19  when they were freshman.  They were focusing on that, right?

20         MS. SAMUELS:  I agree with that, Your Honor.

21         THE COURT:  I want you to argue that, but I want you

22  to go and answer a question I asked Mr. Connolly, and that is

23  this:  In terms of my analysis in looking at these policies,

24  should I think globally, or do I need to look at them policy by

25  policy?  I mean, there's a number of discrete policies here.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  How do you think the Court should go about looking at this

2  issue?

3          MS. SAMUELS:  I have a couple of answers to that,

4  Your Honor, which is I think you need to do both under the law.

5  I think -- as a matter of the equitable remedy of an

6  injunction, I think both the law requires and plaintiffs have

7  framed their argument as a collective, as I'm a student at

8  Virginia Tech and I'm unreasonably restrained from speaking my

9  mind at this general level.

10          I also think that equitable relief injunction looks

11  to, you know, balance in equities and weighing the harms and

12  the public interest, and I think all of that requires a

13  collective assessment.

14          And so I think, in terms of the remedy, and I think

15  in terms of standing, that that is also a collective

16  assessment.  Because to show standing, plaintiffs have to show

17  an objective chill, meaning their speech is being chilled in a

18  way a reasonable person would fear speaking out.  And I think

19  that's also a collective assessment about, you know, if the

20  student were to speak their mind the way they claim they wish

21  to, what reasonable consequences might flow from that?

22          THE COURT:  Right.  It isn't a subjective test, it's

23  objectively reasonable, credible threat of chilling speech,

24  right?  That's the standard?

25          MS. SAMUELS:  That's right, Your Honor.  And I think

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   that means that when we look at the factual record here, even
2   if you credit plaintiff's subjective fears, which is all of the
3   evidence that they've offered, that doesn't carry the day
4   because they have to show an objective chilling effect.

5          And so on that score, Virginia Tech's factual
6   evidence here is unrebutted because you can't even credit
7   plaintiff's assertions, which, of course, you don't have to.
8   We're on a preliminary injunction, not a motion to dismiss, but
9   it's still not enough.

10          The reason, Your Honor, I think you --

11          THE COURT:  The plaintiff bears the burden.

12          MS. SAMUELS:  That's right, the plaintiff bears the
13   burden, and the legal standard is an effective one.

14          The reason I answered both, Your Honor, and I think
15   you might need to go by policy by policy, is if you are going
16   to get into the merits of which of these policies do what and
17   enjoin some of them and not others, which again we ask that you
18   not, I do think that's a very important and discrete question
19   about what is each policy actually doing, how is it actually
20   supposedly violating the First Amendment, and what authority
21   does the Court have to enjoin it on a university-wide basis,
22   which just to put it in perspective, would affect 40,000 people
23   in the university community.  And so I think while I say you
24   need to look at --

25          THE COURT:  On the other hand, to the extent these

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  folks feel chilled from making comments, that affects 40,000

2  people too.  I mean, you know, it affects both sides.  I mean,

3  they have First Amendment rights.

4          MS. SAMUELS:  Of course, Your Honor.  But feeling

5  chilled is not the same as a legally cognizable objective

6  chilling effect.  And I think that's maybe the most important

7  point I'd like to make about standing.

8          THE COURT:  All right.  Let me ask you this question.

9  You talk about, you know, we need to go to -- the Court should

10  only assess the merits after a factually developed record at

11  trial, right?  This issue is not ever getting to trial because

12  if I don't grant a preliminary injunction or if I do grant a

13  preliminary injunction, one of y'all is running off to the

14  Court of Appeals.  Right?  That's what happened in the Fifth

15  Circuit, the Sixth Circuit, and the Seventh Circuit.  So don't

16  I need to drill down now based on the record that we have?

17          MS. SAMUELS:  I don't think so, Your Honor.  I think

18  in the Fifth and Sixth Circuit decisions, which I'd be happy to

19  talk about more at length, for right or wrong, but those courts

20  remanded and sent it back and said, district court, you were

21  wrong about standing -- again, we disagree -- but this needs to

22  go back for a full-fledged discussion on the merits.

23          And I wasn't privy to any of that.  But then they

24  settled, and so those cases were fully adjudicated.  Same with

25  the Seventh Circuit.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1      THE COURT:  So Fifth, Sixth, and Seventh have all

2  settled?

3      MS. SAMUELS:  That's correct, Your Honor.  I defer

4  to -- and Mr. Connolly likely knows more about that than that I

5  do, but my understanding from the public record is that is

6  true.

7      THE COURT:  Well, I think Mr. Connolly has been busy

8  on this issue.  And I got to tell you, this is a fascinating

9  issue that is -- that I've thought about and my law clerk and I

10 have been thinking about and it is a very interesting, a very

11 interesting issue, and I am going to want -- I don't want to

12 interrupt the flow of your argument, but I am going to want --

13 Ms. Samuels, you need to tell me why this Court shouldn't

14 follow the Fifth Circuit and the Sixth Circuit, because we have

15 two courts of appeals who have basically said your argument on

16 standing is wrong.  And I need to understand what your position

17 is there.

18     MS. SAMUELS:  Certainly, Your Honor.  The reason that

19 you shouldn't follow the Fifth and Sixth Circuits, Your Honor,

20 is that *Abbott* is controlling on this Court, and that I don't

21 know -- I cannot come up with a way to read the Fifth and Sixth

22 Circuit decisions that isn't in tension without it.  I think

23 that's the easiest way to explain it.

24     And to make it a little more concrete, the point

25 of -- the driving force of the *Schlissel* decision, which *Fenves*

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   then picks up on, is that this idea of referrals as punishment

2   is enough to satisfy the standing authority.

3           And in *Abbott*, the facts were even better for that

4   student than they are here, because in *Abbott* we have a very

5   similar policy, as Your Honor noted, a facial challenge -- same

6   thing as here -- and the student there received a letter

7   discussing potential charges of harassment and was required to

8   meet with the university officials responsible for adjudicating

9   that charge for 30 to 45 minutes.

10          And the student came to the Fourth Circuit with a

11  very similar argument and said:  How can I not be chilled by

12  having to have this meeting?  And the Fourth Circuit quite

13  simply said:  That's not enough, because the university policy

14  worked exactly the way it was supposed to.

15          The university got reports of potential problems,

16  looked into it, which the Court made a point that schools

17  aren't required to look into these allegations in the abstract,

18  nor would we want them to.  They defined why, why would the law

19  impose that on them?

20          And so when the school official there, which again

21  was the school official responsible for adjudicating that

22  potential charge, required the student to meet for 30 or 45

23  minutes and they didn't follow up, the Fourth Circuit said

24  that's not enough for standing and dismissed or wouldn't allow

25  the facial challenge to proceed.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          I think that's directly on point here, Your Honor.  I

2   think it is, in my view, in tension with the Fifth and Sixth

3   Circuit.  I think that's the way our system works sometimes.

4   And I think that the precedent that a 30- to 45-minute meeting,

5   which plaintiffs don't even claim here, the anonymous members

6   don't even claim, certainly they haven't been asked to do that,

7   but they don't anybody who has ever been asked to do that and

8   been afraid by it.

9          If it wasn't enough in *Abbott*, it can't be enough

10  here.  That's the point I --

11         THE COURT:  But isn't that -- isn't the other -- I

12  mean, sure, you make the point that they had this meeting in

13  *Abbott* and the organizers of this particular rally at the

14  University of South Carolina were questioned about certain

15  things, but didn't the Fourth Circuit focus on the fact that

16  after that meeting, the university said -- well, I mean, two

17  points from the Fourth Circuit opinion.  One, this speech was

18  allowed, this meeting was -- this rally, or whatever it was,

19  was allowed to happen; and then secondly, after the fact, after

20  this meeting where the university looked into it, they said,

21  we're not doing anything else, we're not taking any action.

22  And so the Fourth Circuit's opinion is kind of -- they say, "We

23  do" -- page 173, "We do not agree that school officials

24  confronted with harassment allegations are required to resolve

25  them in the abstract.  Nor does the First Amendment require

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  they assume no actionable harassment or discrimination without

2  first seeking relevant information.  And as this Court has made

3  clear, universities have obligations not only to protect their

4  students' free expression, but also to protect their students."

5      So is *Abbott* distinguishable because the university

6  in that case ultimately said, we are not taking any action on

7  that speech, and then here, in the case Mr. Connolly has

8  brought, there has been no such determination by the university

9  with regard to the speech that these students intend they want

10 to make?

11     MS. SAMUELS:  I think it's distinguishable, but in a

12 way that cuts in our favor, Your Honor, which is that there are

13 no actual concrete factual scenarios before you, because this

14 is a pre-enforcement challenge, where plaintiffs haven't

15 carried their burden on the standing.  And so if we had a

16 situation here where a student said something and the

17 university followed up with them, we, like *Abbott*, would have

18 kind of a factual record to look at there.

19     And the Court noted the oddness of there they brought

20 a filing of facial challenge.  I think that that doesn't need

21 to distract us too much, but the idea that plaintiffs can

22 manufacture their standing by saying, I'm afraid of speaking,

23 when they have nothing in the record to corroborate that or to

24 prove that it's effective, which again it's plaintiff's burden

25 here, it's an objective standard, and so I think, of course, in

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  *Abbott* there was a specific kind of event that happened and

2  there was a factual record developed on that, because we're at

3  an even earlier, even more preliminary, even more abstract

4  phase here, I actually think that weighs in favor of Virginia

5  Tech because what the plaintiff is asking this Court to do is

6  even less --

7      THE COURT:  Well, but isn't *Abbott* distinguishable

8  because what happened at the University of South Carolina was

9  that they were investigating, and the policy here, the BRT

10  policy here, isn't limited to just investigation, it talks

11  about education, and doesn't -- isn't that broader than what

12  the University of South Carolina -- isn't that policy about

13  the -- providing education to people engaging in this kind of

14  speech, isn't that broader than what the University of South

15  Carolina was doing it *Abbott*?  Isn't it distinguishable in that

16  regard?

