IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

SPEECH FIRST, INC.,           )
     Plaintiff,           )
                         )     Case No. 7:21-cv-00203
v.                       )
                         )     Michael F. Urbanski
TIMOTHY SANDS, in his individual  )     Chief United States District Judge
capacity and official capacity as    )
President of Virginia Polytechnic    )
Institute and State University,      )
     Defendant.          )

## MEMORANDUM OPINION

This matter is before the court on the plaintiff's—Speech First, Inc. ("Speech First" or "the plaintiff")—motion for a preliminary injunction, ECF No. 4. Speech First seeks to enjoin defendant Timothy Sands ("Sands" or "the defendant"), in his individual capacity and his official capacity as President of Virginia Polytechnic Institute and State University ("Virginia Tech" or "the university"),[1] from enforcing four policies governing student conduct at Virginia Tech. Id. Speech First alleges that these policies violate the First Amendment rights of its members in the following ways:

- Virginia Tech's bias-related incidents policy, as revised in February 2016, is an overbroad, vague, and viewpoint-discriminatory restriction on speech;

- Virginia Tech's discriminatory harassment policy (Policy 1025), as revised in August 2020, is an overbroad, vague, and viewpoint-discriminatory restriction on speech;

- Virginia Tech's computer policy (Policy 7000), as revised in October 2020, is an overbroad and vague restriction on speech, and the computer policy's associated acceptable use standard is a content-based restriction on speech; and

---

[1] The court previously dismissed a number of other defendants pursuant to a joint stipulation from the parties. ECF No. 13.

- Virginia Tech's informational activities policy (Policy 5215), as revised in August 2020, is an unconstitutional prior restraint and speaker-based regulation of protected activities.

See Compl., ECF No. 1.

In opposing injunctive relief, Sands argues that (1) Speech First's challenge to the computer policy is moot given a recent revision to the policy; (2) Speech First lacks standing to bring a pre-enforcement challenge to Virginia Tech's policies; and (3) Speech First is not entitled to a preliminary injunction because none of Speech First's claims are likely to succeed on the merits, it has failed to establish irreparable harm on this record, and the balance of equities and public interest weigh against a preliminary injunction. See generally Mem. in Opp'n, ECF No. 15. Speech First counters each of these arguments in reply. See Reply in Support of Mot. for Prelim. Inj. ("Reply"), ECF No. 17. The court heard oral argument on July 9, 2021.

This case is the sixth and latest[2] challenge brought by Speech First, a national organization that "works to restore the freedom of speech on college campuses," against certain bias response, anti-harassment, and other speech-related policies at public universities. Mot., ECF No. 4, at 1. In this case, Speech First brings its claims on behalf of three of its members who were or are students at Virginia Tech. The students hold conservative views that they describe as "unpopular, controversial, and in the minority on campus," and they fear will be punished for expressing these views under the university's various speech-related

---

[2] See Speech First, Inc. v. Killeen, 968 F.3d 628 (7th Cir. 2020); Speech First, Inc. v. Fenves, 979 F.3d 319 (5th Cir. 2020); Speech First, Inc. v. Schlissel, 939 F.3d 756 (6th Cir. 2019); Speech First, Inc. v. Cartwright, 6:21-CV-313-GAP-GJK, 2021 WL 3399829, at *1 (M.D. Fla. July 29, 2021); Notice of Dismissal, Speech First v. Wintersteen, No. 4:20-cv-00002 (S.D. Iowa Mar. 12, 2020) (including settlement agreement), ECF No. 25; see also Court Battles, Speech First (last accessed Sept. 17, 2021), https://speechfirst.org/court-battles/.

policies. While the preliminary injunction motion paints Virginia Tech's policies with a broad brush, the court is required to evaluate the language of each policy and its claimed impact on the students' First Amendment rights. As explained further herein, the court will **GRANT IN PART** Speech First's motion for a preliminary injunction to the extent it seeks to enjoin the computer policy's prohibition on "intimidation, harassment, and unwarranted annoyance," and **DENY IN PART** the motion in all other respects.

## I.    BACKGROUND

### A.    The Parties

Speech First is "a nationwide membership organization of students, alumni, and other concerned citizens" that is "dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment." Compl., ECF No. 1, at ¶ 10. Speech First asserts that it has members who are current students at Virginia Tech, including Students A, B, and C, who filed anonymous declarations in support of Speech First's motion for a preliminary injunction. See Student A Decl., ECF No. 4-4; Student B Decl., ECF No. 4-5; Student C Decl., ECF No. 4-6. Student B was a senior at the time the complaint was filed in April and graduated in May 2021. See Reply, ECF No. 17, at 20. In its complaint, Speech First says that it "has members who attend the University, including Students A, B, and C." Compl., ECF No. 1, at ¶ 10 (emphasis added). Speech First's complaint and motion for a preliminary injunction are centered on the concerns of current students. Neither mention possible harm to or requested relief for alumni. In acknowledging Student B's graduation, Speech First does not represent that its standing is premised on any potential harms to Virginia Tech alumni, nor that it intends to amend its complaint or motion accordingly. The court thus has not

included Student B's declaration in its analysis. In any event, Student B's views, fears, and intentions are represented—often word for word—in the declarations of Students A and C.

Students A and C's views are, in their words, "unpopular, controversial, and in the minority on campus." Student A Decl., ECF No. 4-4, at ¶ 4; Student C Decl., ECF No. 4-6, at ¶ 4. Student A identifies as "politically conservative" and Student C identifies as "politically conservative/libertarian." Student A Decl., ECF No. 4-4, at ¶ 4; Student C Decl., ECF No. 4-6, at ¶ 4. In general, both students oppose the Black Lives Matter movement, abortion, the use of preferred pronouns, gay marriage, and illegal immigration, and both are strong supporters of gun rights. <u>See</u> Student A Decl., ECF No. 4-4, at ¶¶ 4–11; Student C Decl., ECF No. 4-6, at ¶¶ 4–10. Student A also opposes affirmative action. <u>See</u> Student A Decl., ECF No. 4-4, at ¶ 5.

While the students' beliefs are slightly different, their intentions and fears are identical. Students A and C both say they want to "engage in open and robust intellectual debate" with their fellow students and to "speak passionately and repeatedly" about these issues in class, online, and in the broader community. Student A Decl., ECF No. 4-4, at ¶ 13; Student C Decl., ECF No. 4-6, at ¶ 12. Both students allege that they do not fully express their beliefs, discuss certain topics, or otherwise engage in protected speech because they are aware of Virginia Tech's policies and do not want to face negative repercussions. Student A Decl., ECF No. 4-4 at ¶¶ 15–20; Student C Decl., ECF No. 4-6, at ¶¶ 14–19. They allege that their reluctance to speak is magnified by the fact that they believe they can be punished for being present during another student's misconduct and appearing to "condone, support, or encourage" it. Student A Decl., ECF No. 4-4, at ¶ 17; Student C Decl., ECF No. 4-6, at ¶ 16.

4

Speech First highlights that only 20 percent of Virginia Tech students who responded to a recent Gallup survey said they felt comfortable expressing ideas in class that "are probably only held by a minority of people," but this is on par with college students at large institutions. Virginia Tech Student Survey (Ex. Y to Norris Decl.), ECF No. 4-2, at 265.[3] Speech First also notes that, after it filed this lawsuit, a Virginia Tech tenured professor publicly called Students A, B, and C "conservative s[***]bags" who were "suing the school because they're bigots." Tweet by @prof_gabriele (Ex. V to Norris Decl.), ECF No. 4-2, at 224.

From the defendant's perspective, the Virginia Tech community is oriented around several fundamental principles, including mutual respect, the value of human diversity, and the right of every person to express thoughts and opinions freely. Mem. in Opp'n, ECF No. 15, at 1. Sands argues that Virginia Tech firmly believes that these principles can co-exist, even if Speech First thinks they cannot. Id. Sands notes that, at orientation, students are informed of the university's commitment to protecting a free and open exchange of ideas on campus. O'Rourke Decl., ECF No. 15-8, at ¶ 14. The Student Code of Conduct reaffirms and advises that "[s]tudents at Virginia Tech enjoy those rights guaranteed by the Constitutions of the United States and the Commonwealth of Virginia," including those "protected under the First Amendment." McCrery Decl., ECF No. 15-2, at ¶ 5; Student Code of Conduct (Norris Decl. Ex. D), ECF No. 4-2, at 42. Virginia Tech also hosts a website highlighting the text of the

---

[3] This record includes many exhibits, many with their own list of attachments. For ease of reference, the court uses the ECF page numbers for exhibit references, which correspond to the PDF pages of the relevant ECF filing. For example, to cite to page 22 of Virginia Tech Student Survey, which is Exhibit Y the Norris Declaration, the court cites to page 265 of ECF No. 4-2. The court continues to reference page numbers in briefs by the actual number at the bottom of the page. For example, the court cites to page 1 of Sand's memorandum in opposition as page 1, even though it is page 10 of ECF No. 15 given the table of contents, table of authorities, and index that precede it.

First Amendment and notes that it "values the rights guaranteed by the First Amendment of the United States Constitution and does not intend to restrict the exercise of these rights." O'Rourke Decl., ECF No. 15-8, at ¶ 9; 2020 Speech on Campus Annual Report (O'Rourke Decl. Ex. B), ECF No. 15-8, at 66–67. It provides information about the importance of freedom of speech in the campus community and has an online tool to report any alleged disruption of constitutionally protected speech. O'Rourke Decl., ECF No. 15-8, at ¶¶ 9–15; 2020 Speech on Campus Annual Report (Ex. B to O'Rourke Decl.), ECF No. 15-8, at 66–67. Sands personally stresses the importance of the First Amendment on campus in university-wide statements and public interviews. Wilkes Decl., ECF No. 15-7, at ¶ 11.

The defendant notes that Virginia Tech has about 750 student groups on campus every year of all shapes and sizes. Wagoner Decl., ECF No. 15-4, at ¶ 6. These organizations "cover[] a remarkable breadth of views," some of which are shared, at least in broad strokes, by Students A and C. Id. To start, Sands has shown that Virginia Tech is home to many conservative and libertarian registered student organizations ("RSOs"). See Wagoner Decl., ECF No. 15-4, at ¶ 6. Each of these organizations has between 32 and 100 members. Id. at ¶ 7. Like all other student organizations, Virginia Tech provides these organizations with certain privileges, such as "(1) use of space for meetings and activities, the vast majority of which RSOs may use at no cost; (2) access to funding, which is paid as part of each student's student activity fee and allocated among the RSOs by the Student Budget Board ('SBB'); (3) use of certain trademarks of the University; and (4) access to GobblerConnect, a student organization database, providing visibility to RSOs and allow[ing] them to promote their events to students." Id. at ¶ 5 (footnote omitted).