17      MS. SAMUELS:  I don't think so, Your Honor.  But I

18  think this is where it's important to distinguish exactly what

19  policy we're talking about.  *Abbott* was about an

20  anti-harassment policy that under which students could be

21  disciplined and sanctioned, perhaps suspended, you know, any

22  other sanction that was listed.

23      The Bias Intervention and Response Team policy here

24  is separate from the Student Code of Conduct, which contains

25  the comparable anti-harassment policy.  But the Bias

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  Intervention Response Team is -- it is not a policy in the same

2  way; it is an organizing principle that allows the school to

3  consolidate pre-existing resources and pre-existing offices to

4  make sure that the university is responding in an efficient and

5  in a consistent way.  And so the Bias Intervention Response

6  Team is -- think of it as more like air traffic control.  It

7  didn't create anything new.  They're gathering on a weekly or

8  biweekly basis to figure out what different offices are seeing

9  and how to address reports that they've received.  And so

10 there's no disciplinary authority.  BRT has no authority to

11 discipline.  They have no authority to sanction.  And, in fact,

12 the Dean of Students, who oversees the --

13        THE COURT:  Yeah, but the BRT can refer -- I mean, I

14 understand it's not in the same chain of command and all that

15 stuff, but the BRT can refer complaints to the Code of -- to

16 the Code of Conduct for discipline, right?

17        MS. SAMUELS:  They can refer cases to Student

18 Conduct.  Whether it's for discipline or not would, of course,

19 would be up to the --

20        THE COURT:  Up to Student Conduct board, right?

21        MS. SAMUELS:  Yes, Your Honor.  But it's important to

22 know that's not a special prerogative of BRT.  That is anybody

23 can refer anything to Student Conduct any time.  You or I could

24 pick up the phone today and make a call to Student Conduct.

25 And so that doesn't give BRT any special authority.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          And we can see this in the record, actually.  This is
2   where I think the shockingly lopsidedness of the record is
3   helpful to us, where the idea that BRT is actively monitoring
4   or policing students is just not borne out in any of the
5   evidence that's been submitted.

6          Most of what BRT does is behind the scenes.  Students
7   don't even know about it.  It's meant to make things easier for
8   them, more streamlined.

9          And we can see where since 2017, there have only been
10  four referrals from BRT to Student Conduct for harassment that
11  potentially involved bias.  So we're talking since 2017 there
12  have only been four.  And three of them were joint referrals
13  with another office.  Only one was referred by BRT alone, and
14  none of those four actually resulted in a finding of
15  harassment.

16         And so the record just does not bear out any
17  suggestion that this is a frequent, ever-happening monitoring
18  by this super structure at the university.  It's exactly what
19  the Dean of Students says, Byron Hughes, in his declaration,
20  that the point of BRT, as a part of the Dean of Students
21  office, is to support students and help mediate conflicts and
22  help everybody get better outcomes as we all try to interact as
23  humans.

24         And so the idea that BRT is some kind of disciplinary
25  authority and/or, you know, takes any concrete action like that

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1    on a regular basis is just not accurate and certainly not

2    supported by the record.

3           THE COURT:  Would it be accurate for the Court to

4    think of BRT as sort of a clearinghouse, a gathering together

5    of folks from different areas around the university, different

6    departments, different -- to sort of consider together concerns

7    of harassment or bias or incidents that the wider university

8    community needs to be aware of?

9           MS. SAMUELS:  I think so, Your Honor.  And I think

10   that's -- I agree.  I think that's supported by the record.

11          Byron Hughes in his declaration explains that when he

12   changed the protocol from 2016 to 2019, that the reason he did

13   is because, under the prior system, the Dean of Students would

14   receive reports and unilaterally figure out what to do about

15   them, and when Mr. Hughes took over, what he's explained is

16   that he wanted to adopt a more collaborative way for all the

17   university offices to come together, and that's exactly why he

18   set this up -- I think a clearinghouse is exactly the way to

19   think about it -- in the protocol for 2019.

20          I really like the phrase he used, it's an air traffic

21   control, which is, I think, the same idea as Your Honor had.

22   It makes a lot of sense when you think about it.

23          You know, you hear about a dispute that two students

24   are having, and that could implicate residence life.  It could

25   implicate sorority and fraternity life.  It might involve, if

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   somebody needs an accommodation, you know, student services or
2   student disabilities might get involved.  And it makes sense
3   that the school wants to bring these people together to make
4   sure that the students are supported the best way they can be.
5   And where that doesn't add any new kind of policy violation or
6   discipline or authority or, you know, prerogative to view any
7   of that any different than anyone in the university, it's hard
8   to understand, one, how plaintiffs could have standing to
9   challenge it, but two, even if they did, how that could somehow
10  infringe on the First Amendment rights.

11         THE COURT:  What about the notion that Mr. Connolly
12  raised that is reflected in the Seventh Circuit's opinion in
13  *Killeen* that, well, most folks don't go to these voluntary
14  meetings anyway, they don't pay attention to them, and they're
15  voluntary?  If -- you know, as opposed to *Abbott*.  Mr. Abbott,
16  that notice of charge he got, even though they said we weren't
17  really ever going to charge him, but he did get a notice of a
18  charge.  That doesn't sound so voluntarily there.  How does
19  this -- I mean, Mr. Connolly said you can't really follow what
20  the Seventh Circuit did because there's no real chilling effect
21  there because nobody went to these meetings anyway.  How does
22  that compare -- how does what happened at the University of
23  Illinois compare to what happens with BRT at Virginia Tech?

24         MS. SAMUELS:  Your Honor, it's very similar in that
25  our evidence in the record says nearly exactly the same thing;

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  that students, when and if BRT contacts a student, students are

2  perfectly free to decline that invitation, it is a voluntarily

3  meeting.  And importantly, it comes from the Dean of Students.

4          THE COURT:  Where is that in the record?  Because, I

5  mean, we've looked for that, that issue about -- yeah, because

6  in the reply brief, that's one of the things that the

7  plaintiffs -- by the way, just as an aside for you lawyers, I

8  think the briefing in this case is very good.  I think the

9  brief filed by Virginia Tech is good, and the reply brief, in

10  particular, filed by the plaintiffs is thoughtful and very good

11  as well.  So I appreciate the work that y'all have done as

12  lawyers.

13          But anyway, the reply brief seems to suggest that

14  maybe that record evidence in -- that was there in the Seventh

15  Circuit is not present in this case.

16          MS. SAMUELS:  The nuance about what the specific

17  record evidence is here, what we have -- so in Mr. Hughes'

18  declaration, in paragraph 17, and in Ms. McCrery's declaration,

19  at paragraph 16, there's unequivocal record evidence

20  corroborated by two different administrators.

21          THE COURT:  I'm sorry.  What paragraph of Hughes?  I

22  have it in front of me.

23          MS. SAMUELS:  Yes, Your Honor.  Paragraph 17, on page

24  8.

25          THE COURT:  I have that.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1        MS. SAMUELS:  At the very bottom of that page, the

2    relevant section is that he says, "Invite them to engage in a

3    voluntary conversation."

4            And if you go to the top of the next page, it says,

5    "If a student fails to respond to this message or declines to

6    meet with our office, no further action is taken and the

7    student faces no consequences of any kind."

8            THE COURT:  Well, how does that square with

9    Mr. Connolly's point that, look, you've got to look at these

10    policies as they're written and not as Virginia Tech may -- may

11    interpret them, and not follow them to the letter?

12    Mr. Connolly says I can't focus on the history here, I've got

13    to focus on the text of the policies.

14            MS. SAMUELS:  Well, the first thing, Your Honor, is I

15    don't agree that Virginia Tech has introduced a bunch of

16    evidence that says you can ignore the policies because we don't

17    follow them to the letter.  I think that we do.  And if we

18    didn't, as evidenced by the change -- the acceptable use

19    standard, the university would make a change.  And policies

20    aren't worth anything if you don't follow them.  And so I don't

21    want to leave the Court with the impression that this is an

22    over-breadth case like the *Legend Night Club* case, where the

23    ordinance there was extremely broad and covered artistic

24    expression in addition to adult entertainment.  And I think it

25    was the city there said, not to worry, we're only going to

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   enforce it in this way, even though the policy gives us wider

2   latitude.

3          I don't think -- we're not here walking away from our

4   policies.  We think they're very important and would change

5   them if we disagreed.

6          I think the distinction, though, is that plaintiff is

7   trying to manufacture their standing by just speculating that

8   what they would do would violate the policies.  When you look

9   at the text of them, I just don't think that that's a fair

10  read.  And so I think a good example of that is in the 1025

11  concern about harassment; that plaintiffs say it's a subjective

12  standard based only on how the recipient feels.

13         And the first point there is that students are never

14  charged under 1025, they're charged under the Student Code,

15  which plaintiff here has explicitly not challenged and fails to

16  acknowledge that meaningful distinction.

17         But even so, both harassment definitions clearly

18  include an objective component.  If you look at the text of

19  1025, which is -- you see at 15-3 the harassment provision.