6

Student organizations also promote views on specific issues which seem similar to those of Students A and C. Virginia Tech is home to RSOs called Students for Life at Virginia Tech and Students for Concealed Carry on Campus, which express views on abortion and gun rights, respectively, that are similar to the views held by Students A and C. Wagoner Decl., ECF No. 15-4, at ¶ 6. For example, each year, Students for Life hosts many events on campus, including a "cemetery for the innocent" in "one of the most public areas on campus." Mem. in Opp'n, ECF No. 15, at 24. During the 2019-2020 fiscal year, Virginia Tech provided funds to Young Americans for Freedom at Virginia Tech to host "a conservative writer and speaker who addresses topics including white privilege, gender identity, and feminism." Wagoner Decl., ECF No. 15-4, at ¶ 8. Virginia Tech is also home to an RSO called Give & Take, whose mission is to "encourage students who have different perspectives on political issues to come together and have a discussion," specifically including immigration. Wagoner Decl., ECF No. 15-4, at ¶ 6.

Virginia Tech provides these various groups with financial support for events, including an annual Free Speech Ball hosted by Turning Point USA. Wagoner Decl., ECF No. 15-4, at ¶¶ 9–10. Virginia Tech also provides other kinds of support. In 2018, for example, Young Americans for Freedom invited conservative commentator Steven Crowder to speak on campus. Id. at ¶ 11. When the police department assessed the organization an unexpected security fee for additional police presence at the event necessitated by strong student interest, the university refunded that fee to the student group and created a fund to ensure that similar fees would be paid with university funds. Id.

7

Sands offered some evidence of individual students expressing certain views held by Students A and C outside of a student organization. On October 24, 2018, presumably Student A and C's first semester at Virginia Tech, a fellow student expressed similar views on preferred pronouns to Students A and C in a campus newspaper article. Acceptance of transgender identities denies science, furthers 'politically correct' agenda (Wagoner Decl. Ex. W), ECF No. 15-4, at 99 (October 2018 article stating that "[t]he debate about pronouns and gender identity will go down in the history books as one of the most illogical moments in our short history."). Sands also highlights the words of a recent chairman of Young Americans for Freedom at Virginia Tech, who said, "[i]t's great that Virginia Tech has a lot of people coming from all sorts of backgrounds and experiences" because "we're allowed to discuss things and . . . have disagreements with our peers, and you don't have to worry about getting in trouble." Young Americans for Freedom speak about the election and future of Virginia Tech (Wagoner Decl. Ex. P), ECF No. 15-4, at 75.

Virginia Tech's evidence does not include examples addressing all of the views of concern to Students A and C. In some instances, the university relies on events that, assuming they will graduate in four years, pre-date Students A and C's time at Virginia Tech. See, e.g., Campuswide Debate a model for political discourse (Wagoner Decl. Ex. AA), ECF No. 15-4, at 113–14 (October 2016 article about students expressing diverse views, including views similar to Students A and C, on police brutality, the Black Lives Matter movement, immigration, and gun rights). Student A also opposes affirmative action, see Student A Decl., ECF No. 4-4, at ¶ 5, and Students A and C both oppose gay marriage. See Student A Decl., ECF No. 4-4, at ¶ 9; Student C Decl., ECF No. 4-6, at ¶ 8. Virginia Tech has not provided the

court with any evidence that Student A's views on affirmative action or Student A and C's views on gay marriage are tolerated or regularly expressed by Virginia Tech students.

### B.      The Student Code of Conduct and University Policies

Virginia Tech's Student Code of Conduct ("the Code" for short) "outlines policies established by the university that set standards for students' behavior, along with procedures for adjudicating and sanctioning violations of these standards." Student Code of Conduct (Norris Decl. Ex. D), ECF No. 4-2, at 41. The Code makes clear that students and student organizations who violate its terms may be disciplined regardless of whether the conduct occurs on university property, off university property, or online. Id. at 44.

In its section on "Student Rights and Responsibilities," the Code states:

1. Students at Virginia Tech will be treated fairly and with dignity regardless of age, color, disability, sex (including pregnancy), gender, gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, or veteran status as described in university policy 1025.

2. Students at Virginia Tech enjoy those rights guaranteed by the Constitutions of the United States and the Commonwealth of Virginia. This includes activities protected under the First Amendment. In accordance with the Code of Virginia, incidents of disruption of constitutionally protected speech may be reported via the Speech on Campus webpage.

Id. at 42.

Under "Prohibited Conduct," the Code includes "[h]arassment" as an "offense[] against people," and defines harassment as "[u]nwelcome conduct not of a sexual nature that is sufficiently severe, pervasive, or persistent that it could reasonably be expected to create an intimidating, threatening, or hostile environment that limits the ability of an individual to work,

9

study, or participate in the activities of the university," noting that the Code has a separate provision on gender-based harassment. Id. at 47.

Under "Other Prohibited Conduct," the Code also prohibits "[f]ailure to observe rules and regulations issued by the university that are not listed specifically as 'Prohibited Conduct' in the document, including but not limited to regulations linked above in the 'Additional University Policies' and 'Additional Community Specific Regulations' sections." Id. at 50. The "Additional University Policies" section specifically lists the three of the policies challenged by Speech First: Policy 1025, Policy 7000, and Policy 5215. Id. at 51–52. The text of these policies is discussed in detail below but a brief overview is of use here.

Policy 1025, or Virginia Tech's Policy on Harassment, Discrimination, and Sexual Assault, or Policy 1025 (hereinafter "Policy 1025" of "discriminatory-harassment policy") prohibits discrimination based on certain characteristics. See Policy 1025 (Norris Decl. Ex. A), ECF No. 4-2.

Policy 7000, or the University's Acceptable Use and Administration of Computer and Communication Systems (hereinafter referred to as "Policy 7000" or the "computer policy"), lays out requirements for use of the university's network and email system and requires system users to "demonstrate respect of … the rights of others to be free of intimidation, harassment, and unwarranted annoyance," without providing definitions of those terms. Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 82–85. It incorporates the Acceptable Use of Information Systems at Virginia Tech, or the acceptable use standard for short. Id. at 82. The acceptable use standard bans individuals from using the system for "partisan political purposes." Acceptable Use Standard (Norris Decl. Ex. F), ECF No. 4-2, at 79.

Policy 5215, or the "Sales, Solicitation, and Advertising on Campus" (hereinafter the "informational activities policy" or "Policy 5215"), imposes a number of restrictions on students' ability to advertise events, gather petitions, and distribute informational literature. See Policy 5215, (Norris Decl. Ex. T), ECF No. 4-2, at 173–84.

The Student Code does not reference the final document challenged by Speech First, a February 2016 document called the Bias-Related Incident Protocol ("BRIP" or "the protocol"). See BRIP (Norris Decl. Ex. H), ECF No. 4-2, at 87–94. The protocol defines "bias incidents" as "expressions against a person or group because of" certain protected characteristics. Id. at 90. The protocol also outlines procedures for addressing bias incidents, but Sands asserts that those procedures are outdated. Since 2019, the Dean of Students Office has replaced the "Core Response Team" with a revised "Bias Intervention and Response Team," or "BIRT," process to govern the university's response to reports of potential bias. Id. at 3–7; see also BIRT (Hughes Decl. Ex. B), ECF No. 15-1, at 17–19. Nothing in the Student Code, the protocol, or the BIRT procedures document indicates that the protocol or BIRT procedures document are policies that can be violated and punished under the Code.

The Code also prohibits students for being present "during any violation of the Student Code of Conduct and/or other university policies in such a way as to condone, support, or encourage that violation," as offenses against the university. Id. at 50. The Code states that students who "anticipate or observe a violation of university policy are expected to remove themselves from participation and are encouraged to report the violation" to University authorities. Id.

Students who are found guilty of policy violations may be subject to disciplinary action via the student-conduct process outlined in the Code of Conduct. Id. at 52–60. The Code outlines a range of sanctions, include a formal warning, wellness activities, suspension, and exclusion. Id. at 55–56. When the University "determines that adjudication is not appropriate," it can invite the students involved "to participate in an educational conversation about the concerns raised in the complaint." Id. at 54–55. There is no "time limit" for students to report an alleged Student Code of Conduct violation. Id. at 52.

## II.    THE PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship, 918 F.3d 353, 366 (4th Cir. 2019) (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 22 (2008)). A party seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. Winter, 555 U.S. at 20; see also Roe v. Dept. of Def., 947 F.3d 207, 219 (4th Cir. 2020), as amended (Jan. 14, 2020). Although a plaintiff "need not establish a 'certainty of success,'" they must "make a clear showing that [they are] likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (quoting Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013)).

## III.   JUSTICIABILITY

Before considering whether Speech First has established the requirements for a preliminary injunction, this court must consider "the threshold issue of justiciability." Dep't

of Commerce v. U.S. House of Representatives, 525 U.S. 316, 328 (1999). Sands argues that none of Speech First's claims are justiciable. He argues that Speech First's challenge to the computer policy's incorporation of the acceptable use standard is moot because Virginia Tech, in good faith, amended the policy to reflect that the prohibition on using the university's network for partisan political purposes only applies to university employees, not students. Sands also argues that Speech First lacks standing under Article III of the U.S. Constitution to bring a pre-enforcement challenge to any of these policies because, on this record, the students have shown no credible threats of enforcement against them.

### A.    Mootness

Under Article III of the U.S. Constitution, "an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed." Brooks v. Vassar, 462 F.3d 341, 348 (4th Cir. 2006). "When a case or controversy ceases to exist—either due to a change in the facts or the law—'the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.'" Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017) (quoting S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs, 789 F.3d 475, 482 (4th Cir. 2015)). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n. 22 (1997) ("Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'") (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)).