20         THE COURT:  I have that.  I have that in front of me.

21  What page are you looking at?

22         MS. SAMUELS:  I'm on page four of the policy; it's

23  paginated page 13 of the docket filing.

24         THE COURT:  I have it.

25         MS. SAMUELS:  Okay.  So under the middle paragraph of

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   the discrimination and/or harassment section, it specifically

2   says, if you skip down to kind of the middle of it,

3   "unreasonably interferes with the person's work or academic

4   performance or participation, or creates a working or learning

5   environment that a reasonable person would find hostile,

6   threatening, or intimidating."

7          And so this -- to say that this doesn't comply with

8   *Davis* suggests that *Davis* requires some -- that the university

9   incant some magic words to satisfy the First Amendment.  And

10  that's never been the law.  The *Jennings* Fourth Circuit en banc

11  decision confirms that.

12         And the point of *Davis* was to say that the way you

13  sort out what's harassment and what's not is by looking at an

14  objectively reasonable standard based on this constellation of

15  facts, circumstances, who was talking to whom, how often, what

16  their relationship was, what was said, what had been done

17  before.  I mean, we could go on, but you look at that with an

18  objective perspective.  That's the point of *Davis*, of setting

19  apart harassment from protected speech.  And this definition

20  does that and satisfies that standard by incorporating this

21  "unreasonably interfere" or "a reasonable person would find."

22         And there's no suggestion that if you don't track

23  *Davis*, which was a Title IX case, you know, word for word all

24  across the university, that you've somehow tripped the First

25  Amendment.  And so to come back --

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1      THE COURT:  So your argument would be that this

2   policy tracks the substance of *Davis*?

3      MS. SAMUELS:  Yes, Your Honor.  And I think the --

4   this isn't in the briefs because it was decided recently and I

5   don't think it's dispositive but the Fourth Circuit just a

6   couple of weeks ago in the *Doe v. Fairfax County School Board*

7   case, which we're happy to submit if it would be helpful -- the

8   Fourth Circuit number was 19-2203, decided on June 16 --

9   paragraph six there, the Court basically acknowledges that

10  sometimes we say "and" and sometimes we say "or," and under the

11  *Davis* standard, they're basically the same, that's not

12  dispositive.

13      And this makes sense because, again, *Davis* didn't set

14  magic words.

15      My other point, Your Honor, though, is that, even if

16  you were looking for those magic words, if you look in the

17  Student Code of Conduct, which is specifically what students

18  would be charged under, which is evident on the face of both

19  the policy and what Ms. McCrery has said -- this is attached to

20  Ms. McCrery's declaration as 15-2.  It's page nine of the

21  Student Code of Conduct.  We do there have the definition of

22  harassment.  It says, "sufficiently severe or pervasive or

23  persistent," and so --

24      THE COURT:  Hold on one second.

25      MS. SAMUELS:  Yes, Your Honor.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          THE COURT:  I'm trying to -- 15-2.  What page are you

2     on?

3          MS. SAMUELS:  It's page 25 of the ECF document, page

4     nine of the Code.

5          THE COURT:  I have that in front of me.  Go ahead.

6          MS. SAMUELS:  That's why I wish I could hand it up to

7     you.

8          THE COURT:  No, I got it.  I got it.

9          MS. SAMUELS:  Excellent.  Under "Offenses Against

10    People," the "harassment" definition, halfway down the page,

11    harassment is defined as "unwelcome conduct, not of a sexual

12    nature, that is sufficiently severe, pervasive, or persistent

13    that it can reasonably be expected to create," et cetera,

14    et cetera.

15          And so if you are looking for those magic words, here

16    they are in the policy that is the only way students would ever

17    be charged or disciplined or sanctioned for engaging in

18    harassing conduct.

19          I think while we're in the Code, it is helpful just

20    to point out, I know I just made this point, but that students

21    are only ever charged under the Code.  And I think the

22    plaintiff accuses us of playing a shell game there, but it's

23    helpful to point out that it's easier for students to

24    understand what they're bound by and not have to go through the

25    university library and put it together.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1        So the point of the Code is to make it easier for

2   students, not harder, to figure out exactly what is expected

3   and what is required of them.  And the idea that that's somehow

4   confusing is just not consistent with the face of 1025, which

5   specifically acknowledges that the complaints under 1025 will

6   be determined -- resolving them is determined by the words or

7   the status of the person accused.  And in this case, that would

8   be, if it was a student, it would go to the Student Code.  And

9   so to suggest that that's meant to be somehow confusing or a

10  moving target is actually the opposite of what's happening

11  here.

12        I think, Your Honor, while we're on harassment

13  policies, I'd just like to address this point plaintiff made

14  that Virginia Tech's harassment policy is viewpoint-based.  I

15  just don't think that's consistent with First Amendment case

16  law, because under that view, any harassment policy would be

17  viewpoint-based.  And it cannot be that Virginia Tech is simply

18  powerless in the face of the First Amendment to prohibit and

19  address instances of harassment on campus.  And we know that

20  for the very simple reason that the university is under several

21  other legal obligations to do so.  They are constrained by

22  Title VII, by Title IX, by the ADA.  I'm happy to go on.  But

23  the university would be liable if it didn't have and enforce a

24  harassment policy.

25        And we see that in the *Feminist Majority* case out of

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  the Fourth Circuit, where a public university in Virginia had a

2  pretty tough time before the Fourth Circuit and was criticized

3  robustly for turning a blind eye, I think are the words the

4  Court used, to online harassment on campus.

5          And so the other way I think we know that harassment

6  policies could be viewpoint --

7          THE COURT:  I'm sorry.  What case?  I've got so many

8  cases in front of me.  What case was that?

9          MS. SAMUELS:  Yes, Your Honor.  The *Feminist Majority*

10 *Foundation v. Hurley* case.  We cited it in our brief.  It's 911

11 F.3d 674.

12         And the driving point there was if the harassment was

13 online -- and the question was how responsible is the school

14 under Title IX for addressing online harassment, which the

15 details of that aren't at issue here, but the idea very much

16 matters, that as plaintiffs would have it, the university just

17 has to let the campus be a total free-for-all, and that that

18 would break the law, is the simple answer to that.

19         The other way that we know that it can't be true that

20 in the face of the First Amendment all harassment policies fall

21 and it's viewpoint-based is that *Davis* gives us the answer,

22 *Davis* draws this line.  And to take Mr. Connolly's example

23 about Black Lives Matter, I think if you zoom out, regardless

24 of the content of words, at some point words can rise to the

25 level of harassment.  And it's not our job here, nor do we have

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  to, nor should the Court have to say exactly in what scenarios,

2  using certain words or certain discussions of racial issues or

3  certain comments, that students are going to cross that line

4  because we don't know, we don't have any of that before us.

5        And -- but we do know that there has to be a line,

6  because the university is liable for it, and that *Davis* tells

7  how we draw that line, and it's this constellation of facts,

8  it's an objective standard.  And the Court has none of that

9  before it, and so I don't think you need to go there, Your

10  Honor.  But if you do, *Davis* draws this line on how harassment

11  policies can't be viewpoint-based because, regardless of your

12  viewpoint or who you're criticizing or how, if you are

13  targeting a student in this case with words, conduct, actions

14  that are interfering, that to an objectively reasonable person

15  would interfere with that student's educational opportunities,

16  that that's harassment, it's not protected, and it's

17  actionable.

18        And we concede that the school doesn't -- you don't

19  have to take my word for it.  We can see in the record that

20  this is how it works.  This is in Ms. McCrery's declaration,

21  the way that harassment provision under the Code, which is,

22  again, the only one that would apply to students, has been

23  enforced.

24        If you look at paragraphs 12 and 13 of that

25  declaration, she walks through how, of the five student conduct

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   cases since 2017, that involved allegations of bias or

2   discrimination where students were found responsible for

3   harassment, four of those involved actual or threatened

4   physical contact or intimidation.

5          And so the idea that the university is punishing

6   speech is just not accurate on this record.  There was physical

7   contact or intimidation there.

8          And the one other case involved the repeated and

9   targeted use of a racial slur and other derogatory comments

10  toward a specific student, not as a general matter, even after

11  being asked to stop more than once.  And that other case is --

12         THE COURT:  Does this go to the issue of objectively

13  reasonable credible threat?  I mean, because -- I mean, I'm

14  trying to figure out where you're going here, because if this

15  is the way the university has enforced this policy over the

16  years, does that go to the notion about whether the fears that

17  are expressed by these students are just subjective fears that

18  don't give -- that don't meet the standard for a credible

19  threat of enforcement from an objective basis?  Because I'm

20  trying to figure out where you're going with that.  Is that

21  where this goes?  Is that where this argument goes?

22         MS. SAMUELS:  I think it goes both places, Your

23  Honor, yes, absolutely.  And we see this in First Amendment

24  cases where standing and the merits kind of collapse on each

25  other often.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1      But that brings me back to kind of where I started,

2  which is *Abbott* controls, and if there is no objective credible

3  threat, objective chill, credible threat of enforcement, that

4  the plaintiffs don't have standing.  But I think it also goes

5  to -- if you were to reach the merits, it goes to whether

6  there's anything to enjoin here or whether the university is

7  violating the First Amendment.  And so I do think it's relevant

8  on both scores, but I think you don't even need to reach

9  necessarily, you know, what the policy says, is it consistent

10 with *Davis*?

11      And notably, the Fifth, Sixth, and Seventh Circuits

12 didn't really touch that and just decided it on standing,

13 obviously different ways.  But I do think that it's relevant

14 both places, but the easiest way is to explain that you don't

15 even need to get into the weeds of the *Davis* standard to say

16 all plaintiffs have offered here are subjective assertions that

17 have no basis in factual records to be objectively

18 corroborated.