## B.    Standing

"[T]he doctrine of standing identifies disputes appropriate for judicial resolution" as "cases and controversies" under Article III. <u>Miller v. Brown</u>, 462 F.3d 312, 316 (4th Cir. 2006). "To establish Article III standing, 'the party invoking federal jurisdiction' must demonstrate that it has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." <u>Bryant v. Woodall</u>, 1 F.4th 280, 285 (4th Cir. 2021), <u>as amended</u> (June 23, 2021) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–61, (1992)). An injury-in-fact is "concrete and particularized and actual or imminent." <u>Lujan</u>, 504 U.S. at 560. In this context, "particularized" means that the "the injury must affect the plaintiff in a personal and individual way." <u>Id.</u> at 560 n. 1. "Since [these elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, <u>i.e.</u>, with the manner and degree of evidence required at the successive stages of the litigation." <u>Id.</u> at 561.

"Therefore, at the preliminary injunction stage, a plaintiff must make a 'clear showing' of his injury in fact." <u>Ass'n for Accessible Medicines v. Becerra</u>, 822 F. App'x 532, 534 (9th Cir. 2020) (unpublished); <u>see also</u> <u>Barber v. Bryant</u>, 860 F.3d 345, 352 (5th Cir. 2017) (similar); <u>Hobby Lobby Stores, Inc. v. Sebelius</u>, 723 F.3d 1114, 1185 (10th Cir. 2013) (Matheson, J., concurring) (similar), <u>aff'd sub nom.</u> <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 573 U.S. 682 (2014); <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment."); <u>Winter v. Nat. Resources Def. Council, Inc.</u>, 555 U.S.

7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

An organization may satisfy Article III's standing requirement in one of two ways: (a) showing "standing to bring suit on its own behalf…for an injury suffered by the organization itself," or (b) establishing "associational standing…on behalf of its members." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005). Speech First attempts the latter and must show that "its members . . . have been injured in fact, and thus could have brought suit in their own right." Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 183–84 (4th Cir. 2013).

Where a lawsuit challenges the constitutionality of a policy before that policy has been enforced, as Speech First does here, the standing inquiry looks to whether "threatened enforcement . . . creates an Article III injury." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (SBA List). To have pre-enforcement standing, a plaintiff must demonstrate (1) "an intention to engage in a course of conduct" that is "arguably affected with a constitutional interest" but "proscribed" by the challenged policy; and (2) that "there exists a credible threat of prosecution thereunder." Id. at 159. Absent a showing that "threatened enforcement" is "sufficiently imminent," a pre-enforcement challenge is not justiciable and falls outside this Court's jurisdiction. Id.

Here, Speech First alleges that its members' speech has been unconstitutionally chilled. The First Amendment provides that "Congress shall make no law…abridging the freedom of speech…." U.S. Const. Amend. I. In Gitlow v. New York, 268 U.S. 652, 666 (1925), the

Supreme Court recognized that this provision also applies to state governments under the Fourteenth Amendment. Virginia Tech is a public university operated by the Commonwealth of Virginia. Compl., ECF No. 1, at ¶ 11.

"The Supreme Court of the United States has explained that standing requirements are somewhat relaxed in First Amendment cases…." Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013) (citing, e.g., Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984)). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." Futrell, 721 F.3d at 235. The Fourth Circuit has "recognized two ways in which litigants may establish the requisite ongoing injury when seeking to enjoin government policies alleged to violate the First Amendment." Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018).

> First, they may show that they intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a credible threat that the policy will be enforced against them when they do so. Second, they may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship – establishing, that is, a chilling effect on their free expression that is objectively reasonable. Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead.

Id. (internal citations and quotation marks omitted). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13–14 (1972); see also Rock for Life-UMBC v. Hrabowski, 411 F. App'x 541, 547 (4th Cir. 2010) (unpublished) ("However, fears of enforcement that are 'imaginary' or 'wholly speculative' are insufficient to confer standing.") (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 302 (1979)).

Lastly, "[a] plaintiff must establish such a threat with respect to each of the provisions it seeks to challenge, as standing regarding one aspect of a policy cannot be bootstrapped into standing as to the rest." Rock for Life-UMBC, 411 F. App'x at 547 (4th Cir. 2010) (unpublished) (citing Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 429–30 (4th Cir. 2007)).

## IV.   THE BIAS-RELATED INCIDENTS PROTOCOL AND BIAS INCIDENTS RESPONSE TEAM

### A.   The Protocol and Bias Incidents Response Team

To start, Speech First takes issue with the university's bias incidents protocol and response team, BIRT. See BRIP (Norris Decl. Ex. H), ECF No. 4-2, at 87–94. "Bias-related incidents" are formally defined by the protocol as "expressions against a person or group because of the person's or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law." Id. at 90. According to the protocol, examples of bias-related incidents include "words or actions that contradict the spirit of the Principles of Community," "jokes that are demeaning to a particular group of people," "assuming characteristics of a minority group for advertising," and "posting flyers that contain demeaning language or images." Id.

The protocol states that complaints about bias-related incidents can be reported to the Office of the Dean of Students (DOS). Bias-Related Incident Protocol (Norris Decl. Ex. H), ECF No. 4-2, at 91. Incidents that are "widely known and/or violate policy will be processed by a Core Response Team." Id. at 92. According to the protocol, the Core Response Team may "record exactly what was said" and "include bystander names" in its summary of incidents

of verbal harassment. Id. at 93. DOS will "record the incident within the secure DOS Reporting System" and may refer reports to the Virginia Tech or Blacksburg Police Department, Virginia Tech's "Threat Assessment Team," or the Student Conduct Office. Id. at 91. Virginia Tech may find that a bias-related incident involving protected speech is still "inconsistent with [its] Principles of Community" and "present[s] an educational opportunity for better understanding protected speech and the role of tolerance in the campus community." Id. at 93. Under the protocol, all students "involved" in a bias-related incident are "given the opportunity to civilly discuss the incident with a trained professional and will be apprised of their options for resolving the incident," though those "options" are not described in the protocol. Id. at 94.

According to Virginia Tech's Dean of Students, Byron Hughes, "although the concerns about bias and its effects on the University community underlying [the 2016 protocol] and outlined therein remain true," the procedures outlined within it are no longer in effect. Hughes Decl., ECF No. 15-1, at ¶ 11. Since 2019, the Dean of Students Office has replaced the "Core Response Team" with a revised "Bias Intervention and Response Team," or "BIRT," process to govern the university's response to reports of potential bias. Id. at ¶¶ 6–17; see also BIRT (Hughes Decl. Ex. B), ECF No. 15-1, at 17–19. Under that process, BIRT meets on a regular basis to review complaints of potential bias and develop an appropriate response. See generally id. Members of BIRT include representatives from several offices across the university. Id. at 19. According to Hughes, BIRT includes different perspectives across campus and "serves as a sort of 'air traffic control'" to coordinate the university's response to bias-related incidents.

Hughes Decl., ECF No. 15-1, at ¶ 8. Roughly a half page of the three-page policy is dedicated

to explaining its relationship to free speech:

> Virginia Tech is a community where the free and civil exchange of ideas is
> valued and every person's perspective is important. Freedom of speech in the
> United States is protected by the First Amendment to the United States
> Constitution and by many state constitutions and state and federal laws. Free
> speech provisions protect many forms of intolerant statements, expressions,
> and conduct.

> Depending on the circumstances, a bias-related incident may not be a crime. In
> certain contexts, courts have found hate speech to be protected even though
> many in the university community find it repugnant. If these expressions are
> inconsistent with the aims of a learning community and our Principles of
> Community, they may present an educational opportunity for better
> understanding protected speech and the role of inclusion in a pluralistic campus
> community.

> BIRT will examine and review each complaint through the lens of free and
> protected speech. Some bias-related incidents may violate the Student Code of
> Conduct and may be adjudicated through the student conduct process. Virginia
> Tech cannot adjudicate matters that are deemed protected speech. Behavior that
> is discriminatory or otherwise hurtful to members of the community is
> addressed through educational interventions.

> Regardless of whether incidents violate policy or are insensitive, it is crucial that
> response occurs in a timely and consistent manner. All community members
> involved – those who report such incidents as well as those accused – will be
> treated with respect, consideration, concern, and care.

BIRT, ECF No. 15-1, at 19. Virginia Tech officials allege that BIRT regularly concludes that

reported incidents are protected speech. Blythe Decl., ECF No. 15-3, at ¶ 10 ("BIRT regularly

concludes that reports of alleged bias [are] constitutionally protected speech.").

According to Virginia Tech's Director of Student Conduct, Ennis McCrery, BIRT lacks

any authority to discipline or otherwise punish students for their speech or anything else. The

Office of Student Conduct administers the Student Code of Conduct, which is "the exclusive

process by which students are adjudicated to be in violation of University policy and

sanctioned for any such violations." McCrery Decl., ECF No. 15-2, at ¶ 7. Bias incidents are handled by DOS. Unlike Student Conduct, DOS "ha[s] no role in student discipline," but rather seeks to "provide support, advice, services, and resources to students facing challenges in their personal or academic lives at Virginia Tech." Hughes Decl., ECF No. 15-1, at ¶ 10. Unlike Student Conduct, BIRT would never "conduct a formal investigation" or "make any adjudication or responsibility finding." Id. at ¶ 17. According to Hughes, "BIRT does not have the power to impose discipline on any student for any reason," and "[n]othing about BIRT's interaction with a student—as either a complaining party or a responding party—would ever appear on...academic transcripts or disciplinary record." Id. BIRT may refer complaints to Student Conduct, but Hughes states that it does so "only [in] cases that implicate an alleged violation of the Student Code." Id. at ¶ 15.

Under both the 2016 and present procedures, students can submit anonymous complaints about bias incidents on the University's website via a "Bias Incident Reporting Form." Bias Incident Reporting Form (Norris Decl. Ex. I), ECF No. 4-2, at 96. According to the form, bias-related incidents can occur on or off campus, including on social media and other digital platforms. Id. at 99. Speech First claims that the "vast majority" of bias-incident reports submitted through this form involve protected speech, pointing to:

- a report that the words "Saudi Arabia" were written on a whiteboard outside of a student's dorm room, alleging bias based on "national or ethnic origin," Bias Incident Reports (Norris Decl. Ex. J), ECF No. 4-2, at 123;

- a report that a student in a University residence hall overheard several male students privately "talking crap about the women who were 'playing' in [a] snowball fight," calling them not "athletic," which the complainant reported as discrimination based on "gender," id. at 127; and

- a report that a student told a joke that included "Caitlyn Jenner's deadname" during a classroom lecture, which was reported as discrimination on the basis of gender identity, id. at 130.