19      THE COURT:  Hold on a second.  Let me drill down on

20 something you just said that I may not have focused on, and

21 that is, you're saying that the Fifth and Sixth and Seventh

22 Circuits did not address this *Davis* merits-based consideration,

23 that they just dealt with the standing issue?

24      MS. SAMUELS:  The *Davis* --

25      THE COURT:  And hold on a second.  Let me just finish

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  my thought.

2       I think Mr. Connolly said these cases may have been

3  remanded, or maybe you said these cases were remanded back for

4  further consideration, and then they settled?

5       MS. SAMUELS:  That's right, Your Honor.  These cases

6  may very well have cited *Davis*.  I don't mean to suggest that

7  they were ignoring it.  But the Fifth, Sixth, and Seventh

8  Circuits were all decided on the threshold justiciability

9  question.  No one reached the merits.  No one has opined

10  whether on the merits, as a matter of First Amendment doctrine,

11  these policies pass muster.

12       I think there's a good reason for that.  I think

13  these are hard questions and you need facts to resolve them,

14  and so I think that that pattern -- even if this does not go

15  our way, I think that pattern does.

16       But so the Seventh Circuit, it just ended and it

17  settled, right, because the denial of the PI was affirmed on a

18  justiciability basis.

19       The Fifth and Sixth were remanded for further

20  proceeding, and my understanding is -- I know there were no

21  more decisions, but my understanding is that they both settled.

22  So the case law --

23       THE COURT:  You know, this is purely a matter of

24  curiosity.  Are there similar challenges being made at other

25  universities currently that are under litigation around the

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  country?

2          MS. SAMUELS:  Yes, Your Honor.  Again, Mr. Connolly

3  will know better, but there is, I know, a pending challenge in

4  Florida brought by the same plaintiff, that there was a PI

5  hearing held, I want to say within the last few months, and

6  we're awaiting a decision on that.

7          THE COURT:  Is it Seminoles or Gators, or some other

8  university?

9          MS. SAMUELS:  I'm embarrassed to say that I'm from

10  Virginia and don't know anything about Florida, so I'm not

11  sure.

12          THE COURT:  Okay.  I'm sure Mr. Connolly can help me

13  with that, with that issue.

14          So you think in Florida there's been teed up a

15  preliminary injunction hearing, and that is awaiting a ruling

16  from the district court in Florida?

17          MS. SAMUELS:  Yes, Your Honor.

18          THE COURT:  Great.  Okay.  That's helpful to know.

19          MS. SAMUELS:  Sure.

20          THE COURT:  Go ahead, Ms. Samuels.

21          MS. SAMUELS:  While we're on *Killeen*, I do think --

22  just before we get away from the other circuit, again, I think

23  *Abbott* is the clearest path here, but the plaintiff --

24  Mr. Connolly suggests that in the Seventh Circuit they were

25  given a roadmap for how to bring a successful case, and the

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  basic problems here, and I just don't think that's a fair

2  reading of this case.  I direct the Court to page 644 of the

3  Seventh Circuit's decision.

4          THE COURT:  Hold on.  Hold on.  Let me get there.  I

5  have to look in a different place.  I'm sorry, page 644?

6          MS. SAMUELS:  Yes.

7          THE COURT:  I have it.  Go ahead.

8          MS. SAMUELS:  In the middle of this paragraph on 644,

9  the Court says -- this is right after footnote two.  It says,

10  "Speech First's sparse submission" -- that's a tongue-twister

11  -- "failed to demonstrate that any of its members face a

12  credible threat of any enforcement on the basis of their speech

13  or that" -- the entity and the issue there -- "BART's or BIP's

14  responses to reports of bias-motivated incidents have an

15  objective chilling effect."

16          And so what the Court said there was -- they don't

17  say the only issue here is that you need other affidavits.

18  What they're saying is, whatever you give us has to satisfy

19  this standard.

20          And so, admittedly, plaintiffs have tried a different

21  tact here, but all they've done is offered these subjective

22  fears about what these students believe or speculate might

23  happen.  And the fact that that's located in a different kind

24  of paperwork, I don't think can solve the fundamental Article

25  III problems that the Seventh Circuit identified and ruled on.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1      THE COURT:  Yeah, I haven't looked at the -- I

2  haven't looked at the complaint in *Killeen* or the paperwork at

3  the district court level to see how what was done there

4  compares to what was done in this case.  I know that the

5  plaintiffs -- Mr. Connolly and the plaintiffs argue that we

6  address -- we do much more here than happened in *Killeen*.  I

7  have not drilled down on that, but I have really smart law

8  clerks that are going to help me with that.

9      MS. SAMUELS:  Your Honor, I think the difference that

10  Mr. Connolly raises it that in *Killeen*, the only evidence was

11  the declaration of Ms. Neily, the president of Speech First,

12  and here we have a declaration of Ms. Neily, and it started

13  with three and now we're down to two anonymous members, and the

14  plaintiff's suggestion is that difference in style, the fact

15  that the individual students have sworn, somehow satisfies

16  their burden under the legal standard, which is the same.  And

17  I think that's kind of an argument that's more form over

18  substance; that if we look at the substance of what these

19  students are offering, it's the same thing that Ms. Neily was

20  saying before the Seventh Circuit.  And so it fails for the

21  same reasons.

22      THE COURT:  Okay.  Go ahead.

23      MS. SAMUELS:  Thank you, Your Honor.  Let me just

24  check my notes and see.  I know we've kind of been all over the

25  place this morning.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1      THE COURT:  Well, that's my fault.  I did that with

2  Mr. Connolly too.

3      MS. SAMUELS:  It's all right.  It's more interesting.

4      I think on the mootness point, this is not -- and it

5  is important.  I don't mean to minimize it, but our standing

6  arguments, I think, carry the day alone without needing to get

7  into mootness, if you don't want to, but because it came up I

8  do just want to raise that.

9      The plaintiff's suggestion that the acceptable use

10  standard, that would change, could be changed with, I think,

11  one single bureaucrat's wrist, is not accurate now because the

12  university made the decision, even though it wasn't required,

13  to take that to the board and ask the board to approve that

14  change, the Board of Visitors, by a formal resolution.  And

15  that happened, and we submitted a supplemental submission to

16  show the Court that happened.  The board's resolution is at

17  docket 16-3.  And now that it's been taken to the board, it

18  can't be changed again without further board action, which one

19  of the reasons the university did that was to address and

20  corroborate that the change really is permanent.

21      I think another reason that the mootness argument

22  cuts our way, Your Honor, is that the -- as Mr. Midkiff

23  explains in his declaration, the change from the university's

24  perspective isn't a substantive change because it's how this

25  policy has always been enforced.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          The only time we were ever aware of it being enforced
2   was when an employee was using a university Zoom account for a
3   local political meeting.  And it's never been used against
4   students.  In fact, as Mr. Midkiff notes, it couldn't because
5   there are -- you know, college Democrats and college
6   Republicans use e-mail all the time.  And so from Mr. Midkiff's
7   perspective, it wasn't even a substantive change, meaning it's
8   not like this is one of those cases like the Fourth Circuit
9   held in *Ferber* where there's an abrupt change in policy that's
10  directly tied to litigation and there's a reasonable chance
11  that as soon as the litigation ends the defendant is just going
12  to pick back up with it.

13          And Mr. Connolly's argument about the legal
14  authority, retaining the legal authority being an (inaudible)
15  under this challenge, if you take that to the extreme, it would
16  mean no statutes could ever be moot because the General
17  Assembly can always enact a statute and retaining both legal
18  and constitutional authority to pass laws doesn't just writ
19  large to the mootness.  What *Porter v. Clark*e says that we have
20  to look at is whether there's a reasonable -- reasonable chance
21  that the allegedly wrongful conduct will recur.  And that
22  reasonableness requirement, the plaintiff ignores.  And the
23  record here doesn't allow an inference that Virginia Tech is
24  reasonable to think that as soon as this case is over, Virginia
25  Tech is going to go back to something it wasn't even doing in

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   the first place.

2         So I think the record here, combined with the legal

3   standard, really proves our point on mootness.  But, again, I

4   don't think it's a critical issue depending on how Your Honor

5   decides to decide the case, but I'm happy to answer any

6   questions on that.

7         THE COURT:  Let's go back to the distinction you

8   tried to draw between the policies and what's actionable under

9   the Student Code of Conduct.  Doesn't the Student Code of

10  Conduct at Virginia Tech say, though, that violations of the

11  university's policies are actionable under the Code?  And

12  that's on pages 12 through 14 of the Student Code of Conduct.

13  So doesn't that really undercut your argument in that regard?

14        MS. SAMUELS:  It does say that, Your Honor, but

15  actionable under the Code, meaning students are charged and

16  disciplined under the Code.  And when you cross-reference that

17  with the text of 1025 that specifically says complaints under

18  this policy are resolved based on the status of the responding

19  party, that takes us right back to the Code.

20        THE COURT:  And yet the standard for harassment under

21  the Code takes us right to *Davis*?

22        MS. SAMUELS:  Correct, Your Honor.

23        The other way we know that -- and, again, I don't

24  think this is because we need this.  I think Virginia Tech here

25  has offered a robust factual record to try to give the Court

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   comfort and information it needs, but the other way we know

2   that is that both Harrison Blythe and Ms. McCrery in their

3   declarations say they're not aware of any time a student has

4   ever been charged under 1025.  So that the practice supports

5   what we're saying about the text of the policy.