Speech First does not allege that Virginia Tech treated any of these reports as violations of the Bias-Related Incidents Protocol or the Student Code of Conduct.

According to McCrery, "[p]rotected speech never results in a referral [from BIRT] to Student Conduct," but this is an inaccurate assessment of the information provided in his declaration. McCrery Decl., ECF No. 15-2, at ¶ 17. BIRT has referred protected speech to Student Code at least twice since 2017, including an Instagram post expressing "unpopular opinions about illegal immigration," a topic about which Students A and C wish to express what they describe as controversial or unpopular views. See McCrery Decl., ECF No. 15-2, at ¶ 13. Student Conduct ultimately found that the speech was constitutionally protected and not harassment under the Student Code. Id.

Virginia Tech has promoted its bias-related incident protocol through a "See Something? Say Something!" Campaign, which Speech First finds concerning given this expression's relationship to anti-terrorism efforts. Speech First also points to data showing an increase in reports of bias-related incidents over the years. Twenty-nine bias incident complaints were filed in the Spring 2017 semester. Bias Incident Reports Spring 2017 (Norris Decl. Ex. P), ECF No. 4-2, at 165. That number increased to 35 reports in the Fall 2017 semester, Bias Incident Reports Fall 2017 (Norris Decl. Ex. Q), ECF No. 4-2, at 167; 37 reports in the Spring 2018 semester, Bias Incident Reports Spring 2018 (Norris Decl. Ex. R), ECF No. 4-2, at 169; and 52 reports in the Fall 2018 semester, Bias Incident Reports Fall 2018 (Norris Decl. Ex. S), ECF No. 4-2, at 171.

B.      **Standing**

Speech First lacks standing to challenge the protocol and BIRT. Speech First has not demonstrated that its members have "an intention to engage in a course of conduct" that is "proscribed" by the protocol and BIRT. SBA List, 573 U.S. at 159. This is because they do not proscribe anything at all.

BIRT lacks any authority to discipline or otherwise punish students for anything. According to Hughes, "[n]othing about BIRT's interaction with a student—as either a complaining party or a responding party—would ever appear on…academic transcripts or disciplinary record." Id. All that BIRT has the authority to do is to "invite" students to participate in a "voluntary conversation" about the alleged bias or refer reports elsewhere. Hughes Decl., ECF No. 15-1, at ¶¶ 15–17. Should a student fail to respond to BIRT's invitation or decline to meet, "no further action is taken, and the student faces no consequences of any kind." Id. at ¶ 17; see also McCrery Decl., ECF No. 15-2, at ¶ 16 ("[T]he BIRT process is entirely voluntary for students."). At most, DOS will "record the incident within the secure DOS Reporting System" and may refer reports to the Virginia Tech or Blacksburg Police Department, Virginia Tech's "Threat Assessment Team," or the Student Conduct Office.

Under Fourth Circuit precedent, this is not enough to confer standing. In Abbott, the Fourth Circuit accepted, "at least for purposes of argument, the plaintiffs' premise: that there are some forms of [meetings with university officials] that are so onerous that they become the functional equivalent of 'enforcement' for standing purposes." 900 F.3d at 178. In that case, the University of South Carolina found that the plaintiffs lacked standing to bring a facial

challenge a university's non-discrimination and non-harassment policy based on an investigatory meeting—and the possibility of future investigatory meetings—after holding a "free speech event" on campus where swastikas and other offense speech were displayed. Id. at 175–79. The court reasoned:

> The single, non-intrusive meeting that plaintiffs rely on here, followed two weeks later by an announcement that no further action would be taken, does not fall within this category. Even an objectively reasonable "threat" that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of "enforcement" or as the kind of "extraordinarily intrusive" process that might make self-censorship an objectively reasonable response. And because the plaintiffs can point to no reason to think they will be subjected to some different and more onerous process not yet experienced or threatened, their claim to injury by way of threatened "process" is purely speculative and thus insufficient to establish standing.

Abbott, 900 F.3d at 179. The Seventh Circuit found that Speech First lacked standing to request an injunction against a similar bias response team at the University of Illinois at Urbana-Champaign, analogizing to Abbott and concluding that, "if a mandatory meeting does not demonstrate a credible threat of enforcement, neither does an invitation to an optional one." Speech First, Inc. v. Killeen, 968 F.3d 628, 641 (7th Cir. 2020), as amended on denial of reh'g and reh'g en banc (Sept. 4, 2020). This court agrees that "[t]he University's invitation to a voluntary meeting falls well short" of establishing harm under the First Amendment. Killeen, 968 F.3d at 642. "[T]he University has made manifest its intent to allow speech even when it might or does cause offense…." Abbott, 900 F.3d at 177.

Speech First argues that "[e]xperts…agree that these teams objectively chill students' speech." Mot., ECF No. 4-1, at 26. In making such an assertion, Speech First cites its own complaint, Compl., ECF No. 1, at ¶ 34; the Fifth Circuit's decision in Fenves, 979 F.3d at 338;

and 2017 report published by the Foundation for Individual Rights in Education (FIRE), entitled "Bias Response Team Report 2017," available at https://www.thefire.org/presentation/wp-content/uploads/2017/03/01012623/2017-brt-report-corrected.pdf. While Fenves and the FIRE Report both support the notion that bias response teams can be used in ways that chill speech, neither asserts that all bias response teams are per se unconstitutional. For example, in Fenves, the court explains that:

> That the CCRT invites anonymous reports carries particular overtones of intimidation to students whose views are "outside the mainstream." As one expert explains, "[i]n both concept and design, such efforts [by "bias response teams"] to encourage students to anonymously initiate disciplinary proceedings for perceived acts of bias or to shelter themselves from disagreeable ideas *are likely to* subvert free and open inquiry and invite fears of political favoritism." Keith Whittington, Free Speech and the Diverse University, 87 Fordham L. Rev. 2453, 2466 (2019); see also Hon. Jose Cabranes, For Freedom of Expression, For Due Process, and For Yale: The Emerging Threat to Academic Freedom at a Great University, 35 Yale L. & Pol. Rev. 345, 360 (2017) (*lamenting potential dangers* of anonymous reports and recordkeeping by campus bias "police").

979 F.3d at 338 (italics added). The FIRE Report argues that, in general, the goal of bias response teams is "to chill speech that the institution or its constituents find offensive or unkind," but it explains that "[t]o the extent that Bias Response Teams are used to better understand students' perspectives, to prepare general programming to constituents of the institution, or to provide resources to a complaining student, these goals are unobjectionable on First Amendment grounds." FIRE Report (Norris Decl. Ex. U), ECF No. 4-2, at 208. In short, Virginia Tech's bias response team should be judged on its own merits.

Here, Speech First has not made a clear showing that the protocol and BIRT objectively chill speech at Virginia Tech because they do not proscribe anything. Speech First has put on no evidence that students feel obligated to come to these voluntary meetings, nor do Students

A and C (or Student B, for that matter) declare that they would feel obligated to attend such a meeting if invited. Perhaps the students can argue that the rise of bias response teams nationally chills their speech, but such a chilling effect is not fairly traceable to Virginia Tech's bias incidents protocol or BIRT. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird, 408 U.S. at 13–14.

BIRT's role in referring bias incidents to Student Conduct or other entities on campus also does not confer standing. BIRT may report a Student Code violation just like any other member of the Virginia Tech community. Indeed, since 2017, it has reported at least two incidents as possible harassment to Student Conduct that were deemed protected speech, including one student's expression of "unpopular opinions about illegal immigration" on Instagram. See McCrery Decl., ECF No. 15-2, at ¶ 13. Here, the students also hold views on immigration which they describe as unpopular, but this one example of an inappropriate referral—about which the students did not seem to know—is insufficient to meet the students' burden of clearly showing an injury-in-fact. To the contrary, this incident—part of Sands's evidence—shows that if one part of the university makes a mistake, the university as a whole will ensure that protected speech remains protected. "The mere possibility of a referral does not demonstrate standing." Killeen, 968 F.3d at 643.

In reaching this conclusion, the court recognizes its departure from the Sixth Circuit's decision in Speech First, Inc. v. Schlissel, 939 F. 3d at 765, and the Fifth Circuit's decision in Speech First v. Fenves, 979 F.3d at 333, which found that Speech First had standing to challenge the University of Michigan's Bias Response Team and the University of Texas's

Campus Climate Response Team, respectively. Although the Sixth Circuit declined to instruct the district court to issue a preliminary injunction, the court found that Speech first had standing, because "[b]oth the referral power and the invitation to meet with students objectively chills speech." 939 F. 3d at 765. The Fifth Circuit agreed. See Fenves, 979 F. 3d at 333 (agreeing with Schlissel that a referral by the University of Texas' Campus Climate Response Team "is sufficient to objectively chill student speech."). For the reasons stated herein, the court agrees with the dissent in Schlissel that "the Response Team itself poses no threat of a concrete harm," Schlissel, 939 F.3d at 772 (White, J., dissenting), sufficient to meet Speech First's burden "to establish a strong likelihood of establishing standing to challenge the Response Team." Id. at 773. The court finds this reasoning both persuasive and consistent with the Fourth Circuit's decision in Abbott, 900 F.3d at 172-73.

## V.    THE DISCRIMINATORY HARASSMENT POLICY

### A.    The Policy

Policy 1025, the discriminatory harassment policy, prohibits discrimination based on certain characteristics. See Policy 1025 (Norris Decl. Ex. A), ECF No. 4-2. Policy 1025 was originally enacted on March 4, 1991. Id. at 7.[4] It has been revised thirteen times since then by either the University Counsel, Virginia Tech's president at the relevant time, the Board of Visitors, or a combination of those three actors. Id. at 6–8. Most recently, the Board of Visitors

---

[4] This record includes many exhibits, many with their own small list of attachments. For ease of reference, the court uses the ECF page numbers for exhibit references, which correspond to the PDF pages of the relevant ECF filing. For example, to cite to the first page of Policy 1025, which is Exhibit A the Norris Declaration, the court cites to page 7 of ECF No. 4-2.

approved revisions to the policy to "reflect new Title IX regulations promulgated by the United States Department of Education, effective August 14, 2020." Id. at 8.