6           THE COURT:  For what it's worth, my law clerk thinks

7   that the current lawsuit in Florida is at the University of

8   Central Florida.

9           MS. SAMUELS:  Seminole or Gator, that still doesn't

10  help me.

11          THE COURT:  It's neither one.  It's neither one.

12  They're both off the hook.

13          MS. SAMUELS:  Excellent.

14          So while we're kind of jumping all over the place,

15  Your Honor, I think the one other point I want to make sure I

16  make about the harassment question is that Mr. Connolly said

17  this morning that speech of the kind which these anonymous

18  members wish to engage in is regularly reported at Virginia

19  Tech, and that that proves their subjective fears are

20  objective, objectively reasonable.  I think it's helpful if we

21  drill down on exactly what plaintiffs are citing there and

22  whether that's a fair read of the record.

23          What they're looking at is Exhibit A of the -- of, I

24  think, the bias reports from 2018, and they cite two of them.

25  But this is the only evidence plaintiffs have offered.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          THE COURT:  I'm sorry.  Exhibit A to what?

2          MS. SAMUELS:  I'm sorry.  It's Exhibit J to the

3  Norris declaration.

4          THE COURT:  Exhibit J to the Norris.  Okay.  Hold on.

5  Let me -- it's in a different part of my notebook.

6          All right.  I have it.  And I looked at all of these.

7  I looked at all of these complaints.  And I -- it's a troubling

8  exhibit, right?

9          MS. SAMUELS:  I don't think so, Your Honor.  I think

10 it actually proves our point because the first point to make

11 here is these are reports, these are not charges, they're not

12 disciplines, they're not sanctions.

13         And, again, this is the only evidence that plaintiff

14 has offered that's specific to Virginia Tech.  I think it's

15 important to note that what may get reported at other

16 universities under other reporting structures is not before the

17 Court here and not relevant to the assessment.

18         But if you look at Ms. McCrery's declaration,

19 paragraph 19, she also looked at this document, because we

20 asked her this question.  Let me get the exact words for you.

21 This is paragraph 19.

22         THE COURT:  Which, is this 15-2?

23         MS. SAMUELS:  It is, yes, Your Honor, of the ECF,

24 pages 13 and 58.

25         THE COURT:  I have it in front of me.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1        MS. SAMUELS:  So in paragraph 19 she says, "I have

2   reviewed this document," Exhibit J to Docket 4-1, she explains

3   what it is, and then she says she cross-checked this against

4   referrals made to Student Conduct during the relevant time

5   period, and to the best of her knowledge, which, again, she's

6   the head of Student Conduct reviewing Student Conduct records,

7   and so I think that means something and can't be discredited in

8   the way that plaintiffs suggest, that it's just her personal

9   knowledge; but after reviewing the record, none of the reports

10  contained in Exhibit J describe the incident that resulted in a

11  referral to Student Conduct, so --

12       THE COURT:  Okay.  So just as I'm thinking about

13  this, this again goes to the issue of whether the fears

14  expressed by Students A, B, and C were objectively reasonable

15  or not.

16       MS. SAMUELS:  That's right, Your Honor.

17       THE COURT:  And whether or not there's a credible

18  threat that -- of enforcement directed against them.

19       MS. SAMUELS:  That's right.  And plaintiffs try to

20  paint this picture of students being monitored and tracked and

21  disciplined and scared of speaking based on what's going on at

22  Virginia Tech.  And when you look at what's going on at

23  Virginia Tech -- which, again, we've offered 80 pages of

24  written testimony from eight declarants and 230 pages of

25  exhibits -- when you actually look at what's going on at

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   Virginia Tech, it's just not what plaintiffs say.  And they

2   haven't offered any evidence that rebuts anything about the

3   vibrancy of student life, the frequency of student speech, the

4   robust exchange of ideas that's going on.  And this is just a

5   small kind of way that proves that point because here the bias

6   incidents were being reported, sure, but they weren't even

7   referred to be investigated, much less adjudicated, and so I

8   don't --

9          THE COURT:  Should the Court -- I appreciate the

10  distinction you're trying to draw based on paragraph 19 of the

11  affidavit of Ennis McCrery, but should the Court equate that

12  exhibit, Exhibit J to the Norris declaration, should that be

13  evidence of -- you know, these are reports made, right?  And so

14  should that be considered to be evidence of what students might

15  think is prohibited by the policy?  Doesn't that go to the

16  issue of objective chill?

17         MS. SAMUELS:  I think it goes to the issue but,

18  again, I think it goes our way, because the point of a bias

19  response mechanism is that anyone can report anything, and that

20  in a non-cumulative, non-objective, non-coercive way the school

21  set up a structure to help mediate these conflicts and help us

22  all have better outcomes together.  But the idea that these

23  reports should somehow scare students, I think it cuts the

24  other way, because no one is getting disciplined, no one is

25  getting called up, like in *Abbott*, no one is having to go to

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   any meeting, and certainly no one is getting sanctioned,

2   because Virginia Tech is committed and deeply cares out

3   fostering student speech, as evidenced by the hundreds and

4   hundreds of student organizations, the tens of thousands of

5   dollars that support speaker events.

6          The school recently created a security fee so that

7   school university funds will cover additional security, where

8   necessary, to allow controversial speakers to proceed.

9          And so the idea that students are objectively afraid

10  to speak their minds just isn't borne out in the hundreds of

11  pages of evidence that we've offered to paint a picture for the

12  Court of what actually happened on Virginia Tech's campus as

13  compared to what the plaintiffs claim by piecing together kind

14  of snippets of what may happen on other campuses.

15         THE COURT:  On the issue of voluntary meetings and

16  what the Seventh Circuit said in *Killeen*, do we know -- with

17  regard, for example, to these complaints in Exhibit J to the

18  Norris declaration, do we know whether folks showed up?  Do we

19  know whether they were called to meetings?  Is there evidence

20  in the record about that?

21         MS. SAMUELS:  Your Honor, the best evidence we have

22  in the record about that is the same paragraph we were just in.

23  This is Mr. Hughes' declaration at paragraph 17, ECF 15-1.

24         The BRT process, again, it was changed in 2019, and

25  so we don't have that many years to offer the Court.  But if

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  you look at paragraph 17, the best evidence in the record of

2  this is that in the spring of 2021, the school received -- BRT

3  received 33 reports at the time this was drafted, which I

4  believe was early May, nearly the end of the school year.  And

5  the Dean of Students' office only sent two messages to respond

6  to students requesting a meeting.  Whether those students

7  accepted is not in the record here.  I think that's what Your

8  Honor is asking about.  We don't have that information before

9  us, but I do think it's helpful to note that, out of 33, only

10 two of these were sent.

11        And more importantly, Your Honor, it's plaintiff's

12 burden to prove their case at this stage, not our burden to

13 disprove it, and they have no evidence of any even letters,

14 e-mails, invitations going out, much less any sanction for the

15 clients.  So even if Your Honor is troubled by that lack of

16 evidence in the record, that's a problem for plaintiffs, not a

17 problem for the school.

18        Okay.  Thank you for your time this morning.  I think

19 I'd just like to wrap up with a couple of points.  The reply

20 brief came in and then we didn't get chance to respond, so just

21 for the record I'd like to point out, Your Honor, two kind of

22 minor issues, but to make sure we preserve them.

23        One is that the standard to show standing, plaintiffs

24 in the reply ratchet it down to try to say that the standard is

25 only a likelihood of showing standing.  But that proposition,

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  they cite no binding authority to support that.

2          The Middle District of North Carolina case they cite

3  actually relies on a D.C. Circuit concurrence for that

4  proposition.  And we looked into it, Your Honor, and the Fourth

5  Circuit doesn't appear to have weighed in on the specific

6  question about standing at PI, but at least as to the

7  requirements for a preliminary injunction, which is before the

8  Court, the *Direx Israel* case that we cite in our brief from the

9  Fourth Circuit holds very clearly that more than a summary

10 judgment review is required.

11         And so I think it's just helpful to remember that

12 we're not here -- plaintiffs aren't here trying to survive a

13 motion to dismiss, they're here asking the Court to enter an

14 extraordinary relief on a preliminary injunction.  And by doing

15 that, they've taken on a heavier than summary judgment burden.

16 And so we just want to be clear that to show standing to invoke

17 this Court's jurisdiction, we do not agree that the standard is

18 it just has to be likely or a coin flip that the plaintiffs

19 have standing.

20         I also just have these last kind of cleanup points.

21         THE COURT:  Which case from the Middle District of

22 North Carolina?  Was that Judge Osteen's case on the abortion

23 statute?

24         MS. SAMUELS:  Your Honor, it's *Action N.C. v. Strach*,

25 is the name of the case.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1         THE COURT:  Oh, I think that's a different.  That's a

2   different case, then.  I was thinking about -- I was thinking

3   about -- *Bryant versus Woodall* is the case I was thinking

4   about.  That's a recent 2021 case involving -- I think that was

5   out of the Middle District of North Carolina.  I think that was

6   Judge Osteen's case.  Yeah, Middle District of North Carolina,

7   right.

8         Tell me what the case is you're referencing,

9   Ms. Samuels.

10        MS. SAMUELS:  Yes, Your Honor.  Plaintiffs cite it in

11  their reply brief.  Let me get to that exact page.

12        THE COURT:  I thought their reply brief was pretty

13  good.

14        MS. SAMUELS:  I will say, Your Honor, that I had to

15  do some research after I read it.