> Policy 1025 defines "discrimination and/or harassment" to include:
>
> Conduct of any type (oral, written, graphic, electronic or physical) that is based upon a person's age, color, disability, sex (including pregnancy), gender, gender identity, gender expression, national origin, political affiliation, race, religion, sexual orientation, or veteran status and unreasonably interferes with the person's work or academic performance or participation in university activities, or creates a working or learning environment that a reasonable person would find hostile, threatening or intimidating[.]

Id. at 4. On a Virginia Tech webpage titled "Discriminatory Harassment," which discusses the policy, Virginia Tech lists "telling unwelcome jokes about someone's identity" and "[u]rging religious beliefs on someone who finds it unwelcome" as "[e]xamples of possible discriminatory harassment." Discriminatory Harassment Webpage (Norris Decl. Ex. C), ECF No. 4-2, at 36. The policy itself says that "Virginia Tech is also committed to the free and vigorous discussion of ideas and issues," the policy "does not allow curtailment or censorship of constitutionally protected expression, nor does it attempt to address behaviors that do not constitute discrimination or harassment," and "offensive behavior that does not violate this policy should be addressed by the appropriate supervisor or administrator." Policy 1025 (Norris Decl. Ex. A), ECF No. 4-2, at 8.

The policy applies to "on-campus incidents and off-campus incidents that cause continuing effects on campus." Id. at 7. It authorizes "students or employees, or others on their behalf," to file complaints "alleging discrimination or discriminatory harassment…carried out by faculty, staff, other students, or third parties." Id. at 7–8. Virginia Tech "[a]dministrators, supervisors, and those with instructional responsibility" have a duty

to report incidents of discriminatory harassment. Id. at 8. Students can make discriminatory-harassment allegations by filing a complaint with the University's Office of Equity and Accessibility (OEA)—specifically, by using the Equity & Accessibility Complaint Form on the University's website—within 300 days of the "last incident of discrimination," unless the alleged discrimination is based on sex. Equity & Accessibility Complaint Form for Policy 1025 (Norris Decl. Ex. E), ECF No. 4-2, at 74.

The discriminatory harassment policy directs individuals to file "[q]uestions and complaints of discrimination or discriminatory harassment involving faculty, staff, or students" with the Assistant Vice President for Equity and Accessibility in Virginia Tech's Office for Equity and Accessibility. Discriminatory Harassment Policy, ECF No. 4-2, at 8. Its procedures indicate that they "provide for thorough and impartial investigations that afford all parties notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred," and notes that the university "applies the preponderance of the evidence standard when determining whether this policy has been violated." Id. The procedures section explains that "[t]he appropriate university avenue for resolving a complaint covered under this policy is determined by the status of the person accused," explaining that students are subject to the Student Code of Conduct and faculty are subject to the Faculty Handbook. Id.

According to the defendant, students who engage in harassing behavior are never charged with violating Policy 1025 but would instead be charged with violating the harassment provision in the Student Code of Conduct. Blythe Decl., ECF No. 15-3, at ¶ 8; see also McCrery Decl., ECF No. 15-2, at ¶ 9 (noting that students accused of harassment are "charged

under the harassment section of the Student Code of Conduct, not under the University's Policy 1025"). In evaluating allegations of verbal harassment specifically, the Office for Equity and Accessibility ("OEA") determines whether the conduct is "severe, pervasive, persistent, or objectively offensive enough" to meet either of those criteria. Blythe Decl., ECF No. 15-3, at ¶ 7. Policy 1025 does not specifically use this language, but an OEA webpage describing Policy 1025 does, and the Code of Student Conduct uses a somewhat similar standard in defining harassment. See Student Code of Conduct (Norris Decl. Ex. D), ECF No. 4-2, at 47. According to the McCrery, "[a] general statement of beliefs that is not targeted at another individual does not satisfy the definition of harassment." McCrery Decl., ECF No. 15-2, at ¶ 11.

**B.      Standing**

Speech First has not clearly shown that its members have intended to engage in conduct that is arguably "proscribed" by the discriminatory harassment policy. SBA List, 573 U.S. at 159. Students A and C have alleged only that they wish to "repeatedly" "engage in open and robust intellectual debate with [their] fellow students" and "encourage" them to "change their minds" or at least understand their views, which they describe as "unpopular, controversial, and in minority on campus." See Student A Decl., ECF No. 4-4, at ¶¶ 13–14, 4; Student C Decl., ECF No. 4-6, ¶¶ 12–13, 4. Students A and C say:

> I do not fully express myself of talk about certain issues because I fear that sharing my beliefs may be considered "discriminatory harassment." I fear that other students will find my views "inappropriate" or "intimidating" or claim that my views "interfere[] with" their educational opportunities. Many of the topics that I want to address could easily be considered "discriminatory" under the University's definition of "discriminatory harassment." My fears are grounded in my own personal experience on campus.

Student A. Decl., ECF No. 4-4, at ¶¶ 16–17; Student C Decl., ECF No. 4-6, at ¶¶ 15–16. They say that their fears are "amplified" by the possibility that "the University can punish me…for being present during someone else's 'discriminatory harassment.'" Student A. Decl., ECF No. 4-4, at ¶¶ 17; Student C Decl., ECF No. 4-6, at ¶¶ 16.

There is a gap between the students' subjective fears and the language of the policy itself, which cabins its reach in multiple ways. First, Speech First has not established that Students A and C would be objectively chilled from expressing general views by a policy that limits itself to speech which "unreasonably interferes with the person's work or academic performance or participation in university activities, or creates a working or learning environment that a reasonable person would find hostile, threatening or intimidating[.]" Policy 1025 (Norris Decl. Ex. A), ECF No. 4-2, at 4. Notably, Speech First has not challenged the definition of "harassment" in the Student Code of Conduct. The Code defines harassment as "[u]nwelcome conduct not of a sexual nature that is sufficiently severe, pervasive, or persistent that it could reasonably be expected to create an intimidating, threatening, or hostile environment that limits the ability of an individual to work, study, or participate in the activities of the university." Student Code of Conduct (Norris Decl. Ex. D), ECF No. 4-2, at 47. The two "harassment" definitions do not use all the same words in the same order, but their substance seems practically identical. They both seek to prevent "conduct" that unreasonably interferes with another student's educational experiences.

Students A and C, in their declarations or by counsel, offer no explanation as to why they believe their conduct may be considered "discriminatory harassment" that interferes with another student's education, but not "harassment" that has the same effect as proscribed by

the Code. Speech First criticizes the discriminatory harassment policy for not using, word-for-word, the "severe, pervasive, and objectively offensive" standard outlined in <u>Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.</u>, 526 U.S. 629, 633 (1999).[5] But the unchallenged definition of "harassment" under the Student Code also does not use this standard word-for-word and Students A and C do not allege that this language has any effect on their speech. <u>Compare</u> Student Code of Conduct (Norris Decl. Ex. D), ECF No. 4-2, at 47 ("severe, pervasive, or persistent"), <u>with</u> <u>Davis</u>, 526 U.S. 629 ("severe, pervasive, and objectively offensive"); <u>see also</u> Reply, ECF No. 17, at 32–33 (critiquing the use of "or" conjunction). Here, it is difficult to trace the students' fears to the text of Policy 1025.

Speech First also takes issue with a Virginia Tech webpage titled "Discriminatory Harassment," which discusses the policy and lists "telling unwelcome jokes about someone's identity" and "[u]rging religious beliefs on someone who finds it unwelcome" as "[e]xamples of possible discriminatory harassment." Discriminatory Harassment Webpage (Norris Decl. Ex. C), ECF No. 4-2, at 36. The webpage does not say that a single instance of these behaviors constitutes discriminatory harassment, nor does it abrogate the portion of Policy 1025 that requires interference with a reasonable student's education. Moreover, Students A and C never declare that they wish to tell jokes on the basis of someone's identity nor do they declare a desire to urge their religious beliefs, if any, on someone. Rather, they say they want to engage in robust debate with their fellow students about their political views. Speech First has not

---

[5] Under <u>Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.</u>, 526 U.S. 629, 652 (1999), a university may be liable for damages where student-on-student harassment "is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." <u>See also</u> <u>Jennings v. University of North Carolina</u>, 482 F.3d 686, 696 (4th Cir. 2007) (en banc).

clearly shown that its members intend to engage in the conduct it takes issue with on the webpage.

The court's finding that Speech First lacks standing to challenge the discriminatory harassment policy is consistent with a recent ruling in Florida to a Speech First challenge to a similar policy at the University of Central Florida ("UCF"). Speech First, Inc. v. Cartwright, No. 6:21-cv-313, 2021 WL 3399829 (M.D. Fla. July 29, 2021). Although not decided on standing grounds, the court in Cartwright reasoned that UCF's Discriminatory-Harassment Policy was not unconstitutionally overbroad.

> The Policy is clearly aimed at regulating unprotected conduct under Tinker — conduct that unreasonably invades the rights of other students. The issue is whether the Policy can be read to encompass protected conduct that does not invade the rights of others. Read as a whole, the Policy does not prohibit all conduct that pertains to any of the protected categories. Instead, it only prohibits conduct that is "severe or pervasive" and that "unreasonably interferes" with the rights of other students.

Id. at *6.

"[U]niversities have obligations not only to protect their students' free expression, but also to protect their students." Abbott v. Pastides, 900 F.3d 160, 173 (4th Cir. 2018). Conduct that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 509 (1969)). By its own terms, this policy protects Virginia Tech students from targeted discriminatory harassment "that is based upon a person's [protected characteristic] and unreasonably interferes with the person's work or academic performance or participation in university activities, or creates a working or learning environment that a reasonable person would find hostile, threatening or

32

intimidating[.]" On this record, Speech First has not established that the expression of general views by Students A and C objectively could be considered to rise to the level of discriminatory harassment necessary to violate Policy 1025. Students A and C merely want to speak passionately and repeatedly about their views. The text of the discriminatory harassment policy does not interfere with the expression of their views, and, in the absence of any evidence of improper and overstretched enforcement, their allegations of subjective chill are insufficient to establish standing. Laird, 408 U.S. at 13–14.