16        THE COURT:  I thought it was pretty good.

17        MS. SAMUELS:  I'd like to think it was because our

18  opposition was good.

19        THE COURT:  There's these two cases they kept citing,

20  one out of the Fifth Circuit and one out of the Sixth Circuit.

21        MS. SAMUELS:  I'm on page 6 of the reply brief, Your

22  Honor, at the very top, the *Action N.C. v. Strach* case.  I only

23  kind of make a big deal of this --

24        THE COURT:  Oh, I see that.  Okay.  All right.

25        MS. SAMUELS:  If you go to that case, the citation

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  for that proposition is a D.C. Circuit separate opinion.  It's

2  not a binding opinion.  And we looked, because we were curious

3  that the Fourth Circuit doesn't seem to have ever articulated

4  the specific standard here, but certainly has not endorsed this

5  coin-flip standing theory that plaintiffs are asking the Court

6  to find under.  And so we just want to preserve that issue.

7       THE COURT:  Well, you don't really think a likelihood

8  is a coin-flip?  I mean, it's not a coin-flip, right?  I mean,

9  you just don't flip a coin.  That turn of phrase isn't

10  appropriate, is it?

11       MS. SAMUELS:  I certainly don't think it's

12  appropriate for a preliminary injunction.  That's a clear

13  showing of likelihood.

14       But what plaintiffs are asking you to find is that

15  it's likely that they have standing.  And I guess the way I

16  would interpret that is, what does "likely" mean?  More than

17  likely than not?

18       THE COURT:  Right, yeah, that sounds like a

19  preponderance standard to me.  A preponderance is not a

20  coin-flip.

21       MS. SAMUELS:  I don't -- I guess the point I would

22  make is that at this stage the plaintiffs are asking you at the

23  outset to invoke what we think doesn't exist: federal court

24  jurisdiction to enjoin these university policies.  We think

25  that likeliness or likelihood of standing is too thin a reed to

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  ask you to do that on, and that certainly in the face of

2  there's no binding authority to say that they don't have to

3  carry their full burden here at the PI stage, which if their

4  burden on the preliminary injunction factors is more than a

5  summary judgment standard, I don't know how on the other side

6  of things for standing it's just likely that they have

7  standing.  I think under Article III they need to carry that

8  burden to ask this Court to do anything.  And they haven't.

9       To be clear, I don't think the question turns on

10  where in the percentage bar; I think they don't have standing,

11  and I think that that's a clear decision.  But because there's

12  no Fourth Circuit binding precedent, to the extent we end up

13  before the Court on this issue, we just need to make sure

14  that's in the record, and we didn't get a chance to reply.

15       THE COURT:  Okay.  Fair enough.  You don't think the

16  *Action N.C. versus Strach* likelihood the plaintiff has standing

17  is the appropriate test?

18       MS. SAMUELS:  That's right, Your Honor.

19       THE COURT:  Okay.  All right.  I got that.  And I'll

20  take a look at that case, and I thank you for that.  And I'm

21  certainly familiar with *Direx Israel*.  I've cited to that, you

22  know, every time we have an injunction hearing.

23       MS. SAMUELS:  Sure.  And I think that the *Bryant* case

24  that Your Honor was referring to, the case that the

25  supplemental authority came in on, we think that's

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   distinguishable in so many different ways, which is why we

2   didn't respond.  I think the most important point is it's not a

3   First Amendment case and it's going to credible threat, but

4   it's not going to objective chill because it wasn't a First

5   Amendment case.

6          And relatedly, the issue there was everybody agreed

7   that the abortion providers were wanting to take action that

8   would be violated by the statute, and the state said not to

9   worry, we don't enforce those anyway.

10          And that's just not what we have here, because our

11   view is that what these students want to do wouldn't violate

12   the policies.  So I think that's just kind of neither here nor

13   there.

14          Also, the last distinction is between -- the statute

15   there had been recently amended in a substantive way, and the

16   Court relied on that.  And here, again, where we started, is

17   these provisions that plaintiffs challenge haven't been changed

18   substantively for nine years.

19          My last point, Your Honor, on these kind of things

20   that we need to be clear on in our reply is that plaintiffs

21   suggest that their claim that Policy 7000, that we somehow

22   forfeited it in our opposition, that's just simply not true.

23          The record makes clear that any alleged violations of

24   that policy are, as I've been saying all morning, adjudicated

25   through Student Conduct.  We noted that in our brief at page 11

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   regarding a similar provision in the acceptable use standard

2   that's nearly identical to the harassment and intimidation

3   provision in Policy 7000 that plaintiffs challenge.  And at no

4   point has plaintiff challenged the Student Code.  So just for

5   the sake of the record, I wanted to mention that.

6           Thank you for your time this morning, Your Honor.  If

7   you have no further questions, I would just like to conclude

8   with a more general point from where we started.  I think that

9   some of these are really hard and interesting First Amendment

10  questions, and I think that the procedural posture here is that

11  plaintiff has to do more than raise serious questions, they

12  have to carry their burden of making a clear showing that

13  they're entitled to relief.  And I think that that burden is

14  even heavier here, where I think you can read their request for

15  injunctive relief as requesting a mandatory and not a

16  prohibitory injunction.  And the way we know that is because

17  the injunction they request would take the parties back to a

18  state of affairs that hasn't existed for nine years.

19          The classic prohibitory injunction is when you sue to

20  block and you log the day it's enforced -- I'm sorry, the day

21  it's signed, or the day it's enacted, or the day it takes

22  effect to preserve that status quo between the parties.

23          But here, the plaintiffs aren't asking that the

24  students be allowed to keep doing something they were doing and

25  were stopped being able to do last week when the university did

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   something.  And so I think that's the scope of that relief that

2   they're asking, which they've been trying to narrow it in their

3   reply, but if you look at Docket 4-7, which is the proposed

4   order they filed with their motion originally, they

5   specifically ask that the university be enjoined from taking

6   any action to enforce the university's policy on bias-related

7   incidents, including investigating and logging and contacting

8   students about bias-related incidents.

9        And I think, Your Honor, a fair read of that is, if

10  an alleged hate crime were to have occurred on the campus of

11  Virginia Tech University, under this injunction that plaintiffs

12  request, the school would be enjoined from even looking into it

13  or even investigating it.  So I think that plaintiffs have

14  taken on a very heavy burden here by asking for a preliminary

15  injunction and by asking for an injunction of such staggering

16  breadth that, if any of this is a close call, I still think we

17  win.

18       And so the thing I'd like to leave the Court with

19  this morning, Your Honor, is that the procedural posture and

20  the burdens that plaintiffs have opted to take on -- and they

21  were free to seek discovery before this hearing and they

22  didn't.  We've offered this robust factual record.  And if

23  there are any close calls, that the context in which this is

24  presented to the Court means plaintiff's motion should be

25  denied.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          Thank you, Your Honor.

2          THE COURT:  Okay.  Thank you, Ms. Samuels.  We've

3   been going for a little bit now, a hour and 47 minutes.  Would

4   y'all like to take a brief break before I hear from

5   Mr. Connolly?  I don't know whether the court reporter needs a

6   little relief or not.  I'm happy to go forward, but if y'all

7   would like to take, like, five minutes, we'll just all mute.

8          The court reporter is nodding her head.  Let's take

9   about a five-minute recess.  I'm not going anywhere.  I'm just

10  going to mute and eliminate my screen.  And then let's come

11  back in -- oh, let's say about eight minutes, we'll come back

12  and we'll hear what response Mr. Connolly has.  Does that suit

13  y'all?  Is that okay?

14         Okay, we'll come back in about eight minutes.  So

15  don't sign off.  Just mute yourselves.  And I'll see y'all back

16  in just a few minutes.  Thank you.

17         MS. SAMUELS:  Thank you.

18         (Recess, 10:47 a.m. to 10:58 a.m.)

19         THE COURT:  Okay.  The Court is back.  The court

20  reporter is here.  Looks like we've got everybody but the

21  clerk.  As soon as the clerk gets here, Mr. Connolly, we can

22  hear from you.

23         MR. CONNOLLY:  Sounds great.

24         THE COURT:  The clerk is here.  Okay.  Thank you all

25  for taking a little Zoom break.  It's pretty easy to forgot

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   sometimes when we're on Zoom that the court reporter is working

2   really hard to take down all these words, and I need to

3   remember to give her a break.

4          So, Mr. Connolly, let's hear what reply you would

5   like to make to the argument made by the university.

6          MR. CONNOLLY:  Thank you.  And we've been going a

7   while so I've trimmed it down to just a few key points that I

8   want to make sure to get out before we end.

9          The first, getting back to one of the first things we

10  talked about in the beginning, a case I promised you, *Jones*

11  *versus Coleman*, 2017 WL 1397212.

12         THE COURT:  Sorry about that, 139 --

13         MR. CONNOLLY:  -- 7212.

14         THE COURT:  Okay.  Thank you.  I got it.  Tell me why

15  that case is helpful.

16         MR. CONNOLLY:  This is the case that says that even

17  though a policy -- or even though the defendant may have

18  stopped enforcing the policy, you can still have a preliminary

19  injunction.  And the reason is, is because what the Court does,

20  is it enters a preliminary injunction telling the defendant not

21  to reinstate the policy.  And the reason it does that is

22  because, one, it's not moot; but two, there's no harm at all to

23  the university since the university claims it has no intention

24  of enforcing this policy.  But what it does --

25         THE COURT:  One, because they've already stopped it?

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          MR. CONNOLLY:  Correct.