In so ruling, the court recognizes that it again parts company with the Fifth and Sixth Circuits' decisions regarding harassment-related policies. In Fenves, the court disregarded arguments that this court finds compelling concerning the cabined text of Virginia Tech's discriminatory harassment policy. 979 F. 3d at 332-33. Moreover, the standing analysis employed in this opinion individually considers the text of and harm posed by each challenged policy alongside the evidence in the record, whereas the standing analysis in Fenves is somewhat more generalized. In Schissel, the court again finds Judge White's dissent more compelling than the majority opinion. The majority found standing to challenge the university's definitions of "bullying" and "harassment" in the University of Michigan's Statement of Student Rights and Responsibilities. Schissel, 939 F. 3d at 763, 765-66. Judge White found the majority's analysis failed to reconcile on-point Sixth Circuit precedent and noted that there was "no evidence that the University has ever punished students who engaged in only protected speech like the speech in which the anonymous students allegedly want to engage." Id. at 773-75. The same is true here.

Second, the policy only governs conduct targeting an individual. The policy defines harassment as "[c]onduct of any type…that is based upon a person's [protected characteristic] and unreasonably interferes with the person's work or academic performance or participation in university activities, or creates a working or learning environment that a reasonable person would find hostile, threatening or intimidating[.]" Policy 1025 (Norris Decl. Ex. A), ECF No. 4-2, at 4 (emphasis added). There is no reason—either under the text of the policy or based on evidence regarding its enforcement—to believe that the students' general expressions of their views would be interpreted as targeted harassment at an individual. Just the opposite, the policy expressly states that it "does not allow curtailment or censorship of constitutionally protected expression, nor does it attempt to address behaviors that do not constitute discrimination or harassment." Id. at 8. Discussions or statements about issues that are front and center of political debate, such as affirmative action or immigration, falls squarely within the First Amendment's protections of robust political speech.

It is helpful to look at exactly what Students A and C wish to say, which are best understood as generalized political views. For example, Student A is strongly against affirmative action and "believe[s] that individuals should be admitted to college because of merit, not the color of their skin." Student A Decl., ECF No. 4-4, at ¶ 5. Such a statement is not arguably proscribed by the policy because it is not "conduct…that is based upon a person's" color, national origin, race, or other characteristic" and could unreasonably affect that individual person in the ways prohibited by the policy. Policy 1025 (Norris Decl. Ex. A), ECF No. 4-2, at 4 (emphasis added). In expressing such a view, Student A's conduct would be based upon Student A's beliefs—not the protected characteristic of the individual to whom

Student A is speaking. By contrast, Student A has not alleged any intention to target individual students based on their skin color and tell those individuals that they should not have been admitted to Virginia Tech through affirmative action.

As another example, Student C believes "there are only two genders[,] male and female," and Student C does not "want to be forced to call someone a 'him' or a 'her' or 'they' or 'them' because that person claims to have a new gender identity." Student C Decl., ECF No. 4-6, at ¶ 7. Student C has not alleged any intention to target individuals based on their gender identity and tell those individuals that Student C does not want to use their preferred pronouns. Student C has not even alleged that Student C has ever interacted or is likely to interact with an individual at Virginia Tech whose gender identity and pronoun usage do not conform with Student C's views.

The court could construe Students A and C's declarations to state intents to express controversial views based on the identities of those to whom they are speaking, but this is inappropriate for at least two reasons. First, such conjectures could inaccurately warp and stretch the students' views beyond what their declarations state they want to cover. More importantly here, construing their declarations this way would fashion a possible basis for standing that is entirely conjectural and remote. It is Speech First's burden at this stage to clearly show standing to seek an injunction. It has failed to satisfy that burden by providing declarations that are best understood as lists of Students A and C's generalized political views.

## VI.   THE COMPUTER POLICY

### A.   The Policy and Standard

Next, Speech First challenges the computer policy, Policy 7000, with which the students must comply to maintain access to the network. See Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 82–85. Policy 7000 relates to "the use of any computing or communications device, regardless of ownership, while connected to the University network, and to the use of any information technology service provided by or through the University." Id. at 82. It was first enacted on June 4, 1999, and was most recently revised on October 29, 2020, to "clarify [the] procedure for reporting and enforcing violations" of the policy, add a procedure for guest users, add a definition of misuse, and cite additional regulations. Id. at 84–85. Policy 7000 prohibits using the university's computer systems and network to violate its policies and requires system users to "demonstrate respect of … the rights of others to be free of intimidation, harassment, and unwarranted annoyance," without providing definitions of those terms. Id. at 85, 82. It also requires "[i]ndividuals using or administering Virginia Tech computer and communication networks, systems, and/or data with any device" to comply with certain laws and other university policies, including the Standard for Acceptable Use of Information Systems at Virginia Tech, or the acceptable use standard for short. Id. at 82.

The acceptable use standard is a webpage which explains that acceptable use of Virginia Tech's computer systems and networks "is always ethical" and "demonstrates respect for intellectual property, ownership of data, system security mechanisms, and individuals' rights to privacy and to freedom from intimidation and harassment." Acceptable Use Standard (Norris Decl. Ex. F), ECF No. 4-2, at 79. The acceptable use standard formerly stated that all individuals using the Virginia Tech network, including students, "must NOT … use university

36

systems for commercial or partisan political purposes, such as using electronic mail to circulate advertising for products or for political candidates." Id.

Suspected violations of Policy 7000 can be reported to the University by sending an email to abuse@vt.edu, which "automatically generates a ticket and follow up on the report." Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 83. "Alleged violations are then referred to the appropriate University office or law enforcement agency for further investigation." Id. Virginia Tech may "temporarily deny access to information technology resources" while it investigates an alleged violation and an individual's access may be limited or terminated as punishment for violating "University policy, law(s), regulations, contractual agreements, or an individual's rights." Id.

Since the complaint in this case was filed, the acceptable use standard's prohibition on partisan political use "has been revised to better reflect how it has always been understood: as applicable only to employees, not students." Mem. in Opp'n, ECF No. 15, at 8 (citing Midkiff Decl., ECF No. 15-5, at 5–6). As of May 17, 2021, the acceptable use standard says: "[i]n making acceptable use of resources you must NOT . . . if you are an employee, use university systems for partisan political purposes, such as using electronic mail to circulate advertising for political candidates." Revised Acceptable Use Standard (Midkiff Decl. Ex. B), ECF No 15-5, at 15 (emphasis added).

In announcing the change to the campus community, Virginia Tech stated that the change was made "to better align the standard with practices." Notice of Change to Acceptable Use Standard (Midkiff Decl. Ex. C), ECF No. 15-5, at 18. According to Virginia Tech's Vice President of Information Technology and Chief Information Officer, Scott Midkiff, the

previous policy "did not accurately reflect how the Acceptable Use Standard is applied." Midkiff Decl., ECF No. 15-5, at ¶ 9. Though the acceptable use standard is not subject to the full governance process, the university's governing body—the Board of Visitors—adopted a resolution confirming this change at their last meeting on June 8, 2021. Id. at 6; Midkiff Suppl. Decl., ECF No. 16-1. According to Midkiff, the Division of Information Technology "considers this change...permanent" and "has no intention" of adding any similar prohibition on students "back into the Acceptable Use Standard at any point in the future." Midkiff Decl., ECF No. 15-5, at ¶ 11.

Since 2017, only one type of charge has been brought against a Virginia Tech student under Policy 7000 or the acceptable use standard, and this charge was related to the possession and distribution of child pornography. McCrery Decl., ECF No. 15-2, at ¶ 20.

## A.    Mootness and the Acceptable Use Standard

Sands argues that Speech First's challenge to the computer policy's incorporation of the acceptable use standard is moot because Virginia Tech, in good faith, amended the policy to make clear that the prohibition on using the university's network for partisan political purposes only applies to university employees. "However, mootness does not result from a defendant's voluntary cessation of his allegedly illegal conduct unless it is clear that the behavior is unlikely to recur." Pashby v. Delia, 709 F.3d 307, 316 (4th Cir. 2013) (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 & n. 10 (1982)). This exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n.1 (2001). It "seeks to prevent 'a manipulative litigant

immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.'" Porter v. Clarke, 852 F.3d 358, 364 (4th Cir. 2017) (quoting ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 54–55 (1st Cir. 2013)). "To that end, 'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" Porter, 852 F.3d at 364 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)).

Speech First argues that its challenge to the acceptable use standard is not moot under the voluntary cessation doctrine. In Speech First's other challenges against repealed or removed policies, courts have found its challenges are not moot. See Fenves, 979 F.3d at 328; Schlissel, 939 F.3d at 769–70. They did so after considering three factors: "(1) the absence of a controlling statement of future intention; (2) the suspicious timing of the change; and (3) the university's continued defense of the challenged policies." Fenves, 979 F.3d at 328 (citing Schlissel, 939 F.3d at 769–70).

Here, the university's timing is certainly not coincidental. Days before filing its response in opposition to the motion for a preliminary injunction, Virginia Tech amended the acceptable use standard to make clear that the prohibition on using its network for partisan political purposes did not apply to students. See Revised Acceptable Use Standard (Midkiff Decl. Ex. B), ECF No 15-5, at 15.

But the other two factors weigh in its favor. Sands has offered a controlling statement of future intention. He and others at the university have asserted repeatedly that Virginia Tech has no intention of reverting back to the prior policy and considers the change permanent.

<u>See</u> Mem. in Opp'n, ECF No. 15, at 10; Midkiff Decl., ECF No. 15-5, at ¶ 11. And, though the policy is not subject to the university's full governance process, the university took the additional step of having the Board of Visitors adopt the policy through a formal resolution on June 8, 2021. <u>See</u> Midkiff Suppl. Decl., ECF No. 16-1. "[T]he merely theoretical possibility that the University could decide to revisit the policy at some remote point in the future without any evidence of an intention to do so—is not enough to survive a mootness challenge." <u>Speech First, Inc. v. Killeen</u>, 968 F.3d 628, 647 (7th Cir. 2020), <u>as amended on denial of reh'g and reh'g en banc</u> (Sept. 4, 2020). Sands also has not defended the policy on any grounds other than mootness. In line with the Fifth and Sixth Circuits' reasoning, the Fourth Circuit also has held that a governmental entity's change of policy renders a challenge moot when it "has not asserted its right to enforce [the challenged policy] at any future time." <u>Telco Commc'ns, Inc. v. Carbaugh</u>, 885 F.2d 1225, 1231 (4th Cir. 1989). Sands asserts no such right here.