2          THE COURT:  Okay.  I get that.

3          MR. CONNOLLY:  It protects the plaintiff.

4          THE COURT:  Okay.  I got that.  Go ahead.

5          MR. CONNOLLY:  Okay.  The second point, the

6   university spoke a few times about the harms they think will

7   come if you enter this preliminary injunction.  To be clear,

8   what we are asking for is for you to -- for the Court to enjoin

9   these policies.  Nothing says that the Court or that the

10  university can't investigate violations of the Student Code or

11  investigate crimes.  All we're asking for the Court to do is to

12  enjoin these policies.

13         And quite honestly, the university still has at its

14  fingertips the ability, right after your injunction is entered,

15  to revise its policies and bring them into line with the First

16  Amendment.  They repeatedly -- the university repeatedly cites

17  *Davis*, *Davis*, over and over again.  But Policy 1025 does not

18  contain the *Davis* standard.  And the Supreme Court was very

19  particular and very careful when it said severe, persistent,

20  and pervasive, because what it was saying is that if you are

21  not careful when you are drafting these types of speech codes,

22  you're going to sweep in an entire swath of protected First

23  Amendment speech, and that is why --

24         THE COURT:  Okay.  But what -- I'm sorry, finish your

25  thought.  Then I want to ask you a question.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          MR. CONNOLLY:  So as far as the harm there, again, if

2     you enjoin enforcement of Policy 1025, they could easily avoid

3     any harm that they believe is going to come by simply going to

4     the *Davis* standard that the Supreme Court has endorsed.  But

5     for some reason, they're not doing that here.

6          THE COURT:  Well, what about the argument made by the

7     university that the only way to discipline anyone, any student,

8     would be by means of the Code of Conduct, and that the Policy

9     1025 is not the mechanism to discipline, it's the Code of

10    Conduct, and that the Code of Conduct uses the *Davis* standard?

11    That's the argument Ms. Samuels made.  What would you say to

12    that, Mr. Connolly?

13         MR. CONNOLLY:  Sure.  So the university's problem is

14    that what they're arguing is in direct conflict with the

15    explicit words of the Student Conduct Policy 1025.  The Student

16    Conduct incorporates Policy 1025 and says -- it incorporates

17    all of its policies, and it says a violation of Policy 1025 is

18    a violation of the Student Code.  Policy 1025, as well, says

19    that students can violate Policy 1025.

20         And their declarations were very carefully worded.

21    And if you look at them, they never actually say that a student

22    cannot be punished for violating Policy 1025.  It goes through

23    the process of the Student Code.  The Student Code gives them

24    all the rights that they have, but the explicit language of the

25    Student Code says you can be punished for Policy 1025.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1          And if you think about it, it's the same thing for

2    the other policies.  Policy 5215, Policy 7000, those are also

3    incorporated under the Code of Student Conduct.  And so there

4    are --

5          THE COURT:  Are there -- I'm sorry.  Go ahead.  I

6    wanted to follow up on that.  Go ahead.

7          MR. CONNOLLY:  Sure.  I didn't see anywhere in any of

8    their declarations saying that someone can't be punished for

9    violating Policy 7000 and Policy 5215.  And the reason they

10   can't argue that, again, is that the Student Code is clear it

11   incorporates all of these policies into the Code.

12         THE COURT:  Okay.  And so then what you would argue

13   is that when Ms. Samuels says, look, if you look at the

14   harassment provision under the Student Code of Conduct, that

15   tracks the *Davis* language, that is -- that is the harassment

16   provision of the Student Code of Conduct; there's another

17   provision of the Student Code of Conduct that says it's a

18   violation of the Student Code of Conduct if you violate the

19   university policy, which would bring in -- you would argue

20   would bring in 1025?

21         MR. CONNOLLY:  Correct.  Correct.

22         THE COURT:  Okay.  I understand that argument.  Thank

23   you for that clarification.

24         MR. CONNOLLY:  Thank you.  And so --

25         THE COURT:  So you would say on its face -- because a

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  violation of 1025 is a violation of the Student Code, then on

2  its face, therefore, it doesn't meet *Davis*, it's overbroad?

3        MR. CONNOLLY:  Policy 1025 does not meet the *Davis*

4  standard, correct.

5        THE COURT:  Okay.  Okay.

6        MR. CONNOLLY:  It doesn't have any of the language

7  that *Davis* says is necessary at all, so it's overbroad, vague,

8  and it's also content- and viewpoint-based, for the reasons

9  we've articulated.

10       Third, *Abbott*.  So *Abbott* is distinguishable.  In

11 *Abbott* the University of South Carolina was investigating a

12 student who had been accused of violating the Student Code.

13 And what the Fourth Circuit said is that calling in a student

14 for a single meeting for him to tell his side of the story is

15 not a sufficient chill.

16       That is far different from what we have here.  And,

17 quite frankly, the Bias Response Team -- I mean, it's Orwellian

18 stuff.  This is -- they are submitting -- requesting anonymous

19 reports.  They get anonymous reports.  They say -- they

20 encourage students to report on each other, saying:  "See

21 something, say something."  They log and keep records.  They

22 have a police officer on the team.

23       I mean, think back to when you were a student.  Do

24 you think having this apparatus available at your university,

25 having them constantly saying, we are watching -- you have a

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  conversation with your roommate in class; someone can report it

2  as being biased just simply by going online.  Do you think that

3  is going to cause a person to be chilled, a freshman entering

4  college?

5          These Bias Response Teams are brand-new things that

6  did not exist ten years ago, and they are chilling speech, and

7  that is exactly what we've put in our declarations.  So this is

8  totally, totally different from what was going on in *Abbott*.

9          Fourth, I have in my notes written down, *Golden*

10 *Knights, UCF Golden Knights*.  That is the other case we have

11 ongoing right now.

12          In the Fifth and Sixth Circuits --

13          THE COURT:  Let me -- Mr. Connolly, let me ask you

14 about that.  Did you have argument on a PI in that case?

15          MR. CONNOLLY:  Correct.  Yes, we did.

16          THE COURT:  And you're awaiting ruling?

17          MR. CONNOLLY:  Correct.

18          THE COURT:  Okay.  And that's in -- is that in the

19 Central District of Florida?

20          MR. CONNOLLY:  That's correct, yes.

21          THE COURT:  I think -- it's not Middle District.  I

22 think it's Central District.  Anyway, go ahead.

23          MR. CONNOLLY:  Central or Middle District of Florida.

24 I forget too.

25          THE COURT:  I don't know what it is, either, but it's

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   somewhere in the middle of Florida, right?

2         MR. CONNOLLY:  Yeah.  I'm being told it's Middle
3   District of Florida.

4         THE COURT:  Okay.  Good.  Excellent.  Middle District
5   of Florida.  All right.

6         MR. CONNOLLY:  Yeah.  And our other two cases, Fifth
7   Circuit and the Sixth Circuit, those settled because the
8   University of Michigan and the University of Texas agreed to
9   disband their Bias Response Teams, and they agreed to all of
10  the relief we requested.  So that's why -- and it's not
11  surprising that they would do that after reading the Fifth
12  Circuit's and the Sixth Circuit's appeal -- opinions.  So
13  that's what ended up happening in those cases.

14        A few other quick points.  My friend says that the --
15  on the mootness argument, that the policy -- the acceptable use
16  standard cannot be changed without board approval now that the
17  board has acted.

18        None of that is in the record.  The record actually
19  says the opposite.  The record says that a single university
20  employee has the authority now to change the policy whenever he
21  wants to.

22        I read what's in the record that they provided as
23  simply, you know, a nonbinding resolution from the Board of
24  Visitors saying they agree with this.  But I didn't see
25  anything in the record that they submitted saying that you can

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  no longer do this.

2         Even if they can't, even if that's true, the speed

3  and ease with which this happened, the same analysis applies.

4  Because -- because the defendant has the ability to go back to

5  the old policy incredibly easily, this claim is not moot.

6         And then finally, the --

7         THE COURT:  Let me ask you a question about that

8  computer policy.

9         MR. CONNOLLY:  Sure.

10        THE COURT:  Does the computer policy have the same

11  kind of chilling effect that you think 1025 does?  Not the

12  partisan political part that got changed, but the harassment

13  part of it, does that raise the same kind of chilling effect

14  concerns that 1025 does?

15        MR. CONNOLLY:  Certainly.  And the reason it does is

16  because it prohibits, quote, unwarranted annoyance.  And

17  there's a reason the university didn't defend this in its

18  opposition.  It's because who knows what that is?  Anything

19  that the students want to engage in is going to be considered

20  by someone to be -- that it could be annoyance.  And even

21  stranger, when is annoyance warranted and unwarranted?

22        The Eleventh Circuit in *Wollschlaeger* talked about

23  this very point.  And so a reasonable student is going to look

24  at this and think, you know, I can easily violate this, and it

25  does chill speech.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1     THE COURT:  What was the *Wollschlaeger* case about?

2  That's one I have not had a chance to read yet.

3     MR. CONNOLLY:  The *Wollschlaeger* was Eleventh

4  Circuit, en banc Eleventh Circuit, and the State of Florida had

5  passed certain restrictions about when a -- when doctors could

6  discuss gun rights, or when doctors could discuss the issues of

7  guns, their patients owning guns.  And they brought a

8  pre-enforcement challenge to that statute.  And the Eleventh

9  Circuit found that they did have -- that the doctors did have

10  standing to challenge this.  And it's a very good opinion.