Above and beyond this, Virginia Tech provided uncontradicted evidence that the prohibition has always been understood to be applicable only to employees, not students. <u>See</u> Midkiff Decl., ECF No. 15-5, at ¶¶ 7–9; Notice of Change to Acceptable Use Standard (Midkiff Decl. Ex. C), ECF No. 15-5, at 18 (explaining to campus community that change was made "to better align the standard with practices"); Hr'g Tr., ECF No. 30, at 59 ("[C]ollege Democrats and college Republicans use e-mail all the time. And so from Mr. Midkiff's perspective, it wasn't even a substantive change….").

In sum, Sands has made it "absolutely clear" that Speech First's student members could not reasonably expect the prior policy to be enforced against them. <u>Porter</u>, 852 F.3d at 364.

Speech First's challenge to the acceptable use standard's restriction on using the university network for partisan political purposes, as incorporated by the computer policy, is moot.

## B.   Standing and the Computer Policy

Though Speech First's challenge to the computer policy's incorporation of the acceptable use standard is moot, its challenge to the computer policy's requirement that users "demonstrate respect of … the rights of others to be free of intimidation, harassment, and unwarranted annoyance" is not. Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 82, 85. Speech First challenges this part of the computer policy as unconstitutionally vague and overbroad. See Mem. in Support of Mot., ECF No 4-1, at 16–17. Sands does not defend the language of this policy at all. He only argues that Speech First lacks standing in general. As to the computer policy, the court disagrees.

To start, Speech First has demonstrated that its members have "an intention to engage in a course of conduct" that is "arguably affected with a constitutional interest" but "proscribed" by the challenged policy, as required to have pre-enforcement standing to enjoin Virginia Tech's enforcement of the policy. SBA List, 573 U.S. at 159. In their declarations, Speech First's Virginia Tech student-members declare:

> I want to use the University email system to contact other students in support of conservative initiatives and political candidates and to oppose controversial student-government proposals. But I refrain because I fear that doing so will be considered a violation of the Acceptable Use Standard or Virginia Tech Policy 7000, and that I will lose my network privileges or even face disciplinary sanctions as a result. I am scared that other students will characterize emails asserting my beliefs as "intimidating," "harassing," "annoying," or "unwarranted," or report me for sending emails for "partisan political purposes."

41

Student A Decl., ECF No. 4-4, at ¶ 18; Student C Decl., ECF No. 4-6, ¶ 17. The students say they want to express their opinions "repeatedly" to their fellow students in classrooms and as part of everyday discourse. Student A Decl., ECF No. 4-4, at ¶ 14; Student C Decl., ECF No. 4-6, ¶ 13. The text of the policy, which is undoubtedly broad, arguably could proscribe the conduct in which the students intend to engage, which is protected political speech.[6]

Sands argues that the students generally have failed to demonstrate an intent to engage in proscribed conduct because "students would never face discipline for merely stating their views, so long as they…do not also engage in any threatening or harassing conduct that would violate the Student Code." Mem. in Opp'n, ECF No. 15, at 13. The court finds this argument unpersuasive as it fails to reckon with the actual language of Policy 7000 and the fact that violations of Policy 7000 come with their own consequences separate and apart from those in the Student Code, as detailed in the policy itself. See Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 83 (explaining that alleged violations can be reported via email to abuse@vt.edu and Virginia Tech may "temporarily deny access to information technology resources" while it investigates an alleged violation and an individual's access may be limited or terminated as punishment for violating "University policy, law(s), regulations, contractual agreements, or an individual's rights.").

---

[6] The Acceptable Use Standard uses some overlapping language, requiring users to "NOT…use mail or messaging services to harass or intimidate another person, for example, by broadcasting unsolicited messages, by repeatedly sending unwanted mail, or by using someone's name or credentials." Acceptable Use Standard, ECF No. 4-2, at 79. As the court reads Speech First's complaint, preliminary injunction briefing, and, in particular, its proposed order granting its requested injunction, Speech First is not seeking to enjoin the university's enforcement of that language and the court will not address it. See Proposed Order, ECF No. 4-7, at 1 (proposing that Virginia Tech be "enjoined during the pendency of this action from….(2) taking any action to enforce the 'intimidat[ion], harassment [or] unwarranted annoyance' provision of Virginia Tech Policy 7000 or the Acceptable Use Standard's prohibition on sending 'electronic mail' for 'partisan political purposes'….").

In general, Sands argues that the students have failed to demonstrate an intent to engage in proscribed conduct and a credible threat of enforcement because "students would never face discipline for merely stating their views, so long as they…do not also engage in any threatening or harassing conduct that would violate the Student Code." Mem. in Opp'n, ECF No. 15, at 13; see also McCrery Decl., ECF No. 15-2, at ¶¶ 8–11. This argument is unpersuasive for three reasons. First, it ignores the expansive language of the computer policy, which sweeps much more broadly than the definition of harassment in the Code. Second, it fails to recognize that violations of university policies—specifically including the computer, discriminatory harassment, and informational activities policies—are prohibited conduct in and of themselves, apart from the Code's prohibition of harassment. Sands has offered no explanation as to why Virginia Tech's understanding of the policies and their relationship to the Code would be clear to students in the face of such language. Third, under Fourth Circuit precedent, "[a] non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary." N. Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999). "This presumption is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." Id. The policies facially restrict expressive activity of the type the students want to engage in, and Sands has offered no evidence that these are policies are dust-covered and moribund. To the contrary, the computer policy was last updated on October 29, 2020. See Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 82.

To be sure, Sands has put on significant evidence that students at Virginia Tech regularly express many of the views held by Students A and C, without fear or consequence and often with university support. But, as Speech First argues, universities may chill First Amendment speech without freezing it completely. See Reply, ECF No. 17, at 11 (quoting Constantine v. Rectors and Visitors of George Mason U., 411 F.3d 474, 500 (4th Cir. 2005)). The university's evidence and promises of constitutional enforcement is not enough in the face of the vague and expansively worded computer policy. In Bartlett, 168 F.3d at 711, the Fourth Circuit reasoned:

> NCRL is left, therefore, with nothing more than the State's promise that NCRL's officers will face no criminal penalties if NCRL distributes its voter guide without registering as a political committee. NCRL's First Amendment rights would exist only at the sufferance of the State Board of Elections. It has no guarantee that the Board might not tomorrow bring its interpretation more in line with the provision's plain language. Without such a guarantee, NCRL will suffer from the reasonable fear that it can and will be prosecuted for failing to register and file the necessary disclosures, and its constitutionally protected speech will be chilled as a result.

The same is true here. Speech First's student-members are left with nothing more than Virginia Tech's assertions that university officials will consistently interpret the computer policy's broad and undefined terms—"intimidation," "harassment" and "unwarranted annoyance"— in favor of their First Amendment rights. The sweeping scope of this policy, particularly the vague language prohibiting an "unwarranted annoyance," is sufficient to confer standing.

## C.   Application of the Preliminary Injunction Factors

Having clearly shown standing to seek a preliminary injunction of the computer policy, Speech First must clearly show that (1) it is likely to succeed on the merits, (2) its members are

likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter, 555 U.S. at 20.

Speech First alleges that the computer policy's prohibition on "intimidat[ing], harass[ing], or unwarranted[ly] annoy[ing]" messages violates the First and Fourteenth Amendments as a vague and overbroad restriction on speech.[7] Unlike its three other policies, Sands has offered no substantive defense of the computer policy.

A statute is overbroad only if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." Virginia v. Hicks, 539 U.S. 113, 118–19 (2003) (internal quotation marks omitted). The overbreadth must be substantial "not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." Id. at 120. And the party claiming overbreadth "bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." Hicks, 539 U.S. at 122 (quotation marks and alterations omitted).

Under the void-for-vagueness doctrine, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). "This precept is usually traced to our Constitution's guarantee of

---

[7] Speech First also asserts that the university's network and email systems are traditional public forums but offers little case law and no evidence to support this argument. The Supreme Court has recognized that "cyberspace" is the most important "place" for the exchange of views today, Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017), but this does not mean that the university's network and email systems are public forums of any kind. See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 48 (1983) ("the school mail system is not a public forum"); United States v. Am. Lib. Ass'n, Inc., 539 U.S. 194, 205 (2003) ("Internet access in public libraries is neither a 'traditional' nor a 'designated' public forum."); Pichelmann v. Madsen, 31 F. App'x 322, 327 (7th Cir. 2002) (unpublished) ("We doubt that the university created such a forum here, however, because the e-mail system was not indiscriminately open for use by the general public."); Loving v. Boren, 956 F. Supp. 953, 955 (W.D. Okla. 1997), aff'd, 133 F.3d 771 (10th Cir. 1998) ("The [University of Oklahoma] computer and Internet services do not constitute a public forum."). Ultimately, deciding whether or not the university's network and email systems are traditional public forums is unnecessary to deciding whether the computer policy should be enjoined as overbroad and vague.

due process; when speech is regulated, the First Amendment buttresses that requirement 'to ensure that ambiguity does not chill protected speech.'" Bruce & Tanya & Associates, Inc. v. Bd. of Supervisors of Fairfax County, Virginia, 854 F. App'x 521, 528 (4th Cir. 2021) (unpublished) (quoting Fox Television, 567 U.S. at 253–254); see also Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871–72 (1997). A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." Fox Television, 567 U.S. at 253. Though "due process demands a measure of clarity," it does not require "exactitude." Bruce & Tanya & Associates, 854 F. App'x. at 528.

The computer policy's prohibition on "intimidation, harassment, and unwarranted annoyance" is clearly vague and overbroad. It fails to define or otherwise cabin the application of any of these terms. Its vague prohibition on "unwarranted annoyance" is particularly troubling, asking students to guess what kinds of annoyance may be warranted or not. See Wollschlaeger v. Gov., Fla., 848 F.3d 1293, 1321–22 (11th Cir. 2017) (explaining how a statute's prohibition on "unnecessary" harassment is unconstitutionally vague because of the many unanswerable questions raise by the modifier). Given its text and active—albeit rare—enforcement, there is "a realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections…." Taxpayers for Vincent, 466 U.S. at 801. Put differently, a student of ordinary intelligence "reading the policy would have no way of knowing whether his or her conduct was proscribed, and the policy creates a strong risk that it could sweep in conduct that is protected under the First Amendment." Cartwright, 2021

WL 3399829, at *7 (M.D. Fla. July 29, 2021). Speech First is likely to succeed on the merits of its challenge to this provision of the computer policy.