11     Finally, with the history of enforcement here --

12  excuse me.  I'm losing my voice.  The -- it is in the record

13  that these sorts of incidents will be reported.  The same

14  document you cited, but also we put in FIRE's report, the

15  Foundation for Individual Rights in Education, where it

16  documented similar Bias Response Teams all over the country and

17  showed how these types of speech that our students want to

18  engage in is frequently reported to Bias Response Teams.

19     Now, the university --

20     THE COURT:  Tell me about this history of the

21  creation of a Bias Response Team.  I was in college a long time

22  ago, before most of y'all were born.  And is this a recent

23  thing, Mr. Connolly?  It's something I'm not familiar with,

24  except by reading it in this case.

25     MR. CONNOLLY:  Yeah, it is.  These started popping up

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  right around -- probably around 2016, and they started slowly

2  -- they've slowly proliferated all over the country.  And one

3  of Speech First's -- that's one of the things we've been going

4  after.  So the University of Michigan, the University of Texas,

5  and we got those Bias Response Teams struck down.

6         And, quite frankly, what happens is that the

7  university knows it can't explicitly punish biased speech, so

8  instead it creates this whole elaborate scheme and mechanism to

9  try to implicitly intimidate students from engaging in this

10  type of speech.  And so these sorts of things -- Virginia Tech

11  is not unique.  There are some others that are all over the

12  country.

13         THE COURT:  Well, I looked at the FIRE report and I

14  saw the listing of universities.

15         What about Ms. Samuels' argument, that she made

16  earlier on in her argument, that this Bias Response Team is

17  just an air traffic control -- I used the word

18  "clearinghouse" -- that this kind of harassing conduct was

19  already subject to lots of various university departments being

20  involved?  For example, if there was some sort of harassment

21  involving a fraternity or sorority, that would get reported to

22  that particular department; or if there was harassment

23  involving something else, it would go to a different

24  department, and this is just sort of a clearinghouse or a place

25  for the university to consider these issues as a unified forum,

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  kind of like -- so what about that argument, that this isn't

2  really anything new, it's just a different structure?

3          MR. CONNOLLY:  It's not an air traffic control at

4  all.  I mean, think of what a true air traffic control, the way

5  they describe it, would look like.  You could have a university

6  system where you say -- you tell students, have you had -- you

7  know, are you experiencing emotional issues of X, Y and Z?  If

8  you have, call the university and we will provide you

9  counseling and we'll help you through this and we'll talk

10 through the issues.

11         They're perfectly free to do that.  What they can't

12 do is what they've done here, which is, for example, if it's

13 designed to help counsel students, why do they allow anonymous

14 reports?  Why do they encourage people to see something, say

15 something?  Why do they have a police officer on the team?

16         And not only that, this isn't just directing

17 complaints to one way or the other.  In the declaration, the

18 university says they meet once a week and they look at the

19 reports they receive and they make a factual determination

20 whether bias has occurred, and they do it by looking at this

21 definition.  It's the Hughes declaration, Exhibit C, where they

22 say:  What is bias?  "Bias incidents are expressions against a

23 person or group because of the person's age, color,

24 disability," and it lists ten other characteristics.

25         So this team is actually making factual

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  determinations about whether bias occurred.  And it's called a

2  response team; they're going to respond to bias.

3         And in Exhibit B of the Hughes declaration, that lays

4  out how the BRT operates, it says that one of its goals is to

5  eliminate bias.

6         And so this is not simply just an air traffic

7  control, where the university is trying to coordinate

8  responses.  This is -- this is a scheme with the purpose of

9  eliminating bias among their students.  And that runs full

10  force into the First Amendment under the Fifth Circuit's

11  opinion and the Sixth Circuit's opinion.

12         That is -- looking through my notes, that -- those

13  were the points that I had to make.  And, again, I would say,

14  for the reasons, you know, we've laid out in our briefs, these

15  policies are infringing on the First Amendment and our students

16  should have a preliminary injunction so that they can finish

17  out their career or finish out their student lives at Virginia

18  Tech without having their First Amendment rights infringed.

19         THE COURT:  All right, Mr. Connolly.  Thank you for

20  that.  I will see if Ms. Samuels has anything to respond and

21  then I'll give Mr. Connolly the last word.

22         Ms. Samuels?

23         MS. SAMUELS:  I know we're wrapping up here, Your

24  Honor.  I would just like to close with the point that some of

25  these things that Mr. Connolly has hypothesized or pointed to

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   at other universities, you know, if BRT was going around

2   intimidating students or telling them what they can and can't

3   say, if there was any evidence of that, we might have an

4   interesting case or a close call here.  And they are free to

5   come back to you when and if that happens.  But the record

6   here, the plaintiffs have put in three, now two, anonymous

7   declarations that all they talk about is what those students

8   think, and those subjective fears are just -- they find no

9   support or no corroboration.  And, in fact, the rest of the

10  record, the voluminous record, points the other way.

11        And so I think that there's a way to kind of

12  reconcile all this, which is yes, across the country, these

13  issues may be more teed up and may be raised in a concrete way

14  that invokes this Court's jurisdiction, but that's just not

15  what we have here on these claims here at Virginia Tech.

16        And for that reason, we'd ask you to deny the motion.

17        THE COURT:  Mr. Connolly, I told you I would give you

18  the last word, sir.

19        MR. CONNOLLY:  Thank you.  Only one last point I'll

20  make.

21        You're going to write this opinion and you're going

22  to have to explicitly disagree with the Fifth Circuit and the

23  Sixth Circuit.  The Bias Response Team is the exact same here,

24  and I don't know how you get around those two opinions when

25  you're writing this opinion.  I think those circuits control

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1   here, and I think that's why I think we're entitled to a

2   preliminary injunction.

3          THE COURT:  How do I agree with the Fifth and Sixth

4   Circuits without disagreeing with the Fourth Circuit, which I

5   can't do?  It's a published opinion.  It's binding on me.

6   Okay?  So how do I -- how do I draw that line as you asked,

7   Mr. Connolly?

8          MR. CONNOLLY:  Sure.  And I think the way you do it

9   is, if you look at *Abbott*, *Abbott* was a -- what the university

10  was doing there is entirely different from what it's doing

11  here.  In *Abbott* they were investigating an allegation that the

12  student violated the Student Code, and they had a single

13  meeting with the student.  That is entirely different from the

14  elaborate scheme we have here.

15         THE COURT:  I'm sorry, isn't that even more than what

16  the BRT does?  I mean, based on the record here, they get all

17  these complaints, and only a couple of them get referred out.

18  Isn't what happened in *Abbott* more intrusive and more chilling

19  than what the BRT does?

20         MR. CONNOLLY:  I don't think so.  Because in *Abbott*,

21  they had a specific complaint, they brought the student in, and

22  they discussed it, they got him to tell his side of the story

23  when they were investigating a complaint under the Student

24  Code.

25         Here, they're outwardly projecting this, the Bias

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  Response Team, to the entire student body; so speech is already
2  being chilled by everything they're doing.  So I think this is
3  far different from what happened in *Abbott*.
4         And, also, at the very end of the Fourth Circuit's
5  opinion in *Abbott*, the Court said -- talked about sort of
6  unique facts about it and said that this does not -- the Fourth
7  Circuit wanted to make clear that it was not saying that
8  students' speech could be chilled for both formal and informal
9  reasons.
10        And so I think the situation here most certainly can
11 be distinguished from *Abbott*.
12        THE COURT:  Yeah, you know what, I note the point
13 you're making when you look at the Section 4 of the *Abbott*
14 opinion, which is the last two paragraphs, where it -- it
15 starts, "Freedom of speech needs breathing space to survive."
16 And then so I note that point, Mr. Connolly, and -- well, and I
17 noted that the couple of different times I read the *Abbott*, the
18 *Abbott* decision.
19        Okay.  Could I get y'all to do me a favor since I
20 don't track what goes on in the Middle District of Florida?  If
21 you get a decision -- we're going to think about this and work
22 on it.  I appreciate the really excellent arguments that y'all
23 have raised answering all my various questions.  I appreciate
24 it.  And we're going to look into this, drill down on it, and
25 write an opinion, and I appreciate your thoughtful arguments.

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1  If you get a decision out of the Middle District of Florida,

2  could you file it as supplemental authority in this case?

3          MR. CONNOLLY:  We will certainly do that, Your Honor.

4          THE COURT:  I always like the help.  So okay, well,

5  if there's nothing further, thank you all so much.  We will do

6  our work and try and get you an opinion out just as soon as we

7  can.

8          Anything else from you, Mr. Connolly?

9          MR. CONNOLLY:  All good.  Thank you.

10          THE COURT:  Ms. Samuels, anything else from you?

11          MS. SAMUELS:  Nothing further, Your Honor.  Thank

12  you.

13          THE COURT:  Okay.  Thank you all so much.  And I hope

14  everybody stays well.  Take care.

15          MS. SAMUELS:  Bye-bye.

16          MR. CONNOLLY:  Thank you.

17  (Proceedings adjourned, 11:25 a.m.)

18

19

20

21

22

23

24

25

Speech First, Inc. v. Sands 7:21cv203 7/9/21

1                    C E R T I F I C A T E

2       I, JoRita B. Meyer, RMR/CRR, Official Court Reporter for

3  the United States District Court for the Western District of

4  Virginia, appointed pursuant to the provisions of Title 28,

5  United States Code, Section 753, do hereby certify that the

6  foregoing is a correct transcript of the proceedings reported

7  by me using the stenotype reporting method in conjunction

8  with computer-aided transcription, and that same is a

9  true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ JoRita B. Meyer           Date: 8/16/2021

15

16

17

18

19

20

21

22

23

24

25