Speech First has also satisfied the other elements of the preliminary injunction[8] standard: irreparable injury, the balance of harms, and the public interest. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Newsom v. Albemarle County, 354 F.3d 249, 261 (4th Cir. 2003); Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 520–21 (4th Cir. 2002); Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978) (holding that "[v]iolations of first amendment rights constitute per se irreparable injury"). Given this irreparable injury to Students A and C and the university's other legitimate means of protecting students from harassment, the balance of equities tips in Speech First's favor.  Finally, "upholding constitutional rights surely serves the public interest." Bason, 303 F.3d at 521. Accordingly, the court will enjoin as vague and overbroad the enforcement of the computer policy's prohibition on "intimidation, harassment, and unwarranted annoyance." Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 82, 85.

---

[8] The defendant argues that Speech First must satisfy an even more exacting standard because Speech First seeks a mandatory injunction rather than a prohibitory injunction. By contrast to a traditional "prohibitory" injunction that would "maintain the status quo…while a lawsuit remains pending," a "mandatory" injunction sweeps more broadly than restoring the parties to the same position they were in before the dispute arose. Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013). Though the policy's prohibition on intimidation, harassment, and unwarranted annoyance objectively chills speech, the university has not enforced this provision of the policy against any students since at least 2017. McCrery Decl., ECF No. 15-2, at ¶ 20. It is not clear if this portion of the policy has been enforced against faculty and staff. However, as far as the court is aware, enjoining the university from enforcing this particular provision of the policy would not upset any status quo and, therefore, would involve only a prohibitory injunction and not a mandatory one. The university has brought charges against students under Policy 7000 for distribution of child pornography, but, under this court's reading, the university still has the ability to do this under another provision of Policy 7000 requiring all system users to "comply with all laws" to maintain network access. Policy 7000 (Norris Decl. Ex. G), ECF No. 4-2, at 82.

## VII.   THE INFORMATIONAL ACTIVITIES POLICY

### A.   The Policy

Last, Speech First challenges the informational activities policy, Policy 5215. <u>See</u> Policy 5215, (Norris Decl. Ex. T), ECF No. 4-2, at 173. Policy 5215 imposes a number of restrictions on students' ability to advertise events, gather petitions, and distribute informational literature. <u>See</u> <u>id.</u> at 173–84. It requires students to obtain "prior written authorization" before engaging in "informational activities." <u>Id.</u> at 173. The informational activities policy defines "informational activities" as "the distribution of literature and/or petitioning for signatures where no fee is involved nor donations or contributions sought." <u>Id.</u> When making "[d]ecisions regarding requests" to distribute literature or petition for signatures, University officials "take into account overall campus safety and security, any special circumstances relating to university activities, and the impact such activity may have on the university." <u>Id.</u> Policy 5215 also prohibits "informational activities" that are not "sponsored by a university-affiliated organization." <u>Id.</u> at 175. Violations of the policy "are actionable under the Student Code of Conduct." Student Code of Conduct (Norris Decl. Ex. D), ECF No. 4-2, at 51.

The designated university scheduling office for informational activities conducted by students under Policy 5215 is Student Engagement and Campus Life ("SECL"). Wagoner Decl., ECF No. 15-4, at ¶ 13. SECL administers activities pursuant to Policy 5215 through a reservation system to which all student organizations have access. <u>Id.</u> at ¶ 14. Reservations "are free of charge" and "provided without regard to the content of the proposed informational activity on a first come, first served basis." <u>Id.</u>; <u>see also</u> Sparks Decl., ECF No. 15-6, at ¶¶ 10–12 (describing similar prior practice). Thus, the "approval" required under

Policy 5215 for students to engage in informational activities requires nothing more than a reservation. Wagoner Decl., ECF No. 15-4, at ¶ 14.

In her declaration, SECL Director Heather Wagoner explains that "there is no application process, and SECL does not exercise any discretion in deciding which [student organizations] will be permitted to use University spaces." Id. "If [the] desired location or date is not available, SECL staff will assist in selecting an alternative date or location for the proposed informational activity." Id. According to Wagoner, SECL processes student requests without regard to content or viewpoint. Id. SECL merely confirms the location is available and then approves. Id. Speech First has not offered any evidence to contradict this.

Because "[s]pace and resources on [c]ampus are limited and must be shared," Wagoner states that SECL's registration system "ensures fair and equitable access." Id. at ¶ 15. She explains that "registration to engage in informational activities is limited to official organizations so that Virginia Tech's limited physical resources can be used for the benefit of the most students." Id. To create a student organization, students must have at least five members and cannot duplicate a student organization that is already existing. Id. at ¶ 4.

From Virginia Tech's perspective, the reservation requirement allows SECL to protect and maintain communal spaces on campus and "hold[] [student organizations] accountable for...litter" and any other damage resulting from their informational activities. Id. at ¶ 15. By confirming and approving space availability, pre-registration allows students engaged in expression to "access high-traffic areas of [c]ampus without impeding student movement (for example, by blocking the exits to busy classrooms) or invading student living spaces (for example, soliciting door to door in residence halls)." Id. Where an activity may implicate safety

concerns or other student needs, registration through SECL alerts the university in advance so that any necessary arrangements can be made. Id.

### B.   Standing

Speech First has standing to pursue its challenge of Virginia Tech's informational activities policy. The students have alleged an intent to engage in protected speech. See Glover v. Cole, 762 F.2d 1197, 1201 (4th Cir. 1985) (noting that distribution of literature is a First Amendment-protected activity). Specifically, they allege:

> Finally, I want to independently distribute literature about conservative ideas and collect signatures for petitions that support conservative causes, especially in high-traffic areas of campus that are open to the public. I refrain from doing either of those things, however, because I fear that I will be punished for engaging in "informational activities" without the sponsorship of a "university-affiliated organization."

Student A Decl., ECF No. 4-4, at ¶ 20; Student C Decl., ECF No. 4-6, at ¶ 19. This conduct is clearly proscribed by the information activities policy, Policy 5215, which requires membership in a registered student organization to engage in informational activities.

Here, again, defendant argues that students have never been punished under the Student Code for violating Policy 5215. This argument fails for two reasons. First, the lack of sanctions does not mean the policy has not been enforced. To the contrary, Student Conduct has referred complaints to SECL to remind students or organizations who have violated Policy 5215 of the applicable rules. McCrery Decl., ECF No. 15-2, at ¶ 23. Second, like the computer policy, the informational activities policy facially restricts expressive activity of the type the students want to engage in, and Sands has offered no evidence that the policy is dust-covered and moribund. See Bartlett, 168 F.3d at 710. To the contrary, the informational activities policy was last updated on August 25, 2020. See Policy 5215 (Norris Decl. Ex. T), ECF No. 4-2, at

173. Student Code "does not seek to charge students with failing to observe rules and regulations related to informational activities out of respect for the students' First Amendment rights," but nothing in the record indicates that students would have any reason to know that. Id. No one would blame the students for following Policy 5215 without such assurances, particularly since the Student Code indicates that violating Policy 5215 is also prohibited under the Code, and their speech is objectively chilled by the policy.

The defendant also argues that the students lack standing because they have not alleged that the policy bars them from distributing literature and collecting petition signatures as a member of a student organization. But this argument skips a step. It assumes that a student cannot be injured by being required to join a student organization in order to engage in First Amendment-protected activities. While Policy 5215 may ultimately be reasonable time, place, and manner restrictions, Speech First has still clearly shown that its students-members' intended conduct is arguably proscribed by the policy. Whether the university is justified in limiting informational activities to student organizations—registered groups of five or more— is "entangled with the merits of Speech First's facial challenge and is better addressed there." Speech First, Inc. v. Cartwright, 6:21-CV-313-GAP-GJK, 2021 WL 3399829, at *4 (M.D. Fla. July 29, 2021).

## C.    Application of the Preliminary Injunction Factors

Having clearly shown standing to seek a preliminary injunction of the informational activities policy, Speech First must clearly show that (1) it is likely to succeed on the merits, (2) its members are likely to suffer irreparable harm in the absence of preliminary relief, (3)

the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter, 555 U.S. at 20.

Speech First argues that the informational activities policy is an unconstitutional prior restraint and a speaker-based regulation of First Amendment-protected activities. The defendant argues that "[e]specially in the context of a university campus the size of Virginia Tech, requiring students to use a content-neutral administrative process to reserve space prior to distributing literature or petitioning for signatures on campus is a far cry from the unconstitutional censorship imposed by a true prior restraint." Mem. in Opp'n, ECF No. 15, at 32–33 (citing Glover v. Cole, 762 F.2d 1197, 1202 (4th Cir. 1985) (acknowledging college policy allowing student groups to solicit on campus "upon prior written approval" was reasonable "time, place, and manner restriction[] on the use of the campus"); Widmar v. Vincent, 454 U.S. 263, 267 n.5 (1981) (acknowledging "a university's authority to impose reasonable regulations compatible with [its educational] mission upon the use of its campus and facilities")). But see Turning Point USA at Arkansas State U. v. Rhodes, 973 F.3d 868, 877 (8th Cir. 2020) ("We fail to see why restricting Union Patio tabling to registered student organizations is any more conducive to creating a 'comfortable,' 'living-room' atmosphere within the Union than opening Patio tabling to all students and groups thereof. The First Amendment protects the rights of both groups and individuals.") (emphasis in original).

At this stage of the litigation, Speech First has failed to clearly show that it is likely to succeed on the merits and is, therefore, entitled to a preliminary injunction. The record does not allow the court to determine whether Virginia Tech's time, place, and manner restrictions are reasonable as a matter of law. This question is a fact-intensive inquiry that requires a more

developed record, perhaps including information about the demands on reservable spaces by RSOs and the availability of alternatives for students who are not members of RSOs. Accordingly, as Speech First has not demonstrated that it is likely to succeed on the merits, the court will not preliminarily enjoin the defendant from enforcing the informational activities policy.

## VIII.   CONCLUSION

For these reasons, the court will **GRANT IN PART** Speech First's motion for a preliminary injunction to the extent it seeks to enjoin the computer policy's prohibition on "intimidation, harassment, and unwarranted annoyance," and **DENY IN PART** the motion in all other respects. This is a narrow decision based on the record currently before the court and the burden of proof at this preliminary stage of the litigation. "[T]he courthouse door remains open to the claims of students who experience cognizable restrictions on their right to free expression." Abbott, 900 F.3d at 180.

An appropriate order will be entered.

Entered: September 21, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.09.21 10:36:16
-04'00'

Michael F. Urbanski
Chief United States District Judge